| | |
|---|---|
| In re | Chapter 11 |
| SA Hospital Acquisition Group, LLC, | Case No. 23-11367 (BLS) |
| Alleged Debtor. | **Objection Deadline: September 15, 2023 at 4:00 p.m.**<br>**Hearing Date: September 19, 2023 at 2:00 p.m.** |

## MOTION TO DISMISS OR ABSTAIN

COMES NOW MorrisAnderson & Associates, Ltd. ("Receiver"), as court-appointed general receiver for SA Hospital Acquisition Group, LLC ("Alleged Debtor") and SA Hospital Real Estate Holdings, LLC ("SAH Real Estate"), and requests that this Court dismiss the involuntary bankruptcy petition under 11 U.S.C. § 303, or dismiss, or in the alternative, abstain from further proceedings in this matter pursuant to 11 U.S.C. § 305.

## INTRODUCTION

1.     This case should be dismissed or the court should abstain because it is in the best interests of the Alleged Debtor and the creditors of the Alleged Debtor.  In this instance, a Missouri state court appointed a highly capable firm as Receiver to operate the business of the Alleged Debtor located in St. Louis, Missouri, and to make distributions to creditors under the comprehensive Missouri Commercial Receivership Act (the "MCRA"), which provides a fair and efficient means to operate a distressed business, liquidate property of a distressed business, and make equitable distributions to the creditors of that distressed business.  The Receiver has done its work with the Alleged Debtor for over 100 days; it is prepared to complete the liquidation of the assets promptly to enable it to make what modest distributions to creditors that it can.  Many creditors are already participating in the receivership process, including three of the Petitioning Creditors, Matthew Haddad, Peter Pinto (Goldberg Healthcare Partners, LLC) and Fariborz

Saidara.  It is wasteful to duplicate the work that the Receiver has already done and that creditors have already relied upon by restarting the process in bankruptcy.  A bankruptcy at this stage will only waste money, put at risk any distributions that can be made, and delay the administration of this troubled debtor.  Bankruptcy provides no discernable benefit in this instance.  This case should be dismissed.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334.

3.     This is a core matter pursuant to 28 U.S.C. § 157(b)(2).  Alleged Debtor consents to this Court entering final orders and judgments with respect to this Motion.

4.     Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

## PRELIMINARY NOTE ON STANDING

5.     Section 303 of the Bankruptcy Code and Rule 1011 of the Bankruptcy Rules state that a debtor named in an involuntary petition may respond and contest the petition. 11 U.S.C. § 303(d); Fed. R. Bankr. P. 1011(a).

6.     The Receiver is the only proper party under state law to appear in this Court on behalf of the Alleged Debtor.  The Receivership Order (defined below and attached as Exhibit 1) grants the Receiver the full power and authority to, inter alia, "assert any rights, claims, or choses in action of [Alleged Debtor]," "to intervene in actions in which [Alleged Debtor] is a party," and/or "to intervene in any action in which a claim is asserted against [Alleged Debtor], for the purpose of prosecuting or defending the claim and requesting the transfer of venue of the action to the court appointing the Receiver."  Ex. 1 at ¶ 5(f) and (h).  Section 515.454.1(4) of the Missouri Commercial Receivership Act also provides that the Receiver is empowered "[t]o intervene in any

action in which a claim is asserted against the debtor [i.e., the Alleged Debtor], for the purpose of prosecuting or defending the claim….".

7. The Receiver is directed to "operate the business of [the Alleged Debtor]." Ex. 1 at ¶ 5(a). The Receivership Order further vests the Receiver with all authority over the management of the Alleged Debtor:

> The Receiver shall be vested with, and is authorized and empowered to exercise, all the powers of [Alleged Debtor and SAH Real Estate], their officers, directors, shareholders, and general partners or persons who exercise similar powers and perform similar duties, including without limitation the sole authority and power to file a voluntary petition under Title 11 of the United States Code.

Ex. 1 at ¶ 5(d).[1]

8. Since the appointment of Receiver as general receiver for the Alleged Debtor, subject to the authority and oversight of the St. Louis City Circuit Court, no person other than the Receiver has the capacity or authority to operate the business of the Alleged Debtor. The Receiver is the proper party to answer and respond to the Involuntary Petition in this case. *See* In re Starlite Houseboats, Inc., 426 B.R. 375, 381 (Bankr. D.Kan. 2010) (noting that the receiver in that case was the proper party to appear and defend an involuntary petition for an alleged debtor).

## BACKGROUND

9. In 2020, the Alleged Debtor acquired the facility formerly known as St. Alexis Hospital in the city of St. Louis, Missouri, from a bankruptcy proceeding. The facility is currently

---

[1] As a corollary provision, the Receivership Order also states as follows:

> [Alleged Debtor and SAH Real Estate] and their agents, servants, employees, representatives, attorneys, officers, directors, managers, partners, and other individuals exercising or having the power to exercise control over the affairs of [Alleged Debtor and SAH Real Estate] are hereby enjoined from exercising any and all the powers of [Alleged Debtor and SAH Real Estate], their officers, directors, shareholders, and general partners or persons who exercise similar powers and perform similar duties, including without limitation the authority and power to file a voluntary petition under Title 11 of the United States Code.

Ex. 1 at ¶ 10.

known as South City Hospital ("South City Hospital" or "SCH").  Declaration of Daniel Wiggins ("Wiggins Decl."), ¶ 4.

10.     The land underlying South City Hospital is owned by Twain GL XXV, LLC ("Twain"), and Twain leases the ground to an affiliate of the Alleged Debtor, SAH Real Estate. SAH Real Estate owns the buildings and improvements consisting of South City Hospital and leases the buildings and subleases the ground to the Alleged Debtor.  Id.

11.     The Alleged Debtor is the licensee and operator of South City Hospital.  Id.

12.     SAH Real Estate and the Alleged Debtor defaulted under the terms of the Twain land lease and guaranty, for among other reasons, failing to make payments under the lease for months.  Wiggins Decl., ¶ 5.  On May 15, 2023, Twain filed a civil action in St. Louis City Circuit Court, Missouri (the "State Court"), seeking the appointment of a receiver over Alleged Debtor and SAH Real Estate.  Id.

13.     On May 25, 2023, the State Court entered its Order for Appointment of Receiver ("Receivership Order") appointing Receiver to be the general receiver over Alleged Debtor and SAH Real Estate.  Wiggins Decl., ¶ 2.  A true and accurate copy of the Receivership Order is attached as **Exhibit 1** and incorporated herein by this reference.  Id.  On May 31, 2023, Receiver posted its bond and assumed the position of general receiver over Debtor and SAH Real Estate. Id.

14.     After the appointment of the Receiver (effective May 31), the Receiver quickly assessed that the cash flows of South City Hospital were significantly negative. Wiggins Decl., ¶ 6. South City Hospital survived on borrowed funds, unpaid suppliers, and unpaid lessors that in aggregate were accumulating over a million dollars in unpaid creditor claims every month.  Id.

15.     Under the stewardship of the owners, South City Hospital was severely lacking in business management in that management did not exhibit business skills or financial acumen needed for prudent business management.  Wiggins Decl., ¶ 7.  There was no financial officer and the accounting records could not be relied upon.  Id.  There was no revenue cycle manager, and the HR manager was part-time.  Id.  The owners were absent.  Id.  Despite financial challenges, in large part because of the dedication of the employees of South City Hospital, the quality of care and patient safety were attentive, although, even that was at risk if supplies could not be obtained.  Id.

16.     American Healthcare Systems-Missouri ("AHS") was a prospective buyer of South City Hospital prior to the appointment of the Receiver, and had been providing tangible (including direct financing) and intangible support to South City Hospital for several months after their interim management agreement ended in the fall of 2022.  Wiggins Decl., ¶ 8.  After the appointment of the Receiver, AHS and Twain were finally permitted to directly engage on terms for a potential assignment of the ground lease.  They were not able to reach mutually agreeable terms for an assignment of the ground lease, and therefore, by mid-June AHS stepped aside as a prospective buyer.  Wiggins Decl., ¶ 9.  Without the prospect of being a purchaser, AHS indicated that they were no longer interested in continuing to fund weekly shortfalls.  Id.  Faced with the uncertainty of funding needed to pay for supplies and employee wages, Twain agreed to provide financing for a short period to allow the Receiver to fully assess South City Hospital's prospects for financial improvement and sale.  Wiggins Decl., ¶ 10.

17.     In addition to the factors described above, South City Hospital suffered from several unfavorable events that negatively impacted the Receiver's endeavors to improve financial performance and develop a sale process:

i.      Employee morale and retention were negatively impacted when healthcare benefits were terminated in May (prior to the receivership).

ii.      Suppliers had stopped shipment of supplies necessary for patient care, resulting in a constant scramble to resource supplies, which further frustrated the clinical staff.

iii.      The lack of reliable financial records meant that South City Hospital was not able to present data pertinent to prospective buyers.  Further, the accounting staff were not trained in closing the monthly accounting books and there were no documented procedures.

iv.      There were several deficiencies with the hospital's revenue cycle management: (a) material amounts of billable supplies and services were not being charged; (b) South City Hospital lacked controls to check for authorizations before billings; (c) South City Hospital lacked processes for discerning and correcting causes of denials; and (d) there were only a few contracts with commercial payors and those had the appearance of not being managed for pricing or collections.

v.      The hospital building had mechanical failures. The building's cooling system incurred partial failure, requiring >$80k to fix. The Receiver authorized repair to maintain the safety of the facility. Two of four elevators were inoperable.  The Receiver authorized them to be repaired to maintain the safety of the facility.

vi.      South City Hospital was under investigation by the Missouri Medicaid Fraud Control Unit for billing related to a single occurrence in January/February 2022.

vii.      During the Receiver's first week, South City Hospital received notification from CMS that Medicare remittances to South City Hospital were suspended because South City Hospital did not submit its annual cost report for 2022 (which was due May 31, 2023). The suspended payments comprised a significant and material amount of South City Hospital's cash flows. The Receiver notified CMS of actions to prepare and submit the cost report; the Receiver obtained a 60-day extension to submit the cost report and further obtain 50% relief from the suspended payments. Under the Receiver's direction, South City Hospital filed the cost report and the suspension was released.

viii.      On June 18, 2023, water from the metropolitan storm sewer system backed up into hospital's ground-level drains resulting in water intrusion in certain areas of the hospital. South City Hospital personnel took immediate steps to clean the impacted areas. The Receiver filed a claim with the property insurer and the claim was accepted. The inspection and remediation of damaged areas is on-going.

Wiggins Decl., ¶ 11.

18.     Though the issues and challenges were daunting, given adequate time and financial resources, the Receiver believed that the issues were fixable. Wiggins Decl., ¶ 12.  The Receiver sought input and perspective from investment bankers and, together with Twain, from prospective interested parties, and additionally sought assistance from government agencies.  Wiggins Decl., ¶ 13.  Unfortunately, the financial deficit and the anticipated duration to reach financial stability was deemed too much for the interested parties, and the prospects of obtaining financing from other parties was not reasonably realistic within the available timeframe, during which South City Hospital would require continued financial assistance.  Wiggins Decl., ¶ 14.

19.     On August 2, 2023, Twain informed the Receiver there would be no additional financing available to support the extensive turnaround and improvement plan that South City Hospital required to potentially achieve financial viability. Wiggins Decl., ¶ 15.

20.     Absent definitive funds needed to pay for patient care and employee wages, the Receiver determined South City Hospital needed to be shut down in order to avoid any risk to patient care.  Id.  On August 3, 2023, the Receiver fully initiated shutdown of South City Hospital, notified the State of the hospital's imminent closing and began transferring patients and laid-off employees.  Id.  On August 4, 2023, the Receiver completed the transfer of patients and laid-off essentially all clinical employees.  Id.

21.     State and federal agencies were notified of the hospital closure and the termination of jobs caused by the lack of continued financing, the City of St. Louis and the media were asked to assist with informing the community of the closure of South City Hospital and to be prepared to assist with job placements for the impacted employees, signage was removed, the building was secured and outside security services were hired to maintain a presence at all times.  Wiggins Decl., ¶ 16.  On August 7, 2023, the State approved South City Hospital's request for suspension of its

hospital license for 90 days.  Wiggins Decl., ¶ 17. The suspension of the license, rather than its termination, maintained value for any prospective purchaser.  Id.

22.     Twain did provide financing for the Receiver to safely transfer patients and to wind up the affairs of the Alleged Debtor and SAH Real Estate.  Wiggins Decl., ¶ 18.

23.     The financing provided by Twain enabled the Alleged Debtor to retain certain employees to complete and collect billings, secure assets, secure records, dispose of regulated materials, maintain the building, facilitate a liquidation process, and potentially assess the feasibility of pursuing causes of action that could yield proceeds for the receivership estate. Wiggins Decl., ¶ 19.

24.     On August 18, 2023, South City Hospital received a letter from CMS regarding an inspection conducted in July.  Wiggins Decl., ¶ 20.  CMS determined that South City Hospital was not in compliance with the Medicare Conditions of Participation for hospitals.  Id.  A hospital that no longer meets the appropriate Conditions of Participation is subject to termination of its provider agreement and participation in the Medicare program.  Id.  The preliminary determination letter notified South City Hospital of the violations and that the projected date on which South City Hospital's provider agreement will terminate is November 7, 2023.  Id. To avert an immediate termination, South City Hospital prepared and submitted a response on August 25, 2023, which South City Hospital believed was satisfactory to CMS.  Id.

25.     Since the closure of South City Hospital, the Receiver has engaged in dual paths of seeking a single buyer or multiple buyers in a liquidation.  Wiggins Decl., ¶ 21.  The Receiver has responded to inquiries from various parties regarding the hospital property.  Id.  An appraiser has appraised the personal property and the Receiver was vetting a prospective auctioneer for South City Hospital's equipment and furnishings.  Id.  The Receiver anticipated proceeding to a sale of

personal property during September.  Id.  The Receiver has solicited buyers for some or all of the remaining accounts receivable.  Id.

26. At the time of the filing of this Bankruptcy Case, the Receiver was in the process of implementing a formal claims process.  Wiggins Decl., ¶ 23.  Even before the claims process was in place, creditors have been filing claims.  Id.  In fact, Matthew Haddad, Peter Pinto (Goldberg Healthcare Partners, LLC), and Fariborz Saidara (3 of the 4 Petitioning Creditors) filed Notices of Claim in the receivership in order to participate in that process.  Wiggins Decl., ¶ 24. True and accurate copies of the Notices of Claim filed by Matthew Haddad, Peter Pinto (Goldberg Healthcare Partners, LLC), and Fariborz Saidara are attached hereto as **Exhibit 2**.  Id.  Matthew Haddad and Peter Pinto are represented in the Missouri State Court by the same attorney that represents the Alleged Debtor, SAH Real Estate, and Jeffrey Ahlholm and Lawrence Feigen, the co-managing members of the Alleged Debtor and SAH Real Estate.  *See* Ex. 2.

27. The Receiver is continuing to operate the business of the Alleged Debtor by completing the billing and collecting the accounts receivable, securing the medical and personnel records, maintaining the property, and was accommodating lessors with respect to their property. Wiggins Decl., ¶ 25.

28. On August 11, 2023, in an attempt to disrupt the work of the Receiver, the owners of Alleged Debtor attempted to file a Chapter 11 bankruptcy case in the United States Bankruptcy Court for the Central District of California, without authority under state law or the permission of the Receiver.  Wiggins Decl., ¶ 26.

29. The principals of the Alleged Debtor filed none of the traditional first day pleadings necessary, or at least advisable, to continue operation of South City Hospital in its current state. Although, the principals and the attorney for the principals represented that they would secure

funding for South City Hospital, no details have ever been forthcoming and no motion to secure financing for South City Hospital was ever filed.  Wiggins Decl., ¶ 27.

30.     A true and accurate copy of the California Bankruptcy Court docket is attached hereto as **Exhibit 3**.  Id.

31.     On August 21, 2023, the California Bankruptcy Court entered its order dismissing the California bankruptcy filing because the Alleged Debtor's owners had no authority under state law to file a bankruptcy case for the Alleged Debtor.  Wiggins Decl., ¶ 28.

32.     A true and accurate copy of the California Bankruptcy Court's dismissal order is attached hereto as **Exhibit 4**.  Id.

33.     A mere ten days later, on August 31, 2023, Matthew Haddad, Fairborz Saidara, Goldberg Healthcare Partners, LLC (Peter Pinto), and Yoel Pesso (collectively, the "Petitioning Creditors") filed a Petition for Involuntary Bankruptcy in the United States Bankruptcy Court for the District of Delaware (this "Court"), initiating the above-captioned bankruptcy case (the "Bankruptcy Case").  Dkt. No. 1.

## ARGUMENT

34.     The Bankruptcy Case should be dismissed pursuant to 11 U.S.C. § 305(a) because the interests of creditors of the Alleged Debtor and the Alleged Debtor would be better served by such dismissal; and alternatively, the Court should abstain from proceeding in this Bankruptcy Case to permit the Receiver to continue the process of liquidation of the assets and providing an equitable distribution to creditors.

35.     Absent proof that the Petitioning Creditors hold noncontingent claims that are not subject to a bona fide dispute as to liability or amount, the Involuntary Petition should be dismissed for lack of standing pursuant to 11 U.S.C. § 303(a).

# I. It is in the best interests of the Alleged Debtor and the creditors of the Alleged Debtor that this Bankruptcy Case be dismissed, or alternatively, that the Court abstain from these proceedings to enable the State Court receivership to proceed.

36.     Section 305(a) of the Bankruptcy Code permits a bankruptcy court to dismiss or suspend proceedings in a pending case:

> The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if . . . . the interest of creditors and the debtor would be better served by such dismissal or suspension.

11 U.S.C. § 305(a).  The decision to dismiss or suspend under Section 305(a) is discretionary and must be made on a case-by-case basis. In re A & D Care, Inc., 90 B.R. 138, 141 (Bankr. W.D. Pa. 1988).  Even if the basis for an involuntary case has been established, the court still must determine whether an order for relief should be entered or the case should be dismissed under 11 U.S.C. § 305.  In re Williamsburg Suites, Ltd., 117 B.R. 216, 218 (Bankr. E.D. Va. 1990) ("Dismissal pursuant to § 305 is appropriate even when petitioning creditors have established a case for an involuntary bankruptcy.").  The question to be addressed is still the same:  in determining whether abstention from jurisdiction and dismissal of the case is appropriate, is whether the interests of creditors and the debtor would be better served by dismissal.  In re O'Neil Village Personal Care Corp., 88 B.R. 76, 79-80 (Bankr. W.D. Pa. 1988).

37.     Courts in this Circuit look to the totality of the circumstances and a broad range of factors when analyzing whether dismissal or abstention under § 305(a)(1) is appropriate. Some of the (somewhat overlapping) factors analyzed include the following:

    (a)    efficiency and economy of administration and avoiding an unnecessary duplication of efforts and a waste of time and resources;

    (b)    whether an alternative means is available for achieving an equitable distribution of the assets;

    (c)    whether a non-federal insolvency has advanced so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process;

(d)  whether federal proceedings are necessary to reach a just and equitable solution;

(e)  the lack of any advantage to creditors by invoking federal bankruptcy jurisdiction and/or the lack of prejudice to parties resulting from abstention and dismissal;

(f)  the existence of minimal assets to administer; and

(g)  the motivation and/or purpose of the parties seeking to invoke federal bankruptcy jurisdiction.

In re AMC Invs., LLC, 406 B.R. 478, 487–88 (Bankr. D. Del. 2009) (*citing* In re Monitor Single Lift I, Ltd., 381 B.R. 455, 462 (Bankr. S.D.N.Y. 2008)); *see also* In re AIG Fin. Prod. Corp, 651 B.R. 463, 477 (Bankr. D. Del. 2023).

38.     These factors and the totality of the circumstances here favor dismissal of the proceeding or abstention to permit the receivership proceeding to move forward toward a liquidation and equitable distribution to creditors as that result is in the best interests of creditors and the Alleged Debtor.  Considering the factors that are suggested in determining whether to dismiss or abstain, courts regularly dismiss bankruptcy cases to permit receiverships to complete the liquidation and distribution process.  *See, e.g.*, In re Koffee Kup Bakery, Inc., No. 21-10168, 2022 WL 141516, at *9 (Bankr. D. Vt. Jan. 14, 2022) (dismissing in favor of state court receivership); In re Packard Square LLC, 575 B.R. 768, 783 (Bankr. E.D. Mich. 2017), *aff'd sub nom.* In re Packard Square, LLC, 586 B.R. 853 (E.D. Mich. 2018) (dismissing and barring refiling against the debtor for a period of two years); In re Starlite Houseboats, Inc., 426 B.R. 375, 389 (Bankr. D. Kan. 2010) (dismissing in favor of state court receivership); In re Michael S. Starbuck, Inc., 14 B.R. 134, 135 (Bankr. S.D.N.Y. 1981) (dismissing in favor of a federal equity receiver).

**(a)  Efficiency and economy of administration and avoiding an unnecessary duplication of efforts and a waste of time and resources favors dismissal or abstention.**

39.     In this instance, a knowledgeable and respected turnaround firm was appointed as Receiver.  The Receiver evaluated the situation at South City Hospital, and it was determined that

the current state of the financials were unreliable, such that a traditional marketing process for the facility as a going concern would be significantly delayed. Wiggins Decl., ¶ 11(iii). While the Receiver viewed that a turnaround was possible long term, significant additional funding would be necessary to continue the active operations of South City Hospital to have any chance to achieve that goal. Id. at ¶ 12. However, Twain was no longer willing to fund the significant shortfalls in income for an extended period, and no other party was willing to provide the funding immediately as would be necessary to maintain patient safety and make payroll for employees. Id. at ¶ 15. The Receiver could not put the patients at risk or leave South City Hospital's dedicated employees unpaid for work that they performed. Faced with those risks, the Receiver was required to quickly close South City Hospital. Id. The Receiver safely and efficiently transitioned all patients to alternate hospitals, and South City Hospital's workforce was reduced commensurate with the needs of the facility and to facilitate a liquidation process. Id.

40.     The Receiver has marshalled the assets, is collecting receivables, is working on a claims process and assessing claims. Wiggins Decl., ¶ 22. The Receiver reduced expenses at South City Hospital while maintaining the staffing and resources to efficiently and effectively complete the liquidation process. Id. The Receiver is prepared to sell the equipment, furnishings, inventory, any remaining uncollected accounts receivable, and ultimately, to dispose of the building owned by SAH Real Estate. Id. At this point, putting the previously absent owners back in control over the assets and the process would unnecessarily and expensively duplicate the process that the Receiver is already completing and endanger the already tenuous prospect of creditor recoveries.

**(b)** **There is already an alternative means available for achieving an equitable distribution of the assets.**

41.     The Missouri State Court receivership action is an alternative means for achieving an equitable distribution for creditors.  The State Court has been engaged in the process and provides appropriate oversight over the Receiver.  The Missouri Commercial Receivership Act (R.S.Mo. § 515.500 et seq.) is a comprehensive act that provides guidance to receivers and judges in the state of Missouri on the receivership powers and duties (§ 515.545), provides a sale process (§ 515.645), establishes a streamlined claims process (§ 515.615 to § 515.635), and specifies a hierarchy of claims for distribution, akin to the priority scheme provided in the Bankruptcy Code (§ 515.625).[2]  At the time this Bankruptcy Case was filed, the Receiver was implementing a claims

---

[2] R.S.Mo. § 515.625 provides for priorities for distribution in the following order:

(1)  Any secured creditor that is duly perfected under applicable law, whether or not such secured creditor has filed a proof of claim, shall receive the proceeds from the disposition of the estate property that secures its claim.  However, the receiver may recover from estate property secured by a lien or the proceeds thereof the reasonable, necessary expenses of preserving, protecting, or disposing of the estate property to the extent of any benefit to a duly perfected secured creditor.  If and to the extent that the proceeds are less than the amount of a duly perfected secured creditor's claim or a duly perfected secured creditor's lien is avoided on any basis, the duly perfected secured creditor's claim is an unsecured claim under subdivision (8) of this subsection.  Duly perfected secured claims shall be paid from the proceeds in accordance with their respective priorities under otherwise applicable law;

(2)  Actual, necessary costs and expenses incurred during the administration of the receivership, other than those expenses allowable under subdivision (1) of this subsection, including allowed fees and reimbursement of reasonable charges and expenses of the receiver and professional persons employed by the receiver.  Notwithstanding subdivision (1) of this subsection, expenses incurred during the administration of the estate have priority over the secured claim of any secured creditor obtaining or consenting to the appointment of the receiver;

(3)  A secured creditor that is not duly perfected under applicable law shall receive the proceeds from the disposition of the estate property that secures its claim if and to the extent that unsecured claims are made subject to those liens under applicable law;

(4)  Claims for wages, salaries, or commissions, including vacation, severance, and sick leave pay, or contributions to an employee benefit plan earned by the claimant within one hundred eighty days of the date of appointment of the receiver or the cessation of any business relating to the receivership, whichever occurs first, but only to the extent of ten thousand nine hundred fifty dollars;

(5)  Unsecured claims, to the extent of two thousand four hundred twenty-five dollars for each natural person, arising from the deposit with the person debtor before the date of appointment of the receiver of money in connection with the purchase, lease, or rental of estate property or the purchase of services for personal, family, or household use that were not delivered or provided;

(6)  Claims for a marital, family, or other support debt, but not to the extent that the debt is assigned to another person, voluntarily, by operation of law, or otherwise; or includes a liability designated as a support obligation unless that liability is actually in the nature of a support obligation;

(7)  Unsecured claims of governmental units for taxes which accrued prior to the date of appointment of the receiver;

(8)  Other unsecured claims.

process to efficiently gather claims from any creditors that want to participate in that process to enable the equitable distribution to creditors.

**(c)    The receivership proceeding has advanced so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process.**

42.    The State Court receivership proceeding and the liquidation of the assets is well underway as has been previously described.  The absentee owners have already demonstrated their inability to properly manage the facility.  Wiggins Decl., ¶¶ 6 and 7.  While patient care was being maintained, the financial shortfalls that South City Hospital suffered as a result of the prior management was borne by its creditors month after month.  <u>Id.</u>  Because the situation inherited by the Receiver and available financing options curtailed alternatives, the Receiver is prepared to proceed forward with a sale of the equipment and furnishings in order to provide at least some recovery for the creditors.  <u>Id.</u> at ¶ 22.  Some creditors have already filed claims, and the Receiver is prepared to initiate a formal claims process to efficiently enable additional creditors to file claims if they wish to participate in a potential distribution.  <u>Id.</u> at ¶ 22.  The Petitioning Creditors and the owners of South City Hospital apparently want to disrupt that process.

43.    This Court is well aware that Chapter 11 bankruptcy cases are expensive.  The debtor-in-possession in this case will have to file schedules of assets and liabilities and monthly financial reports.  Creditors must be noticed of a multitude of actions taken by the debtor, including the use, sale, or lease of property outside the ordinary course of business.  The process for obtaining confirmation of a plan is long and expensive.  The Chapter 11 process requires the services of numerous professionals, all of which would have to be paid as administrative expenses of the bankruptcy estate.

44.    The Petitioning Creditors and the owners of South City Hospital have not shared a plan for any reasonable opportunity for an enhanced recovery.  To start over now in bankruptcy

would require the estate and the creditors to endure all of the expenses of a Chapter 11 case and a significant delay in the administration process. This would be incredibly wasteful and truly would be a disservice to the creditors that have already engaged with the receivership process in the Missouri State Court.

**(d)** **Federal proceedings are not necessary to reach a just and equitable solution.**

45. While federal bankruptcy is a powerful and useful tool in many circumstances, it is not the only tool available for a just and equitable collective solution for creditors. "There is no need to invoke the machinery of the bankruptcy process if there is an alternative means of achieving the equitable distribution of assets." In re Michael S. Starbuck, Inc., 14 B.R. 134, 135 (Bankr. S.D.N.Y. 1981). As discussed above, the MCRA provides a comprehensive procedure for administering assets and operating a business as a Receiver. This process is well underway for the Alleged Debtor and its affiliate, SAH Real Estate. There is nothing unjust or inequitable about the procedures provided for under the MCRA. One reason to invoke federal court jurisdiction is if the assets are disbursed among various jurisdictions. In this instance, all of the operations and assets of South City Hospital are located in the City of St. Louis, and all of the assets are currently being administered in a receivership under the supervision of the St. Louis City Circuit Court. Wiggins Decl., ¶¶ 4 and 5. Federal bankruptcy in this instance is not necessary for creditors to achieve a just and equitable distribution.

**(e)** **There is no advantage to creditors in general by invoking federal bankruptcy jurisdiction, and regardless, there is no prejudice to parties resulting from abstention and dismissal.**

46. Because the MCRA already provides for a comprehensive and fair procedure for liquidating assets and distributing proceeds there is no advantage to federal bankruptcy and there

is no prejudice to the Alleged Debtor or the creditors of the Alleged Debtor in continuing the liquidation and distribution under the supervision of the State Court.

**(f)** **There remain assets to administer at this point, but the Receiver is in a position to promptly and efficiently implement liquidation.**

47. There are accounts receivable, equipment, furnishings, and some inventory remaining at South City Hospital. The Receiver was preparing and is prepared to sell the personal property of South City Hospital. The Receiver was also exploring alternatives for the sale of receivables. The plan is to complete this process promptly. Starting the process over would only cause delay and additional expense.

**(g)** **At best, the motivation and purpose of the Petitioning Creditors to invoke federal bankruptcy jurisdiction is dubious based on the timing.**

48. The principals of the Debtor just attempted to place the Alleged Debtor into a bankruptcy case in California with some vague notion that new financing might be available. Wiggins Decl., ¶¶ 26 and 27. When asked for details for this financing or a plan to enhance the value for the benefit of creditors, the principals of the Alleged Debtor have never been able to provide them. Id. at ¶ 27. Even after filing the bankruptcy case in California, the Alleged Debtor's principals did not file any traditional first day motions that would enable the Alleged Debtor to actually operate or to fund the operations or liquidation. Id. To be clear, even in liquidation, the medical equipment, pharmaceuticals, the large facility, the complex medical billing and collection issues are expensive and require significant capital and knowledgeable resources to complete the liquidation process. The principals never presented how they would manage the facility in St. Louis or finance the endeavor, and there was never any realistic potential for any better result for creditors.

49.     The relationship of the Petitioning Creditors to Jeffrey Ahlholm and Lawrence Feigen, the co-managing members of the Alleged Debtor, is not known at this point. However, there is circumstantial evidence of potential collusion:

    a.  The involuntary bankruptcy was filed (August 31) a mere 10 days after the voluntary bankruptcy dismissal order was entered (August 21). *See* Dkt. No. 1 and Ex. 4.

    b.  All four of the Petitioning Creditors are located in the Central District of California, the court that just dismissed the voluntary petition. *See* Dkt. No. 1. Instead of filing in their own backyard, the Petitioning Creditors chose not to file this case in the court that just dismissed the voluntary petition filed by the co-managing members. This Court clearly is an authorized venue as the Alleged Debtor is organized under the laws of Delaware, but it seems equally clear that they were attempting to avoid the same result – dismissal – by changing courts.

    c.  The involuntary bankruptcy was filed as an involuntary Chapter 11, not an involuntary 7. While certainly involuntary Chapter 11 cases can and are filed for companies that are continuing to operate, here it raises the issue that this filing is actually an attempt to change the management of the Alleged Debtor from the Receiver back to the co-managing members. This is the same goal the co-managing members had in filing the voluntary bankruptcy that was dismissed. Given that the co-managing members – managers that completely mismanaged the Alleged Debtor in the first place – will be placed back in management of Alleged Debtor should this Involuntary Petition be granted, it is hardly a stretch to believe that this involuntary bankruptcy has been coordinated between the parties, if not orchestrated by Jeffery Ahlholm or Lawrence Feigen or both.

    d.  Two of the four Petitioning Creditors Matthew Haddad and Peter Pinto (Goldberg Healthcare) share the same attorney in the Missouri State Court receivership action as the Alleged Debtor, SAH Real Estate, and Jeffery Ahlholm and Lawrence Feigen. *See* Ex. 2. The closeness of Mr. Haddad and Mr. Pinto's relationship to Jeffery Ahlholm and Lawrence Feigen could hardly be better demonstrated then by them sharing an attorney.

50.     These circumstances suggest that this filing was possibly orchestrated by Jeffrey Ahlholm and Lawrence Feigen in an attempt to get around their lack of authority to initiate a

voluntary bankruptcy proceeding for the Alleged Debtor.[3]  This would not be the first time that an involuntary bankruptcy was filed in collusion with insiders that did not have the authority to file a voluntary bankruptcy petition.  *See*, *e.g.*, <u>Federal Deposit Ins. Corp. v. Cortez</u>, 96 F.3d 50 (2nd Cir.1996) (involuntary proceeding brought by the debtor's stepfather); <u>In re Glob. Ship Sys., LLC</u>, 391 B.R. 193, 204 (Bankr. S.D. Ga. 2007) (dismissing involuntary as bad faith); <u>In re Corto</u>, 1995 WL 643372, Nos. 93–CV–0175E(H), 93–CV–0176E(H) and 93–CV–0340E(H) (W.D.N.Y. Oct. 18, 1995) (affirming dismissal of bad faith involuntary filed in collusion with the petitioning creditors that were debtor's mother and son), aff'd, 112 F.3d 503 (1997); <u>In re Winn</u>, 49 B.R. 237 (Bankr. M.D.Fla.1985) (involuntary petition prepared by the debtor and filed by debtor's attorney and two personal friends).  In all of these cases, which were dismissed as bad faith filings, the debtor attempted to accomplish indirectly by means of collusive, involuntary filings that which the debtor was unable to accomplish directly with a voluntary petition.

51.  Counsel has requested the production of communications between the co-managing members and the Petitioning Creditors regarding the filing of the Involuntary Petition.  As of the filing of this motion, counsel for the Receiver has not received those communications.  Discovery may reveal the true motivation and goals behind this filing to be other than for a proper bankruptcy purpose, in which case the filing may also constitute a bad faith filing.[4]

---

[3] This Court may dismiss a case for cause under Section 1112.  Lack of good faith is recognized as grounds for dismissal of a Chapter 11 case.  <u>In re SGL Carbon Corp.</u>, 200 F.3d 154, 159–63 (3rd Cir. 1999).  Furthermore, it is clear from the statutory context and the fact that this Court is a court of equity that Section 303 also requires that an involuntary petition must be filed in good faith.  <u>In re Forever Green Athletic Fields, Inc.</u>, 804 F.3d 328, 336 (3rd Cir. 2015).  When a party files a motion to dismiss and places good faith "at issue" by presenting a prima facie case of bad faith in the filing, the non-moving party bears the burden of demonstrating good faith.  <u>Id.</u> at 335; <u>SGL Carbon</u>, 200 F.3d at 162 n.10 ("Once at issue, the burden falls upon the bankruptcy petitioner to establish that the petition has been filed in 'good faith.'").  The Third Circuit has adopted a totality of the circumstances standard for determining bad faith under § 303, which is "most suitable for evaluating the myriad ways in which creditors filing an involuntary petition could act in bad faith."  <u>Forever Green</u>, 804 F.3d at 336.

[4] Receiver reserves its right on behalf of the Alleged Debtor to seek its costs, fees, damages, and punitive damages under 11 U.S.C. § 303(i).

## II. **The Petitioning Creditors must establish the existence of their noncontingent claims that are not subject to a bona fide dispute in order to have standing.**

52.     The Bankruptcy Code provides that an involuntary petition filed against an alleged debtor with more than 12 creditors must be signed by "three or more entities, each of which is either a holder of a claim against [the Alleged Debtor] that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303(b)(1); *see* In re Deluxe Bldg. Sols., LLC, 646 B.R. 715, 723 (Bankr. M.D.Penn. 2022).  The Bankruptcy Code does not define what constitutes a "bona fide dispute."  But the Third Circuit has held that a bona fide dispute exists "[i]f there is a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts."  B.D.W. Assocs. Inc. v. Busy Beaver Bldg. Ctrs., Inc., 865 F.2d 65, 66 (3Rd Cir. 1989).  "Under this standard, the bankruptcy court must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of debt."  In re Diamondhead Casino Corp., No. 15-11647(LSS), 2016 WL 3284674, at *8 (Bankr. D.Del. June 7, 2016) (*citing* In re Busick, 831 F.2d 745, 750 (7th Cir.1987).  "The court's objective is to ascertain whether a dispute that is bona fide exists; the court is not to actually resolve the dispute."  Id. (*citing* In re Rimell, 946 F.2d 1363, 1365 (8th Cir. 1991).  The burden is on the petitioning creditor to first establish a prima facie case that no bona fide dispute exists.  In re AMC Invs., LLC, 406 B.R. 478, 483–84 (Bankr. D.Del. 2009).  Once a prima facie case has been established, the burden shifts to the alleged debtor to demonstrate the existence of a bona fide dispute.  Id.

53.     In this case the four Petitioning Creditors assert the following in the Involuntary Petition:

| 13. Each petitioner's claim | Name of petitioner | Nature of petitioner's claim | Amount of the claim above the value of any lien |
|---|---|---|---|
| | Matthew Haddad | Contractual obligation | $ 2,625,000 |
| | Goldberg Healthcare Partners, LLC | Contractual obligation | $ 535,000 |
| | Frank Saidara | Contractual obligation | $ 110,000 |
| | Yoel Pesso | Contractual obligation | $ 500,000 |
| | | Total of petitioners' claims | $ 3,770,000 |

54.    As of the filing of this Motion, the Receiver has not been able to locate documentation on these alleged contractual claims at South City Hospital.  Wiggins Decl., ¶ 29.  The Receiver has been clear that the financial records at South City Hospital were not well maintained under the prior management.  With that caveat, the Receiver cannot say that the claims do not exist, but the records in the possession of the Receiver do not verify the validity of these claims as to liability or amount or whether the claims remain contingent.  Counsel for the Receiver has requested that the Petitioning Creditors provide documentation on the alleged claims.  As of the filing of this Motion, the Receiver has not received documentation on the alleged claims.[5]  It is the Petitioning Creditors burden to establish the prima facie case that their noncontingent claims exist and that there is no bone fide dispute.  Because the Receiver cannot verify the liability or amount of the Petitioning Creditors' claims, the Receiver must hold the Petitioning Creditors to their burden of proof on this issue.[6]

55.    If the Petitioning Creditors cannot establish the existence of their noncontingent claims and that the claims are not subject to bona fide dispute, the Involuntary Petition must be dismissed for lack of standing.

---

[5] Although three of the four Petitioning Creditors have filed Notices of Claim in the State Court receivership, counsel for the Receiver has not received full claims with documentation supporting those claims.  *See* Ex. 2.

[6] It is possible that documentation will be provided such that this is not a live issue for the hearing scheduled on September 19, 2023.  It is Receiver's goal to winnow down the factual issues as much as possible for presentation at the hearing.

## CONCLUSION

56.     The Receiver has already extensively worked through the process of evaluating the operations of South City Hospital, promptly closing South City Hospital when other options were no longer available, and has turned its attention to an efficient liquidation of the assets.  At this point, the Receiver for the Alleged Debtor states that it is in the Alleged Debtor's best interests to continue with the liquidation process in receivership with the oversight of the State Court.  There is not another viable option available at this point.  There is no realistic path to reorganization, and this is going to be a liquidation of the assets of South City Hospital, regardless of the forum.  There are no benefits provided to the Alleged Debtor or the creditors of the Alleged Debtor in bankruptcy.  A bankruptcy will only result in a duplication of the work performed by the Receiver and additional expenses that will come out of any creditor recovery.  It is in the best interests of the Alleged Debtor and the creditors that this bankruptcy case be dismissed.  Alternatively, the Court should abstain from proceeding forward with this case and permit the Receiver to complete its administration of the assets and making distributions to creditors.

WHEREFORE, MorrisAnderson & Associates, Ltd., as general receiver for SA Hospital Acquisition Group, LLC and SA Hospital Real Estate Holdings, LLC, respectfully requests that this Court enter an order dismissing the above-captioned bankruptcy case, or in the alternative, abstain from proceeding forward with the above-captioned bankruptcy case to permit the completion of the administration of the assets and distribution to creditors by the Receiver under the supervision of the St. Louis City Circuit Court, and that the Court grant such other and further relief as is justified under the circumstances.

Dated: September 11, 2023
Wilmington, Delaware

**POLSINELLI PC**

*/s/ Katherine M. Devanney*
Christopher A. Ward (Del. Bar No. 3877)
Katherine M. Devanney (Del. Bar No. 6356)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
kevanney@polsinelli.com

-and-

**THOMPSON COBURN LLP**
Brian W. Hockett
One US Bank Plaza
St. Louis, Missouri 63101
Telephone: (314) 552-6461
Facsimile: (314) 552-7000
bhockett@thompsoncoburn.com

*Counsel for MorrisAnderson & Associates, Ltd, as
general receiver for SA Hospital Acquisition Group, LLC
and SA Hospital Real Estate Holdings, LLC*