## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| SA Hospital Acquisition Group, LLC, | Case No. 23-11367 (BLS) |
| Alleged Debtor. | **Re: Docket No. 11** |

## JOINT RESPONSE OF RECEIVER AND TWAIN GL XXV, LLC TO PETITIONING CREDITORS' EMERGENCY MOTION TO ENFORCE THE AUTOMATIC STAY

COMES NOW MorrisAnderson & Associates, Ltd. ("Receiver"), as court-appointed general receiver for SA Hospital Acquisition Group, LLC ("Alleged Debtor") and SA Hospital Real Estate Holdings, LLC ("SAH Real Estate") and Twain GL XXV, LLC ("Twain" and together with Receiver, the "Respondents"), and in response to the Emergency Motion to Enforce the Automatic Stay ("Motion") filed by Matthew Haddad, Fairborz Saidara, Goldberg Healthcare Partners, LLC (Peter Pinto), and Yoel Pesso (collectively, the "Petitioning Creditors"), the Respondents state as follows:

## INTRODUCTION

1.      None of the alleged stay violations identified by the Petitioning Creditors stand up to scrutiny when the facts are understood.  The proceedings in the Missouri State Court did not in any way impact the Alleged Debtor's interests because the proceedings were not seeking any relief *against* the Alleged Debtor.  In addition, the business of the Alleged Debtor during the gap period is entitled to continue operating as if the involuntary case had not been commenced, and the Receiver is the only party with authority to operate the business.  There is no violation of the stay in the continuation of the operation of an alleged debtor's business during the gap period.  Just as important, the Petitioning Creditors fail to satisfy even the most basic of threshold jurisdictional requirements.  The Petitioning Creditors have not identified a concrete, particularized injury

traceable to the alleged stay violation because they have none.  Without an injury, they do not have standing to pursue any claims relating thereto.  The Motion should be denied.

## <u>BACKGROUND</u>

2.  On May 15, 2023, Twain GL XXV, LLC ("Twain") filed a civil action in St. Louis City Circuit Court, Missouri (the "State Court"), seeking the appointment of a receiver over Alleged Debtor and SAH Real Estate.

3.  On May 25, 2023, the State Court entered its Order for Appointment of Receiver ("Receivership Order") appointing Receiver to be the general receiver over Alleged Debtor and SAH Real Estate.  A true and accurate copy of the Receivership Order is attached as **<u>Exhibit 1</u>** and incorporated herein by this reference.  On May 31, 2023, Receiver posted its bond and assumed the position of general receiver over Alleged Debtor and SAH Real Estate.

4.  Under the Receivership Order, the Receiver is directed to "operate the business of [the Alleged Debtor]." Ex. 1 at ¶ 5(a).  The Receivership Order further vests the Receiver with all authority over the management of the Alleged Debtor:

> The Receiver shall be vested with, and is authorized and empowered to exercise, all the powers of [Alleged Debtor and SAH Real Estate], their officers, directors, shareholders, and general partners or persons who exercise similar powers and perform similar duties, including without limitation the sole authority and power to file a voluntary petition under Title 11 of the United States Code.

Ex. 1 at ¶ 5(d).  Since the appointment of Receiver as general receiver for the Alleged Debtor, subject to the oversight of the St. Louis City Circuit Court, no person other than the Receiver has the authority to manage and operate the business of the Alleged Debtor. The Receiver is operating the business of the Alleged Debtor.

5.  Promptly after taking over as Receiver, the Receiver required funding immediately to operate the business of the Alleged Debtor and SAH Real Estate.  Prior to the appointment of

the Receiver, American Healthcare Systems – Missouri, LLC ("AHS") was a prospective purchaser that had been providing direct and indirect support for the operations of the Alleged Debtor's hospital, South City Hospital. After the appointment of the Receiver, AHS initially agreed to provide funding for the operations. On June 13, 2023, the Receiver filed an Emergency Motion of Receiver to Incur Secured Financing (the "First Financing Motion"). A true and accurate copy of the First Financing Motion is attached here to as **Exhibit 2**. On June 14, 2023, the Missouri State Court granted the First Financing Motion and approved the revolving line of credit from AHS in its Order Granting Emergency Motion of Receiver to Incur Secured Financing (the "First Financing Order"). A true and accurate copy of the First Financing Order is attached hereto as **Exhibit 3**. The First Financing Order secured the financing provided by AHS with a security interest in the assets of the Alleged Debtor. However, soon afterward, AHS determined that it would no longer be a prospective purchaser, and because of that, AHS no longer had an interest in funding the operations of South City Hospital.

6.      Twain, by and through its affiliate Twain Financial Partners, LLC, stepped in to provide operational funding for a short period of time to allow the Receiver to determine if a plan could be developed to turn around South City Hospital and to potentially sell South City Hospital. On June 20, 2023, the Receiver filed Receiver's Emergency Motion to Incur Secured Debt Pursuant to Mo. Rev. Stat. § 515.590.2 and Grant Related Relief (the "Second Financing Motion"). A true and accurate copy of the Second Financing Motion is attached hereto as **Exhibit 4**. On June 21, 2023, the State Court entered its Order Granting Receiver's Emergency Motion to Incur Secured Debt Pursuant to Mo. Rev. Stat. § 515.590.2 and Grant Related Relief (the "Second Financing Order"). A true and accurate copy of the Second Financing Order is attached here to as **Exhibit 5**. Under the terms of the Second Financing Order, the revolving line of credit provided

by Twain would be secured by the property of the receivership estate, and would be repaid *pari passu* with AHS.

7.      Although the Receiver believed that a potential turnaround for South City Hospital existed, the financing and time required for the Receiver to implement the plan were too much for the interested parties.  At the beginning of August 2023, Twain determined that it would no longer provide the operational funding for South City Hospital that the Receiver needed to continue the operations, pay employees, and maintain patient safety.  With no other party, including the owners of SA Hospital Acquisition Group, LLC, willing and able to fund the operations and no realistic prospects for obtaining additional funding immediately, the Receiver determined that it would close South City Hospital.  Receiver successfully transitioned the patients to other facilities and shut down South City Hospital.

8.      There remained expenses for winding up the operations and liquidating the assets of South City Hospital.  Twain agreed to provide the funding for the wind up operations.  On August 1, 2023, the Receiver filed the Receiver's Emergency Motion to Incur Secured Debt Pursuant to Mo. Rev. Stat. § 515.590.2 and Grant Related Relief (the "Third Financing Motion"). A true and accurate copy of the Third Financing Motion is attached here to as **Exhibit 6**.  On August 3, 2023, the State Court entered its Order Granting Receiver's Emergency Motion to Incur Secured Debt Pursuant to Mo. Rev. Stat. § 515.590.2 and Grant Related Relief (the "Third Financing Order").  A true and accurate copy of the Third Financing Order is attached here to as **Exhibit 7**.  Under the terms of the Third Financing Order, Twain would provide a revolving line of credit to the Receiver to fund the Receiver's transition of patients and wind up costs as well as the Receiver's and the Receiver's professional fees in connection with the receivership.  The revolving line of credit would provide the Receiver with the financing needed for operating the

business of the Alleged Debtor and SAH Real Estate during the wind up phase.  The revolving line of credit was secured by a "superpriority administrative expense claim in favor of Twain" and by a first priority security interest in all assets of the receivership estate (other than equipment, on which Twain had a second priority lien).  Ex. 7, p. 3.  The Third Financing Order also provided that Twain would be repaid *pari passu* with AHS and Twain loans under the First Financing Order and the Second Financing Order.

9.    However, this was a mistake.  Twain had intended that its wind up financing would be repaid before the Twain and AHS operating loans approved under the First Financing Order and the Second Financing Order were repaid.  So Twain and AHS agreed that the Third Financing Order should be amended to provide for the payment of Twain's winddown financing prior to the repayment of the Twain and AHS operating loans.  So on August 28, 2023, Receiver filed its Consent Motion to Modify Court's August 3, 2023 Order (the "Modification Motion").  A true and accurate copy of the Modification Motion is attached here to as **Exhibit 8**.  The only purpose of the Modification Motion was to modify the terms of the Third Financing Order as between Twain and AHS.

10.    On August 31, 2023, the Petitioning Creditors filed a Petition for Involuntary Bankruptcy in the United States Bankruptcy Court for the District of Delaware (this "Court"), initiating the above-captioned bankruptcy case (the "Bankruptcy Case").  Dkt. No. 1.

11.    On September 1, 2023, the State Court held a hearing on the Modification Motion, and the State Court entered its Order providing clarification on what Twain and AHS intended with respect to the terms of the post-receivership lending between the two lending parties (the "Modification Order").  A true and accurate copy of the Modification Order is attached hereto as **Exhibit 9**.  The only matter heard by the State Court at the September 1, 2023, hearing was an

adjustment in the priorities of two non-debtor parties with the consent and agreement of both.  That was it.  No relief was being sought against the Alleged Debtor and no relief was awarded against the Alleged Debtor.  The matter was purely between two other parties before the State Court.

12.    The Modification Order did not grant Twain a superpriority administrative expense claim as suggested by the Motion (at ¶ 45).  Twain already had a superpriority administrative expense claim and lien on the Alleged Debtor's assets securing the financing under the Third Financing Order.  *See* Ex. 7, p. 3.  The Modification Order did not provide for a new borrower, grant a lien on additional collateral, or authorize payment.

13.    On September 5, 2023, the Alleged Debtor made a payment to Twain of $800,000 on the revolving line of credit at the direction of the Receiver.  The payment was made as part of the operation of the business of the Alleged Debtor to reduce accrual of interest on an obligation that is secured by a first-priority lien on all assets of the Alleged Debtor (other than equipment on which it is secured by a second-priority lien).

14.    Five other motions were also set for a hearing in the State Court on September 6, 2023.  At the September 1, 2023, hearing counsel for the Receiver announced that counsel needed to look at the motions to see specifically which motions could go forward, which motions had to go forward, and which motions could wait.  At the September 6, 2023, hearing no action was taken on the motions, except with respect to one motion – Receiver's Motion to Extend Stay Pursuant to Mo. Rev. Stat. § 515.575.2 (the "Motion to Extend Stay").  The State Court granted the Motion to Extend Stay as to the non-debtor co-defendant, SAH Real Estate, only.  A true and accurate copy of the Order Granting Receiver's Motion to Extend Stay Pursuant to Mo. Rev. Stat. § 515.575.2 with Respect to SA Hospital Real Estate Holdings, LLC is attached hereto as **Exhibit 10**.  Had counsel for the Petitioning Creditors asked counsel for the Receiver prior to filing their Motion,

- 6 -

counsel for the Receiver would have told them that this is how the September 6, 2023 hearing would be handled.

15.     On September 6, 2023, the Petitioning Creditors filed their Motion seeking to enforce the automatic stay and requesting an award of Petitioning Creditors' damages for the alleged violations of the automatic stay by Receiver, Twain, and AHS.[1]  Dkt. No. 11.

## ARGUMENT

### A.  The Motion must be Dismissed because the Petitioning Creditors Lack Standing.

16.     The Petitioning Creditors have pointed out that the automatic stay protects the debtor and creditors.  *See* Motion at ¶ 1.  There is no doubt that is true.  However, that does not end the inquiry on whether a particular creditor has standing to file a motion to enforce the stay and seek damages for a particular alleged violation of the automatic stay.  Constitutional standing and statutory requirements must be satisfied in order for a creditor to pursue an alleged stay violation.  Petitioning Creditors, by their Motion, have failed to satisfy the threshold requirements because they have not identified any injury.

17.     Constitutional standing is a threshold requirement in every federal case Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).  The party invoking federal jurisdiction bears the burden of establishing its standing.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Constitutional standing questions the justiciability of an issue, that is whether a plaintiff

---

[1] The Motion originally named three law firm respondents as well, but those three respondents were subsequently dismissed from the Motion.

or movant as the case may be, has made out a case or controversy between movant and respondent within the meaning of Article III of the Constitution.  Id.  In order to have constitutional standing under Article III, "a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." Davis v. Fed. Election Comm'n, 554 U.S. 724, 733, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008).

18.     The standing requirement also means that a party may only seek redress for their own injury and not the injury of another.  In order to have standing to seek contempt for violation of the stay, a creditor must assert a claim for its own direct injury and not a claim that belongs to another party or the estate in general.  "If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim."  In re Emoral, Inc., 740 F.3d 875, 879 (3rd Cir. 2014) (*quoting* St. Paul Fire & Marine Ins. Co. v. PepsiCo., Inc., 884 F.2d 688, 701 (2nd Cir. 1989)); *cf.* Barnett Bank of Se Ga., N.A. v. Trust Co. Bank of Se. Ga., N.A. (In re Ring), 178 B.R. 570, 577 (Bankr.S.D.Ga.1995) (holder of second security interest in chapter 7 debtor's property had prudential standing to seek damages for the debtor's violation of the automatic stay pursuant to § 105 because, among other things, it suffered the particularized injury of losing its security interest).

19.     Additionally, pursuant to § 362(k), "an individual *injured* by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1) (emphasis added).  Before one can seek damages under Section 362(k), the person must be injured.

20.     The Petitioning Creditors make the point in their motion that they are creditors and that creditors are protected by the automatic stay.  This general proposition is without contention.

Simply being a creditor is not enough.  If the Petitioning Creditors are creditors and if the Petitioning Creditors each had an injury such as that identified in <u>Ring</u>, they might have standing. However, on the face of their Motion, the Petitioning Creditors have failed to identify that each in fact has a concrete (and not speculative) injury, that the alleged injury is their own direct injury on which they are seeking redress, and that the injury is not just a general claim of injury that may belong to the estate.  In this instance, the acts complained of by the Petitioning Creditors do not impact any of the Petitioning Creditors directly.  The Petitioning Creditors have not identified any injury that belongs to them individually.  They only conclude that because there was an alleged stay violation (there was not), that they are entitled to damages.  Motion at ¶ 53.  The Petitioning Creditors ignore that each one must be an individual injured by that alleged stay violation before any damages could be awarded.[2]  Rather it seems clear from the Motion that the Petitioning Creditors are seeking redress for what they perceive as an offense and/or injury to the bankruptcy estate in general.  They are not an estate representative.

21.    The Petitioning Creditors have the burden to establish standing.  The Petitioning Creditors have not shown on the facts stated on the face of their Motion that they have an injury under the requirements of constitutional standing and as required under 362(k) for damages because the Petitioning Creditors are not injured.  They lack standing, and accordingly, the Motion must be dismissed.

---

[2] The Petitioning Creditors may argue that they believe they have been injured because they incurred attorneys' fees. However, incurring attorneys' fees independent of an actual justiciable, concrete and direct injury, is not itself an injury.  *See* <u>In re Toppin</u>, 645 B.R. 773, 790 (E.D.Pa. 2022) ("actual injury is a condition precedent for attorney's fees under Section 362(k)").

**B. <u>The Motion should be Dismissed because the Petitioning Creditors are not Authorized to Pursue a Claim Against the Receiver.</u>**

22.    Pursuant to the Missouri Commercial Receivership Act (R.S.Mo. § 515.500 et seq.) ("MCRA"), the Receiver has judicial immunity provided for acts and omissions arising out of and performed in connection with its official duties.  R.S.Mo. § 515.600(a).  It further requires that any "person, other than a successor receiver duly appointed by the court, shall not have the right to bring an action against a receiver or the agents, attorneys, and employees of the receivership employed by the receiver pursuant to 515.605 for acts and omissions while acting in the performance of their functions and duties in connection with the receivership unless such person first files a verified application with the appointing court requesting leave to bring such action and the court grants such application after notice and hearing."

23.    All four of the Petitioning Creditors were provided notice of the receivership.  A true and accurate copy of the Certificate of Service – Notice of Receivership is attached hereto as **<u>Exhibit 11</u>**.  *See* Ex. 11, pp. 45-46. Three of the four Petitioning Creditors are participants in the Missouri State Court receivership action as they have filed Notices of Claim in the State Court. True and accurate copies of the Notices of Claim filed in the State Court by Matthew Haddad, Fairborz Saidara, and Peter Pinto (Goldberg Healthcare Partners, LLC) are attached hereto as **<u>Exhibit 12</u>**.  In direct violation of R.S.Mo. § 515.600(b), the Petitioning Creditors have filed their Motion seeking relief from the Receiver for acts taken while acting in the performance of its functions and duties in connection with the receivership.

24.    The Petitioning Creditors are prohibited by R.S.Mo. § 515.600 from seeking relief from the Receiver that they are seeking without first obtaining permission from the Missouri State Court, and the Motion should be dismissed.

C. **The Hearing on September 1, 2023 did not Violate the Stay.**

25.    In the Motion, the Petition Creditors indicate that the automatic stay prevents parties from continuing a proceeding against the Alleged Debtor after commencement of the case. Motion at ¶ 45. (citing to 11 U.S.C. § 362(a)(1)).  There is no doubt that this is accurate.

26.    However, the automatic stay (absent some further order from a court extending the stay to other non-debtor parties or creditors), does not stay litigation or proceedings against non-debtor parties to that litigation.  This should not be a contentious proposition.  *See* Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1205 (3rd Cir. 1991) ("the automatic stay is not available to non-bankrupt co-defendants of a debtor even if they are in a similar legal or factual nexus with the debtor").  "Thus, within one case, actions against a debtor will be suspended even though closely related claims asserted by the debtor may continue. Judicial proceedings resting on counterclaims and third-party claims asserted by a defendant-debtor are not stayed, while same-case proceedings arising out [of] claims asserted by the plaintiff are stayed."  Id.  The Alleged Debtor is one defendant in the receivership action in the State Court.  SAH Real Estate, a non-debtor affiliate of the Alleged Debtor, is also a defendant.  No one is stayed by the Bankruptcy Code from proceeding forward with litigation against SAH Real Estate.  In addition, the nature of an action under the Missouri Commercial Receivership Act invites other parties that may have an interest in the receivership estate to appear and be heard on, not only matters seeking relief from the Alleged Debtor, but also against SAH Real Estate and matters among the other parties, such as AHS and Twain, relating thereto.

27.    In this instance, the Modification Motion presented on September 1, 2023, sought relief against AHS (with the consent of AHS), not the Alleged Debtor.  Priority liens were already granted to AHS and Twain and payment to AHS and Twain was already authorized under the First

Financing Order, Second Financing Order, and Third Financing Order.  The purpose of the Modification Motion was to clarify the Third Financing Order that was already entered to make it clear between Twain and AHS that AHS agreed that post-receivership liquidation funding provided by Twain pursuant to the Third Financing Order could be repaid before the operational loans provided by AHS pursuant to the First Financing Order and provided by Twain under the Second Financing Order, which were to be repaid *pari passu*.  AHS was subordinating, in part, to Twain.

28.    Upon presentation of the Modification Motion, the Missouri State Court on September 1, 2023, entered the Modification Order.  The Modification Order had no impact on anyone other than two creditors: Twain and AHS.  The Modification Order did not affect the Alleged Debtor in any way.  The Modification Order did not affect the Petitioning Creditors in any way.  The only parties impacted by the order were Twain and AHS.

29.    The Motion suggests that the Modification Order somehow granted Twain a superpriority claim against the assets of the Alleged Debtor.  Motion at ¶ 45.  This is not accurate.  The Third Financing Order entered on August 3, 2023, already granted Twain a superpriority claim against the assets of the Alleged Debtor.  See Ex. 7, p. 3.  The only thing the Modification Order did was clarify the position of Twain against AHS.

30.    Because no one was seeking relief against the Alleged Debtor on September 1, 2023, the entry of the Modification Order did not violate the automatic stay.

**D.  Operating the Business of the Debtor does not Violate the Stay.**

31.    The period between the filing of the Involuntary Petition and the date on which an order for relief is entered is commonly referred to as the "gap period."

32.    The business of the Alleged Debtor is entitled to continue to operate during the gap period as if no case had been commenced:

> Notwithstanding section 363 of this title, except to the extent that the court orders otherwise, and until an order for relief in the case, any business of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced.

11 U.S.C. § 303(f); *see also* <u>Consol. Partners Inv. Co. v. Lake</u>, 152 B.R. 485, 490 (Bankr. N.D.Ohio 1993) ("By virtue of § 303(f), during the gap period, the [d]ebtor was authorized to continue such operation until an order for relief was entered as though no involuntary petition had been filed. The rationale for allowing the debtor to operate during the involuntary gap period is that prior to the entry of an order for relief, the subject of an involuntary petition should not be adversely affected by the case.").

33.    In this instance, the Receiver is operating the business of the Alleged Debtor as authorized under state law.  *See* Receivership Order, Ex. 1 at ¶ 5(a); *see also* R.S.Mo. § 515.545. The Receiver has full authority to direct the actions of the Alleged Debtor, Ex. 1 at ¶ 5(d), and the co-managing members are prohibited from directing the operations of the business of the Alleged Debtor.  Ex. 1 at ¶ 10.  So while the Receiver is a custodian of the assets, the Receiver is also in charge of operating the business of the Alleged Debtor.

34.    Although South City Hospital has closed its active patient care operations, the business of the Alleged Debtor is still operating.  The Alleged Debtor still has employees, regulated materials onsite, patient and employee records, equipment, and it continues billing and collection of accounts receivable activities.  The building at South City Hospital requires maintenance, repairs, and security.  Prohibiting the Receiver from directing the activities of the Alleged Debtor in operation of the business, as the Petitioning Creditors would have this Court do, would damage

the Alleged Debtor. This is precisely why the business of an alleged debtor is permitted to continue operating during the gap period as if the case had not been commenced. This minimizes the adverse effect of the involuntary petition prior to entry of an order for relief.

35.     A $800,000 payment was made by the Alleged Debtor to the secured creditor, Twain, on September 5, 2023, on the post-receivership revolving line of credit of the Alleged Debtor as authorized by the Third Financing Order entered on August 3, 2023. *See* Ex. 7. An entity acts through people and at the direction of people. In this instance, the State Court's Receivership Order directed that the Receiver is in charge of operating the business of the Alleged Debtor, and the co-managing members are enjoined from doing so. The Receiver caused the Alleged Debtor to make the payment in order to reduce interest expense for the Alleged Debtor on the Twain obligations that have priority over all other creditors (other than with respect to equipment on which Twain has a second priority lien). Accruing unnecessary interest would otherwise be wasteful, and the payment from the Alleged Debtor to Twain here only makes sense in order to save money and to preserve the property of the Alleged Debtor.

36.     Continuing to operate the business of the Alleged Debtor is not a violation of the automatic stay. In re Gaudreault, 315 B.R. 1, 8 (Bankr. D. Mass. 2004). In Gaudreault, the alleged debtor recorded a declaration of homestead exemption during the gap period, an act which a judgment creditor complained deprived the bankruptcy estate of valuable property and violated the automatic stay. In deciding that the debtor was entitled to record a homestead statement during the gap period, the bankruptcy court determined that the rights that are retained during the gap period under Section 303(f) trump the more general provisions of Section 362(a). Id. ("the specific statutory provisions of what rights a debtor retains during the gap period prevail over the more general provisions of § 362(a)(3)").

37.     Voluntarily transferring property on account of a pre-petition antecedent debt during the gap period in operating the business of the debtor is also not a violation of the automatic stay.  *See* <u>In re Consolidated Partners Inv. Co.</u>, 156 B.R. 982, 985 (Bankr. N.D. Ohio 1993).  In <u>Consolidated Partners,</u> the alleged debtor transferred three parcels of real property on account of an antecedent debt during the gap period of an involuntary bankruptcy proceeding.  <u>Id.</u> at 983.  The trustee sought to hold the recipient of the gap period payment in contempt for violation of the automatic stay.  The Court determined that there was not violation of the automatic stay when an alleged debtor makes a voluntary transfer under the authority of 11 U.S.C. 303(f).  <u>Id.</u> at 985.

38.     The remedy available to recover transfers during the gap period is provided in 11 U.S.C. § 549.  <u>Id.</u>   If an order for relief is granted on the Involuntary Petition, the gap period payments made in the operation of the business of the Alleged Debtor may be avoided under 11 U.S.C. § 549.  So here it is possible that the payment made to Twain, or to employees, or for insurance, or for security at South City Hospital, might be avoided as a post-petition transfer. These are all actions and payments that are necessary or advisable to continue the business of the Alleged Debtor during the gap period.  Until the order for relief is entered, business of the Alleged Debtor may continue operating as if this case was not commenced.

39.     The payment made by the Alleged Debtor to Twain on September 5, 2023, did not violate the automatic stay.  It was a voluntary payment made by the Alleged Debtor at the direction of the Receiver in continuing the operation of the Alleged Debtor's business during the involuntary gap period as is permitted under 11 U.S.C. § 303(f).

**E.  <u>The Hearing on September 6, 2023 did not Violate the Stay.</u>**

40.     For the same reasons discussed in Part C above, the September 6, 2023, hearing did not violate the stay.  No proceedings against the Alleged Debtor went forward.  The only matter

that was going forward and that did go forward was limited to relief against the Alleged Debtor's affiliate, SAH Real Estate. There was no violation of the stay.

**F.     The Motion Is Procedurally Improper Under Fed. R. Bankr. P. 7001(7)**

41.     The Motion improperly seeks injunctive relief that can only be granted through commencement of an adversary proceeding under Rule 7001(7) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and not by way of motion and contested matter under Bankruptcy Rule 9014. Specifically, Rule 7001 expressly provides that "the following are adversary proceedings: …(7) a proceeding to obtain an injunction or other equitable relief…"

## CONCLUSION

42.     There was no violation of the stay with respect to the acts identified by the Petitioning Creditors. The business of the Alleged Debtor during the gap period is entitled to continue operating as if the involuntary case had not been commenced, and the Receiver is the only party with authority to operate the business. Furthermore, the Petitioning Creditors do not have standing to pursue any claims relating thereto. The Petitioning Creditors have not identified a concrete, particularized injury because they have none. The Motion should be denied.

WHEREFORE, MorrisAnderson & Associates, Ltd., as general receiver for SA Hospital Acquisition Group, LLC and SA Hospital Real Estate Holdings, LLC and Twain GL XXV, LLC, respectfully request that the Court enter an order (i) denying the Emergency Motion to Enforce the Automatic Stay filed by the Petitioning Creditors, and (ii) granting such other and further relief as is just and appropriate under the circumstances.

Dated: September 13, 2023
       Wilmington, Delaware

**POLSINELLI PC**

*/s/ Katherine M. Devanney*
Christopher A. Ward (Del. Bar No. 3877)
Katherine M. Devanney (Del. Bar No. 6356)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
kevanney@polsinelli.com

-and-

**THOMPSON COBURN LLP**
Brian W. Hockett
One US Bank Plaza
St. Louis, Missouri 63101
Telephone: (314) 552-6461
Facsimile: (314) 552-7000
bhockett@thompsoncoburn.com

*Counsel for MorrisAnderson & Associates, Ltd, as general receiver for SA Hospital Acquisition Group, LLC and SA Hospital Real Estate Holdings, LLC*

-and-

**McCARTER & ENGLISH LLP**

*/s/ William F. Taylor, Jr*
William F. Taylor, Jr. (2936)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
wtaylor@mccarter.com

*Attorneys for Twain GL XXV, LLC*