# Exhibit 1
# Evidence of Petitioning Creditors' Claims

# CONVERTIBLE PROMISSORY NOTE

AMOUNT:  US$500,000                    DATED: September 13, 2021

SA Hospital Acquisition Group, LLC, SA Hospital Real Estate Holdings, LLC and SA Hospital Real Estate Holdings-Jefferson LLC, all with a primary business address located at 3933 South Broadway, St. Louis, MO 63118 (collectively as "Company" or "SAH") ("Company"), hereby promises to pay to the order of Joel Pesso, with an address located in Los Angeles, California 90048 or Assignees ("Holder"), the sum of Five Hundred Thousand Dollars, United States Dollars (US$500,000), together with interest as provided hereto:

1. <u>TERMS</u>. All amounts of principal and interest under this Convertible Promissory Note ("Note") shall be funded, due and payable as follows unless the Holder exercises its right to convert.

<u>Principal</u>:  To be paid in full on or before December 30, 2021 ("Due Date").

<u>Advances</u>:  Holder to lend Company Five Thousand Dollars ($500,000.00) which at Lender's choice such funds shall either (i) be transferred to the Company on September 13, 2021 or (ii) Two Hundred and Fifty Thousand Dollars ($250,000) to be transferred to the Company on September 13, 2021 and Two Hundred and Fifty Thousand Dollars ($250,000) to be transferred to the Company on September 20, 2021.

<u>Interest</u>:  Interest shall be accrued at the monthly rate of two percent (2.0%) per month in simple interest. The accrued interest is either payable in cash at the time of Due Date, or at Holder's election, convertible into LLC Member units in the Company at the same Conversion Rate as Holder has converted the Note into equity.

<u>Rights</u>:  The Note shall be subordinated to all existing debts of the Company and be subordinated to all liens on the Company's assets existing as of the date of this Convertible Promissory Note; however, this Note shall be senior to any debt incurred hereinafter. The Company cannot payoff this Note prior to the Due Date without the written permission of Holder, who shall retain the right to convert until the Due Date.

<u>Payoff</u> :  Holder may, at its election accept a payoff of all amounts due in the form of converting such amount due to an equity interest in the Company in accordance with Section 2 of this Convertible Promissory Note.  Alternatively, Holder may elect that all amounts due under this Convertible Promissory Note (including all accrued interest) be paid in cash by the Due Date. If Holder elects to receive all amounts due under this Convertible Promissory Note in cash as of the Due Date, the Holder, in addition to such cash, shall also receive LLC Member units equivalent to 200.0% or 2x the Conversion Rate ($40,000,000) (based on the original loan amount  of $500,000) which is equal to one and one-quarter percent (1.25%) ownership in the Company on a fully-diluted basis at the time of the payoff.

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN AND WILL NOT BE

REGISTERED, EXCEPT OTHERWISE PROVIDED FOR HEREIN, WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("1933 ACT") AND REGISTRATIONS OF THE RULES AND REGULATIONS PROMULGATED THEREUNDER, AND MAY NOT BE SOLD OR OFFERED WITHIN THE UNITED STATES (AS DETAILED IN REGULATIONS) EXCEPT PURSUANT TO REGISTRATION UNDER OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE 1933 ACT.

2. <u>RIGHTS, PREFERENCES, PRIVILEGES AND RESTRICTIONS</u>.

    (a) <u>Conversion</u>. The Holder, at its sole option and discretion, may convert its principal and accrued interest into member units of the Company; to remove all doubt, the member units include all 3 related LLC's that either own or have an economic interest in the Jefferson Campus real estate, the Broadway Campus real estate and the South City Hospital operating business. The Conversion Rate shall be at a valuation of Twenty Million Dollars ($20,000,000.00) on a fully-diluted basis, which represents an approximate 65% discount to the COMPANY's current appraised valuation, and over an 80% discount to the Company's stabilized valuation. Some or all of the converted Note, along with any or all accrued interest, shall use this Conversion Rate. For avoidance of doubt, Holder's equity ownership percentage based on the original loan amount of $500,000 shall be equal to two and one-half percent (2.5%) without taking into account the interest that is converted to equity under this section.

    (b) <u>Liquidation Preference</u>. In the event of any liquidation of the Company, the Holder will be entitled to receive its unpaid principal and interest in preference to the holders of Company Equity, Company Shareholder Debt or any other obligation other than senior secured debt. Company hereby grants the right to Holder to defend its debt preference in whatever manner Holder finds necessary for an amount equal to the Original Principle and accrued interest. A consolidation or merger of the Company, a sale of substantially all of its assets or a bankruptcy filing shall be deemed a liquidation.

    (c) <u>Notice of Conversion</u>. Holder shall provide Company with a three (3) day written notice.

    (d) <u>Protective Provisions</u>. In the event of a sale of equity by the Company at a Company valuation below Twenty Million Dollars ($20,000,000), Holder shall have the right to convert part or all of this Note at the same Company valuation as the equity sale on a non-dilutive basis.

3. <u>HOLDER REPRESENTATIONS AND COVENANTS</u>. In connection with the purchase and sale of the securities, the Holder represents and warrants to, and covenants and agrees with Company as follows:

    (a) Holder is subscribing herein for Holder's own account, not as nominee or agent, for investment purposes only;

    (b) Holder carefully reviewed and understands the various risk factors of an investment in the

Company, including unaudited financial data for the Company;

(c) Holder has, or Holder and his/her or its purchaser representative together have, such knowledge and experience in financial and business matters that Holder is, or Holder and such purchaser representative are, capable of evaluating the merits and risks of this investment and of making an informed investment decision;

(d) Holder is not relying on the Company or any of its partners, employees, counsel, accounts, advisers, representatives or agents for advice, but has relied solely upon the advice of his/her or its own purchaser representative, counsel, accountant and other advisors, with regard to the legal, investment, tax and other considerations regarding this investment;

(e) Holder is legally competent to execute this Subscription Agreement and Power of Attorney and has a net worth of at least One Million Dollars ($1,000,000), or had an individual income in excess of Two Hundred Thousand Dollars ($200,000) – or Three Hundred Thousand Dollars ($300,000) joint income with such person's spouse – in each of the two (2) most recent years and who reasonably expects an income in excess of Two Hundred Thousand Dollars ($200,000) – or Three Hundred Thousand Dollars ($300,000) joint income – in the current year;

(f) Holder has not relied upon a purchaser representative in making any decision with respect to this investment;

(g) Holder has delivered to the Company, together with this Agreement and only if applicable, a Purchaser Representative Questionnaire, the purchaser representative about whom information has been furnished therein is the person who has advised Holder in making a decision with respect to this investment, and is Holder's purchaser representative;

(h) Holder understands that no federal or state agency has passed upon or made any recommendation or endorsement with respect to this investment and that an investment in the Company involves a significant degree of risk;

(i) Holder is an organization, Holder (i) has not been organized for the purpose of subscribing for the Membership Units/Shares; OR (ii) has been organized for the purpose of subscribing for the units and has made all representations, warranties, covenants and agreements contained in this Agreement with respect to and on behalf of all of the beneficial owners of Holder, as well as Holder;

(j) Holder is an organization, and (i) Holder is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it has been formed; (ii) Holder has the right and power under this organization to execute, deliver and perform its obligations under this Agreement; (iii) this subscription has been duly authorized by all necessary actions on the part of all persons (including Holder's officers, directors, partners and trustee) and will not violate any agreements to which Holder is a party; (iv) the individual executing and delivering this Agreement on behalf of Holder has the requisite right, power, capacity and authority to do so; and (v) this Agreement is enforceable against Holder in accordance with its terms;

(k) Holder will execute, deliver, acknowledge and file any and all further documents and provide any and all further information (including, without limitation, copies of Holder's organizational instruments, the identities of the beneficial owners of Holder and current financial information with respect to Holder and/or any such beneficial owners) which the Company may deem necessary or appropriate in connection with the transactions contemplated by this Agreement;

(l) Holder understands that the legal consequences of the representations, warranties, covenants and agreements contained in this Agreement are that Holder must bear the economic risks of this investment for an indefinite period of time;

(m) Holder shall promptly notify the Company in writing of any material change in any of the representations or warranties set forth in this Agreement prior to the acceptance of this Agreement by the Company; and

(n) Holder has made the representations, warranties, covenants and agreements contained in this Agreement with the expectation that they will be relied upon by the Company and other subscribers for the units in determining whether Holder is suitable as a purchaser of the units. If more than one person is signing this Agreement, each representation, warranty, covenant and agreement contained in this Agreement shall be a joint and several representation, warranty, covenant or agreement of each such person.

4. <u>INDEMNIFICATION</u>. Holder hereby agrees to indemnify the Company and its affiliates, members, controlling persons, officers, directors, employees, counsel, accountants and representatives for any and all losses, damages, liabilities, costs and expenses (including attorneys' fees and expenses) incurred or sustained by reason of or in connection with any breach of any representation, warranty, covenant or agreement of Holder contained in this Agreement, unless Holder is the object of fraud gross negligence or malfeasance by the Company with respect to the issuance of this Note.

5. <u>ORGANIZATION</u>. SA Hospital Acquisition Group, LLC, SA Hospital Real Estate Holdings, LLC and SA Hospital Real Estate Holdings-Jefferson LLC, are duly organized company and validly existing under the laws of the State of Delaware and is in good standing under such laws. Company has all requisite corporate power and authority to carry on its business as presently conducted.

6. <u>AUTHORITY</u>. The execution and delivery of the Note do not, and the consummation of the transactions contemplated hereby will not, conflict with, or result in any violation of, or default (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any obligation or to a loss of a material benefit, under, any provision of the Operating Agreement, and any amendments thereto, or any other Agreement to which Company is a party.

7. <u>CONSENT</u>. No consent, approval or authorization of or designation, declaration or filing with any government authority on the part of Company is required in connection with the valid execution and delivery of the Note, or the offer, sale or issuance of the Unit, or the consummation of any other transaction contemplated hereby, except the Holder has been advised that at such time as the conversion right is exercised by the holder there may be filings

that are required by the Securities and Exchange.

8. <u>ACTIONS</u>. There is no action, proceeding or investigation pending, or to Company's knowledge, threatened, against Company which might result, either individually or in the aggregate, in any material adverse change in the business, prospects, conditions, affairs or operations of Company.

9. <u>CORPORATE ACTION</u>. The issuance, sale and delivery of the Note have been duly authorized by all required corporate action on the part of Company, and when issued, sold and delivered in accordance with the terms hereof and thereof for the consideration expressed herein and therein, will be duly and validly issued, fully paid and non-assessable.

10. <u>BINDING AGREEMENT</u>. This Note has been duly authorized, validly executed and delivered on behalf of Company and is a valid and bind agreement in accordance with its terms, subject to general principles of equity and to bankruptcy or other laws affecting the enforcement of creditors' rights generally. Company has all requisite right, power and authority to execute and deliver this Note and to consummate the transactions contemplated hereby. All corporate action on the part of Company, its directors and shareholders necessary for the authorization, execution, delivery and performance of this Note has been taken.

11. <u>APPROVALS</u>. Company is not aware of any authorization, approval; or consent of any U.S. government body or foreign body which is legally required for the issuance and sale of the securities issuable upon conversion.

12. <u>TRASNFER OR ASSIGNMENT OF NOTE</u>. Neither the Company nor the Holder is permitted to sell or assign this Note without the prior approval and written authorization of the Other Party to this Agreement.

13. <u>MISCELLANEOUS</u>.

   (a) <u>Entire Agreement</u>. This Note constitutes the entire agreement between the parties, and neither party shall be liable or bound to the other in any manner by any warranties, representations or covenants except as specifically set forth herein. Any previous agreement among the parties related to the transactions described herein is superseded hereby. The terms and conditions of this Note shall inure to the benefit of and be binding upon the restrictive successors and assigns of the parties hereto. Nothing in this Note, express or implied, is intended to confer upon any party, other than the parties hereto, and their respective successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Note, except as expressly provided herein.

   (b) <u>Independent Contractor</u>. The Holder is an independent contractor and is not the agent of Company. The Holder is not authorized to bind Company or to make any representation or warranties on behalf of Company.

   (c) <u>Survival</u>. All representations and warranties in this Note by Company and the Holder shall survive the closing of the transactions contemplated by this Note.

   (d) <u>Governing Law</u>. This Note shall be construed in accordance with the laws of the State of Delaware. Any action under this Note shall be taken within this jurisdiction.

(e) Counterparts. This Note may be executed in counterparts, and the facsimile transmission of executed counterpart to this Note shall be effective as an original.

(f) Notice. Any notice hereunder may be given as follows:

TO COMPANY:                            TO HOLDER:
Jeffrey Ahlholm
4308 Via Entrada
Newbury Park, CA 91320

(h) Time of the Essence. Time shall be of the essence for all purposes under this Note.

IN WITNESS WHEREOF, the undersigned has executed the Note as of the date first set forth above.

OFFICIAL SIGNATORY OF COMPANY          OFFICIAL SIGNATORY OF HOLDER

By: _____            By: _____
Name: Jeffrey F. Ahlholm               Name: _____
Title: Co-Managing Member              Title: _____
Date: 9/13/2021                        Date: _____

6

## CONFIDENTIAL REDEMPTION, SETTLEMENT AND RELEASE
## SA HOSPITAL ACQUISTION GROUP, LLC

This Confidential Redemption Settlement and Release Agreement ("Settlement Agreement") is entered into as of April 15, 2022, between and among Peter Pinto, an individual, and all investment vehicles or assignees of Peter Pinto, including but not limited to Goldberg Healthcare Partners LLC (collectively hereafter as the "Pinto Parties"), Agra Capital Advisors, LLC, a California limited liability company ("Agra"), Jeffrey Ahlholm, an individual ("Ahlholm"); and SA Hospital Acquisition Group, LLC, a Delaware limited liability company ("SAH"). All of the parties hereto are sometimes referred to herein as the "Settling Parties". This Settlement Agreement shall be effective upon (a) the execution and delivery of the Note, Guaranty and 4th Deed of Trust provided for in paragraph 4(a) below, and (b) the execution and delivery by all parties of that certain Assignment of Debt and Mutual General Release dated as of April 15, 2022, by and between, among other parties, ACME Property Management, LLC, and Jeff Ahlholm, concerning Medversant Technologies LLC.

## RECITALS

WHEREAS, Ahlholm, and SAH along with other parties pursued the acquisition of St. Alexius Hospital (now known as South City Hospital) from the bankrupt estate of AmeriCore Holdings, LLC pending before the United States Bankruptcy Court for the Eastern District of Kentucky and the acquisition of East Orange General Hospital from Prospect Medical Holdings.

WHEREAS the Pinto Parties desired to participate in such acquisition(s) and agreed to advance Three Hundred Fifty Thousand Dollars ($350,000) to SAH in order to acquire one or both of St. Alexius Hospital and/or East Orange General Hospital, and all related assets.

WHEREAS, the Pinto Parties acknowledge the many changes in management, operating agreements, capitalization and capitalization tables necessary for the St. Alexius Hospital acquisition to stabilize, including the loss of any equity interest of any Settling Party in East Orange General Hospital;

WHEREAS the Pinto Parties no longer desire to have any direct financial interests whatsoever (whether through LLC Member units or debt) in SAH or its affiliates;

WHEREAS Ahlholm has formed a limited liability company to hold all of Ahlholm's equity interest in SAH ("Holdings"); and

WHEREAS the Pinto Parties have agreed to surrender, sell and transfer any and all of their respective interests in SAH and its affiliates whether such interests are equity or debt, to SAH in exchange for a lump sum payment of Five Hundred Thousand Dollars ($500,000) from SAH and a 10% profits interest in Holdings.

NOW, THEREFORE, in consideration for the mutual exchange of promises contained herein, the adequacy and sufficiency of which are hereby acknowledged, the Settling Parties hereby agree as follows:

1. <u>Recitals.</u>  The recitals in this Agreement are incorporated herein.

2. <u>No Admission</u>.  This Settlement Agreement is entered in connection with the compromise of disputed claims.  Neither this Settlement Agreement nor any action or acts taken in connection with this Settlement Agreement or pursuant to it will constitute an admission by the Settling Parties or any other person or entity of any violation of law, nor will it constitute or be construed as an admission of any wrongdoing whatsoever.

3. <u>Redemption of Interests in SAH</u>.   At the Closing (as defined below), in exchange for the Consideration referred to in section 4 below, the Pinto Parties shall sell, transfer and deliver to SAH, and SAH shall redeem and purchase from Seller, any and all equity or debt interests that the Pinto Parties may have in SAH and its affiliates (the "<u>Redeemed Interests</u>"), upon and subject to the terms and conditions of this Agreement.

4. <u>Consideration.  Consideration for the Redeemed Interests shall be as follows:</u>

    (a)      <u>Purchase Price</u>.  An aggregate purchase price (the "<u>Purchase Price</u>") for all of the Redeemed Interests of Five Hundred Thousand Dollars ($500,000).  The Purchase price shall be paid in full at Closing (as defined below) by SAH to the Pinto Parties by wire transfer of immediately available funds to an account designated by the Pinto Parties.  This portion of the Purchase Price will be evidenced by a Promissory Note of SAH in the form annexed hereto as <u>Exhibit A</u> (the "**Note**"), guaranteed by SAH's affiliate, SA Hospital Real Estate Holdings - Jefferson LLC, Agra and personally by Ahlholm pursuant to the Entity and Personal Guaranty in the form annexed hereto as <u>Exhibit B</u> (the "**Guaranty**"), and secured by a 4th Deed of Trust executed and delivered by SA Hospital Real Estate Holdings - Jefferson LLC, in the form annexed hereto as Exhibit C (the "**Deed of Trust**"), all to be executed by the parties named therein and delivered simultaneously with this Agreement.

    (b)      <u>Interest in Holdings</u>.  In addition to the Purchase Price, prior to the Closing, Ahlholm shall (i) form Holdings with an operating agreement providing for the Pinto Parties to have a 10% limited liability interest in Holdings; and (ii) assign and transfer to Holdings all of the Ahlholm SAH Interests.  Pinto Parties acknowledge that Ahlholm's and Holdings' interest in SAH may be diluted over time; provided, however, that neither Ahlholm nor Holdings shall take any action, nor cause nor give consent to SAH to take any action, that will result in any disproportionate material adverse effect upon the economic value of the Pinto Parties' interest in Holdings or SAH through its interest in Holdings.  The operating agreement of Holdings shall provide that the Pinto Parties may transfer their ownership without consent to principals, family members of principals, heirs and executives upon death, trusts for the benefit of principals and family members, and entities controlled by or under common control of principals, and to other persons with the consent of Holdings, which consent is not to be unreasonably denied or delayed.

5. <u>Contingency; Closing; Deliveries.</u>

    (a)      The closing of the transactions contemplated herein (the "<u>Closing</u>") shall be on a date and time mutually agreed upon by the Settling Parties, but no later than (i) the closing of any sale or refinancing of SAH or its property contemplated to occur in May 2022, or (ii) July 1, 2022, through an exchange of consideration and documents using wire transfers, electronic mail or facsimile transmission of executed documents.

(b)    At the Closing, the following Parties shall deliver to each other, the documents, instruments and other items described below:

(i)    SAH shall deliver to the Pinto Parties the unpaid balance of the Purchase Price in immediately available funds pursuant to Section 4(a)(ii) hereof; and

(ii)    the Pinto Parties shall deliver to SAH (1) the original of the Note marked "Paid," and to SAH, Agra and Ahlholm (as appropriate) and the original Guaranty marked "Canceled," and (2) such other documents and instruments as SAH shall reasonably require, by notice not less than 5 days prior to the Closing, to substantiate the transfer and assignment of the Redeemed Interests to SAH; and

(iii)    Ahlholm shall deliver to the Pinto Parties a certified copy of the certificate of formation of Holdings, a fully executed copy of the operating agreement of Holdings showing the Pinto Parties as 10% owners thereof, satisfactory evidence of the assignment of the Ahlholm SAC Interests to Holdings, and such instruments and documents as the Pinto Parties shall reasonably require, by notice not less than 10 days prior to the Closing, substantiating all the foregoing.

(c)    The Settling Parties further agree to execute and deliver such other documents and instruments as any Settling Party may reasonably deem necessary to effectuate, perfect, document or evidence the transactions contemplated by this Agreement.

6. <u>Representations and Warranties</u>.  The Settling Parties hereby represent and warrant as follows:

a.    SAH is a limited liability company, which is duly organized, validly existing and in good standing under the laws of the State of Delaware. SAH full power and authority to carry on its business as now conducted.

b.    The Pinto Parties represent and warrant that they have good title to all the Redeemed Interests, free and clear of all liens, claims, and encumbrances, with full legal right and power to transfer and convey ownership of the Redeemed Interests to SAH.

c.    Ahlholm represents and warrants that they have good title to all the Ahlholm SAH Interests, free and clear of all liens, claims, and encumbrances, with full legal right and power to transfer and convey Ahlholm's equity interest in SAH to Holdings.

d.    Each of the Pinto Parties, SAH, Agra and Ahlholm have full power, authority and legal right to enter into this Agreement, the Note, the Guaranty and any other documents or instruments executed and delivered by them, and to consummate the transactions provided for herein.  All actions on the part of any of the Pinto Parties, SAH, Agra and Ahlholm necessary to approve the transactions contemplated by this Agreement to be performed by each such Party have been duly taken.  This Agreement has been, and the other agreements, documents and instruments

required to be delivered by the Pinto Parties, SAH, Agra and Ahlholm, in accordance with this Agreement will be, duly executed and delivered by each of them, respectively, and constitute, or will constitute when delivered, the valid and binding agreement of each of them enforceable against each of them, respectively, in accordance with their terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by general principles of equity.

e.  The execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement by the Pinto Parties, SAH, Agra and Ahlholm do not and will not violate, conflict with or result in the breach of any material term, condition or provision of, or require the consent of any other person under (i) any existing law, ordinance, or governmental rule or regulation to which the Pinto Parties, SAH, Agra and Ahlholm, respectively, are subject, (ii) any judgment, order, writ, injunction, decree or award of any court, arbitrator or governmental or regulatory official, body or authority which is applicable to the Pinto Parties, SAH, Agra and Ahlholm respectively, or (iii) any instrument, document or agreement, oral or written, to which any of the Pinto Parties, SAH, Agra and Ahlholm are a party.

f.  No broker or similar advisor acting on behalf or under the authority of any of the Settling Parties is or will be entitled to any broker's or finder's fee or any other commission or similar fee from the Pinto Parties, SAH, Agra and Ahlholm, in connection with the transactions contemplated herein.

g.  Neither the Pinto Parties not Ahlholm nor SAH is relying on any statement, representation or warranty, oral or written, express or implied, made by the Pinto Parties, SAH, Agra, and Ahlholm or any of their members/owners or any of their respective affiliates or representatives, except as expressly set forth in this Agreement. Except for the representations and warranties of SAH, Agra and Ahlholm expressly set forth in this Section 6 and not in limitation hereof, neither SAH nor any of their respective managers, officers, directors, members, managers, representatives or agents makes any express or implied representation or warranty on behalf of SAH or themselves or otherwise, in each case in respect of SAH's assets, liabilities, prospects or otherwise.

7.  <u>Release</u>.  Effective as of the full satisfaction of all the requirement of the Closing, each Party to this Agreement, on behalf of themselves and their respective representatives, officers, directors, managers, spouse, agents, heirs, successors and assigns, releases and discharges each and every other Party and their respective- former, current or future managers, officers, employees, representatives, agents, fiduciaries, attorneys, directors, shareholders, insurers, predecessors, parents, affiliates, successors, heirs, and assigns from any and all claims, liabilities, causes of action, damages, losses, demands or obligations of every kind and nature, whether now known or unknown, suspected or unsuspected, which such Party ever had, now has, or hereafter can, shall or may have for, upon or by reason of any act, transaction, practice, conduct, matter, cause or thing of any kind whatsoever, relating to or

based upon, in whole or in part, any act, transaction, practice or conduct prior to the date hereof, except as to matters not dealing or related to (i) the Redeemed Interests, (ii) the business and operations of SAH, any (iii) any investments (whether in equity or debt) made by the Pinto Parties in SAH. This release and discharge includes, but is not limited to, claims arising under federal, state, and local statutory or common law. Each Party promises never to file a lawsuit or assist in or commence any action alleging any wrongful action against any other Party to this Agreement or asserting any claims, losses, liabilities, demands, or obligations released hereunder.

8. <u>Known or Unknown Claims</u>. The Parties understand and expressly agree that the Release set forth in Section 7 extends to all claims of every nature and kind dealing with or related to any investments (whether in equity or debt) made by the Pinto Parties in SAH, known or unknown, suspected or unsuspected, past, present, or future, arising from or attributable to any conduct of the Parties to this Agreement and their respective successors, subsidiaries, and affiliates, and all their employees, owners, members, shareholders, agents, officers, directors, predecessors, assigns, agents, representatives, and attorneys, whether known by such Party or whether or not such Party believes he may have any claims, and that any and all rights granted to such Party under Section 1542 of the California Civil Code or any analogous state law or federal law or regulations, are hereby expressly WAIVED, if applicable. Said Section 1542 of the California Civil Code reads as follows:

> **A general release does not extend to claims that the creditor or releasing Party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released Party.**

9. **MISCELLANEOUS**

a. <u>No Assignment of Claims</u>. Each of the undersigned Parties represents and warrants that with respect to the respective releases given by the Parties hereto, no portion of any claim, right, demand, action, or cause of action released hereunder, and no portion of any recovery or settlement to which any Party might be entitled based upon any such claim, right, demand, action, or cause of action, has been assigned or transferred to any other person, firm, or corporation, in any manner, including by way of subrogation, operation of law, attorneys' lien, or otherwise. Each Party agrees to indemnify and hold harmless the other Party from all claims, expenses, and liabilities arising from a breach of the representations and warranties set forth in this paragraph.

b. <u>Integration.</u> Each of the Parties represents and warrants that, in executing this Agreement, it has relied solely on the statements expressly set forth herein, and has placed no reliance whatsoever on any statement, representation, or promise of any other Party, or any other person or entity, not expressly set forth herein, or upon the failure of any other Party or any other person or entity to make any statement, representation, or disclosure of anything whatsoever. The discovery by any Party, subsequent to the execution of this Agreement, of any facts not heretofore known to that Party, or that the facts or law upon which any Party relied in executing this Agreement was not as that Party believed it to be (other than as expressly set forth herein), shall

not constitute grounds for declaring this Agreement void, avoidable, or otherwise unenforceable. This paragraph is intended by the Parties to preclude any claim (other than a material misrepresentation with respect to the representations set forth in Section 6 of this Agreement) that either Party was fraudulently induced to enter this Agreement, or was induced to enter this Agreement by a mistake of fact or law.

     c.    <u>Headings</u>**.**  The headings contained in this Agreement have been inserted for convenience only and in no way define or limit the scope or interpretation of this Agreement

     d.    <u>Binding on Successors</u>**.**  This Agreement shall inure to the benefit of and be binding upon the heirs, representatives, successors, and assigns of each Party

     e.    <u>Counterparts</u>**.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

     f.    <u>Cooperation</u>**.**  After the Closing, each Party hereto agrees to perform any further acts, and to execute and deliver (with acknowledgment, verification and/or affidavit, if required) any further documents and instruments, as may be reasonably necessary or desirable to implement and/or accomplish the provisions of this Agreement and the transactions contemplated herein.

     g.    <u>Authority</u>**.**  Each individual who signs this Agreement on behalf of any corporation or other entity represents and warrants that such corporation or other entity, acting through its duly authorized directors or officers, has specifically approved this Agreement and authorized him or her to sign this Agreement on behalf of such corporation or other entity.

     h.    <u>Awareness of Risk and Conflicts or Violations</u>**.** The Parties agree, acknowledge, and understand they have the ability to evaluate the risks and merits of entering into the Agreement and of transferring, respectively, the Redeemed Interests, the Ahlholm SAH Interests, and any other interest addressed herein. The Pinto Parties acknowledge that other parties and entities, which may include one or more of the Settling Parties, intend to continue to develop the value of SAH, and may take actions that could result in an increase or decrease in the value of an investment in SAH, including the Redeemed Interests and the Ahlholm SAH Interests. The Pinto Parties and Ahlholm represent that they have made their own independent judgment about the value of the Redeemed Interests, the Ahlholm SAH Interests being transferred to Holdings, and future prospects of SAH. Each Party further represents that he or it has sufficient sophistication to understand the consideration given in exchange for the Redeemed Interests and the Ahlholm SAH Interests.

     i.    <u>Confidentiality</u>. The Parties agree to keep the terms of this Agreement confidential and will not disclose same to any third parties except, when necessary, upon the request of their respective attorneys, tax advisors, financial or banking contacts, and/or as otherwise required by law.  Such persons, upon disclosure, shall be expressly advised of the confidential nature of this Agreement and shall be directed to maintain it in strict confidence.  In the event of any inquiry, the Parties may disclose the fact that a settlement has been reached without an admission of liability and the existence of a confidential settlement agreement between them without disclosing its terms.  The Parties hereto and their respective counsel agree that if either of them is served with a

summons, subpoena, or other form of compulsory process seeking production or other disclosure of this Agreement, it shall take reasonable steps to protect the confidentiality of this Agreement and shall immediately give written notice to all other Parties to the Agreement, specifying the information sought and enclosing a copy of the summons, subpoena, or other form of compulsory process.  In no event shall production or disclosure of the Agreement be made before twenty-one (21) calendar days after giving such notice to the other Parties, unless ordered by a court or otherwise required by law to make such disclosure prior to the expiration of twenty-one (21) calendar days.

j.      <u>Other Provisions: Amendment.</u> The terms of this Agreement may not be modified, amended or otherwise changed in any manner, except by an instrument in writing executed by each of the Parties hereto.

k.      <u>No Waiver</u>. The waiver or failure to enforce any provision of this Agreement shall not operate as a waiver of any future breach of any such provision or any other provision hereof.

l.      <u>Interpretation</u>.  The language in all parts of this Agreement shall in all cases be construed simply as a whole and in accordance with its fair meaning and not strictly for or against any Party.  The Parties hereto acknowledge and agree that this Agreement has been prepared jointly by the Parties and has been the subject of arm's length and careful negotiation, that each Party has been given the opportunity to independently review this Agreement with legal counsel and other consultants, and that each Party has the requisite experience and sophistication to understand, interpret and agree to the particular language of the provisions hereof. Accordingly, in the event of an ambiguity in or dispute regarding the interpretation of this Agreement, this Agreement shall not be interpreted or construed against the Party preparing it, and instead other rules of interpretation and construction shall be utilized.

m.      <u>Governing Law</u>.  This Agreement, and any and all disputes arising out of or relating to this Agreement, shall be governed by and construed in accordance with the laws of California, without regard to conflicts of law principles.  No party shall contest the jurisdiction and venue of the Courts of the State of California or the federal courts sitting in Los Angeles, California to hear and determine any dispute arising out of this agreement.

n.      <u>Severability</u>.  The provisions of the Agreement are severable, and if any part of it is found to be unenforceable, the other paragraphs shall remain fully valid and enforceable.

o.      <u>Attorney's Fees and Costs.</u> Each of the Parties hereto shall bear its own legal fees, costs and expenses in connection with negotiating this Agreement.  In the event of breach of any provisions of this Agreement, or if any Party is required to file any action or initiate any proceeding to enforce any covenants of this Agreement, the prevailing Party shall be entitled to seek recovery of its reasonable attorneys' fees and costs of litigation or other proceeding.

*[Signatures on following page.]*

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement as of the date and year last signed below.

**Goldberg Healthcare Partners**

By: _____
                    Manager

Dated: ___5/12/2022_____

**SA HOSPITAL ACQUISITION GROUP, LLC**

By:_____
        Jeffrey Ahlholm, Co-Manager

Dated:_____

**PETER PINTO**

By: _____
Dated:_____5/12/2022_____

**JEFFREY AHLHOLM**

By:_____
Dated: _____

**AGRA CAPITAL ADVISORS, LLC**

By:_____
                    Manager

Dated:_____

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement as of the date and year last signed below.

**Goldberg Healthcare Partners**

By:_____
            Manager

Dated:_____


**PETER PINTO**

By:_____
Dated:_____

**SA HOSPITAL ACQUISITION GROUP, LLC**

By:_____
    Jeffrey Ahlholm, Co-Manager

Dated:_____5 - 10- 2022_____


**JEFFREY AHLHOLM**

By:_____
Dated:_____5 - 10 - 2022_____

**AGRA CAPITAL ADVISORS, LLC**

By:_____
           Manager

Dated:_____5 - 10 - 2022_____

## EXHIBIT A

## Promissory Note

**$500,000.00**
**1.5% Interest per Annum until Maturity**
**9.0% Interest per Annum after Maturity**

**Made:  April 15, 2022**
**Matures:  June 28, 2022**

**FOR VALUE RECEIVED**, SA HOSPITAL ACQUISITION GROUP, LLC ("Debtor") hereby promises to pay on June 28, 2022 ("Maturity"), the sum of FIVE HUNDRED THOUSAND DOLLARS ($500,000.00), to the order of GOLDBERG HEALTHCARE PARTNERS, LLC ("Creditor"), together with accrued interest, at such place as Creditor shall specify.  This Note shall bear interest at the annual rate of 1.5%, until Maturity, and 9% interest thereafter.

Borrower hereby waives notice, presentment, dishonor and notice of dishonor.  The debt evidenced by this Note is personally guaranteed by the Entity and Personal Guaranty of SA Hospital Real Estate Holdings - Jefferson LLC, Jeffrey Ahlholmand Agra Capital Advisors, LLC.  In the event of a default of this Note, Creditor shall have rights under the Personal Guaranty in addition to, and not exclusive of, the conventional enforcement of this Note.

Debtor agrees to pay all expenses and costs of Creditor to enforce this Note, including reasonable attorney's fees, to the fullest extent permitted by law.

This Note, its interpretation and enforcement shall be in all respects governed by the Laws of the State of California applicable to contracts made and to be performed entirely within such State.

SA HOSPITAL ACQUISITION GROUP, LLC.

By:_____
Name:  Jeffrey Ahlholm
Title:   Co-Managing Member

00101050.DOCX v 4

## Settlement, Assignment of Debt and Mutual General Release

This Settlement, Assignment of Debt and Mutual General Release (the "**Agreement**") is effective as of February 7th, 2023 by and among Matthew Haddad , an individual, ("**Haddad**") and Jeffrey Ahlholm, an individual ("**Ahlholm**"), Larry Feigen, an individual ("**Feigen**"), PLM Health, LLC a California limited liability company ("**PLM**"), SA Hospital Acquisition Group, LLC, a Delaware limited liability company (referred to herein as "**South City Hospital**") and SA Hospital Real Estate Holdings - Jefferson LLC, a Delaware limited liability company, (referred to herein as "**Jefferson PropCo**"). All of the parties hereto are sometimes referred to herein as the "**Settling Parties**" in the aggregate and individually as a "**Party**".

## <u>RECITALS</u>

WHEREAS, on or about February 20, 2022, South City Hospital and Haddad entered into a Loan Agreement (the **"Haddad Note"**) which set forth the principal terms of a Promissory Note from South City Hospital which Ahlholm and Feigen guaranteed;

WHEREAS, as of the date hereof and through January 31, 2023, South City Hospital owed Haddad $625,000 not including accumulating interest and costs of collection from the date due in connection;

WHEREAS, on or about June 15, 2022, Matthew Haddad initiated the lawsuit entitled *Matthew Haddad v. SA Hospital Acquisition Group LLC, et al.*, County of Los Angeles Superior Court Case No. 22STCV19405 (the "**Action**");

WHEREAS, there were business agreements between South City Hospital and PLM Health, LLC, which Haddad is the managing member which may be written, unwritten, verbal, referenced or unreferenced in written agreements or other communications, including the PLM Advisory Agreement and PLM Referral Agreement, breached or unbreached, disputed or in any other way considered by the parties, which the parties intend to be fully and finally settled and replaced by this Agreement (the **PLM Advisory Agreement**").

WHEREAS, effective May 19, 2022, SA Hospital and PLM entered into the PLM Agreement ad PLM Referral Agreement to provide consulting services in the preparation of South City Hospital's ERC application pursuant to the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) payroll reimbursement program, relative to COVID-era potential tax incentives or rebates (hereinafter referred to as "**ERC Program Agreement**");

WHEREAS, effective January 19, 2023, the Settling Parties agree that PLM completed its required services to earn its compensation as set forth in the PLM Agreement and PLM Referral Agreement which under the terms of the agreements amounted to approximately $1,800,000;

WHEREAS, PLM Health has assigned all of its rights to collection of payments to Haddad who has been bearing the costs of such collection;

WHEREAS, the parties have agreed to settle for $2,625,000 representing all sums owing

1

under the Haddad Note and sums owing under the PLM Agreement, PLM Advisory Agreement, and legal expense, which shall be herein referred to as the Haddad Total Obligation;

WHEREAS Ahlholm and Feigen have agreed to cause Jefferson PropCo desires to pay $220,000 to Haddad, and Haddad desires to receive this partial payment from Jefferson PropCo in exchange for the reduction of the amount owed under the Haddad Total Obligation, which is expected to close February 2023 with a reputable title and escrow service provider (the "**Jefferson Transaction**");

WHEREAS, Haddad agreed that any proceeds Haddad receives from the Jefferson Transaction shall be deducted from the Haddad Total Obligation;

WHEREAS, the parties wish to resolve the Action, and all claims and controversies existing between the parties pursuant to this Agreement; and

WHEREAS, the parties wish to direct the Escrow Agent to release the Escrow Funds pursuant to the terms of this Agreement ("Release"), which shall be incorporated by reference herein;

NOW, THEREFORE, in consideration of the mutual promises set forth below, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged by each of the Settling Parties, the Settling Parties agree as follows:

## TERMS

1.    **Incorporation of Recitals**.    The Settling Parties repeat and incorporate the foregoing recitals as if fully set forth herein.

2.    **Assignment.**    PLM hereby assigns all of its rights under the PLM Advisory Agreement, PLM Referral Agreement and ERC Program Agreement to Haddad and PLM has no further claims against the South City Hospital.

3.    **Consideration and Security Agreement.**    In consideration for the releases provided herein, Haddad shall receive the liquidated sum of $2,625,000 due within 10 days of the execution of this Agreement which South City Hospital anticipates will be paid from one or more of the following sources:

(a) In the event the Jefferson PropCo sale and/or refinance closes, Haddad is to receive $220,000.00, by wire transfer via the closing escrow to the banking coordinates provided by Haddad;

(b) In the event South City Hospital receives a refinancing Haddad is to receive a wire transfer of $2,625,000.00 from the receiving escrow (less $220,000 if the funding in Section 3(a) occurs). For clarity, in the event the Jefferson PropCo event detailed in Section 3(a) above does occur and Haddad receives $220,000 prior to South City's receipt of ERC Program funding as contemplated herein then Haddad shall receive $2,405,000.

(c) In the event South City Hospital can obtain a factoring or bridge financing of the ERC Program Funding then Haddad shall be paid from such funding prior to any other stakeholders.

(d) In any event and notwithstanding the above, the parties agree that whether or not any of the above funding events occur prior to the due date, South City Hospital shall be responsible for the payment of the consideration to Haddad and in order to secure such payment South City Hospital hereby grants to Haddad a security interest in all assets including but not limited to all refunds or credits now or hereafter due to Debtor from the Employee Retention Credit (ERC) program and including but not limited to all goods, Accounts (including health-care receivables), Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles (except as provided below), commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, certificates of deposit, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and all Borrower's Books relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

(e) **Representations and Warranties of Haddad and PLM.** Each of Assignor, PLM and Haddad further agrees, represents and warrants that:

   (a) The Agreement and Exhibits have not been modified, amended, altered or changed by Assignor, PLM or Haddad in any manner.

   (b) Neither PLM or Haddad has assigned, mortgaged, pledged, encumbered or otherwise hypothecated its or his rights, title and interests except under this Agreement.

(f) **Representations and Warranties of Assignee, South City Hospital, Feigen and Ahlholm.** Each of South City Hospital, Jefferson Propco, Feigen and Ahlholm, as appropriate, further agrees, represents and warrants that:

   (a) South City Hospital, Jefferson Propco, Feigen and Ahlholm will not without the prior written consent of Haddad, modify, amend, alter, change, cancel or terminate this Agreement.

   (b) South City Hospital, Jefferson Propco, Feigen and Ahlholm, as appropriate, have the right, power and authority to execute this Agreement. Neither Ahlholm nor Feigen has heretofore assigned, mortgaged, pledged, encumbered or otherwise

hypothecated its or his rights, title and interests in any manner nor will either do so at any time hereafter.

(c)     South City Hospital, Jefferson Propco, Feigen and Ahlholm covenant to execute and deliver to Haddad, upon demand, such additional assurances, writings or other instruments as may be required by Haddad to effectuate the purpose hereof, including, without limitation, the perfection of Haddad's right, title and interest in the ERC Funding.

(g) **Release**.  Upon the completion of all the obligations of the Parties set forth in Paragraphs 2 and 3 above, each Party to this Agreement, on behalf of himself and his respective representatives, officers, directors, managers, spouse, agents, heirs, successors and assigns, releases and discharges each and every other Party and their respective- former, current or future managers, officers, employees, representatives, agents, fiduciaries, attorneys, directors, shareholders, insurers, predecessors, parents, affiliates, successors, heirs, and assigns from any and all claims, liabilities, causes of action, damages, losses, demands or obligations of every kind and nature, whether now known or unknown, suspected or unsuspected, which such Party ever had, now has, or hereafter can, shall or may have for, upon or by reason of any act, transaction, practice, conduct, matter, cause or thing of any kind whatsoever, relating to or based upon, in whole or in part, any act, transaction, practice or conduct prior to the date hereof, except as to matters not dealing with or related to any investments (whether in equity or debt) made by the Settling Parties.  This release and discharge includes, but is not limited to, claims arising under federal, state, and local statutory or common law.  Each Party promises never to file a lawsuit or assist in or commence any action alleging any wrongful action against any other Party to this Agreement or asserting any claims, losses, liabilities, demands, or obligations released hereunder.

(h) **Known or Unknown Claims**. The Settling Parties understand and expressly agree that the Release set forth in Paragraph 7, upon its effectiveness, extends to all claims dealing with or related to any investments, loans or agreements made among the Settling Parties, except as explicitly excluded herein, of every nature and kind, known or unknown, suspected or unsuspected, past, present, or future, arising from or attributable to any conduct of the Settling Parties to this Agreement and their respective successors, subsidiaries, and affiliates, and all their employees, owners, members, shareholders, agents, officers, directors, predecessors, assigns, agents, representatives, and attorneys, whether known by such Party or whether or not such Party believes he may have any claims, and that any and all rights granted to such Party under Section 1542 of the California Civil Code or any analogous state law or federal law or regulations, are hereby expressly WAIVED, if applicable. Said Section 1542 of the California Civil Code reads as follows:

> **A general release does not extend to claims that the creditor or releasing Party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released Party.**

(i) **MISCELLANEOUS**

    a.  <u>No Assignment of Claims</u>. Each of the undersigned Settling Parties represents and warrants that with respect to the respective releases given by the Settling Parties hereto, no portion of any claim, right, demand, action, or cause of action released hereunder, and no portion of any recovery or settlement to which any Party might be entitled based upon any such claim, right, demand, action, or cause of action, has been assigned or transferred to any other person, firm, or corporation, in any manner, including by way of subrogation, operation of law, attorneys' lien, or otherwise. Each Party agrees to indemnify and hold harmless the other Party from all claims, expenses, and liabilities arising from a breach of the representations and warranties set forth in this paragraph.

    b.  <u>Representation of the Parties</u>.  Each of the Settling Parties represents and warrants that it has had an opportunity to consult legal counsel as to its rights and the consequences of signing this Agreement. The Settling Parties further represent and acknowledge that they fully understand and appreciate the meaning of each of the terms of this Agreement, they understand they may be waiving legal rights or claims by signing this Agreement, and they are voluntarily entering into this Agreement with a full and complete understanding of its terms and legal effect and with the intent to be legally bound by this Agreement.

    c.  <u>Integration.</u>  Each of the Settling Parties represents and warrants that, in executing this Agreement, it has relied solely on the statements expressly set forth herein, and has placed no reliance whatsoever on any statement, representation, or promise of any other Party, or any other person or entity, not expressly set forth herein, or upon the failure of any other Party or any other person or entity to make any statement, representation, or disclosure of anything whatsoever. The discovery by any Party, subsequent to the execution of this Agreement, of any facts not heretofore known to that Party, or that the facts or law upon which any Party relied in executing this Agreement was not as that Party believed it to be (other than as expressly set forth herein), shall not constitute grounds for declaring this Agreement void, avoidable, or otherwise unenforceable. This paragraph is intended by the Parties to preclude any claim (other than a material misrepresentation with respect to the representations set forth in Sections 5 and 6 of this Agreement) that either Party was fraudulently induced to enter this Agreement or was induced to enter this Agreement by a mistake of fact or law.

d. <u>Headings</u>.   The headings contained in this Agreement have been inserted for convenience only and in no way define or limit the scope or interpretation of this Agreement.

e. <u>Binding on Successors</u>.   This Agreement shall inure to the benefit of and be binding upon the heirs, representatives, successors, and assigns of each Party.

f. <u>Counterparts</u>.   This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

g. <u>Cooperation</u>.   Each Party hereto agrees to perform any further acts, and to execute and deliver (with acknowledgment, verification and/or affidavit, if required) any further documents and instruments, as may be reasonably necessary or desirable to implement and/or accomplish the provisions of this Agreement and the transactions contemplated herein.

h. <u>Authority</u>.   Each individual who signs this Agreement on behalf of any corporation or other entity represents and warrants that such corporation or other entity, acting through its duly authorized directors or officers, has specifically approved this Agreement and authorized him or her to sign this Agreement on behalf of such corporation or other entity.

i. <u>Awareness of Risk and Conflicts or Violations</u>.   The Parties agree, acknowledge, and understand they have the ability to evaluate the risks and merits of entering into the Agreement. Each Party represents that he or it has made his or its own independent judgment about the value of this Agreement and Attachments. Each Party further represents that he or it has sufficient sophistication to understand the consideration given in exchange for this Agreement and Attachments and has received sufficient legal and financial counsel on his or its own to execute this Agreement and Attachments.

j. <u>Confidentiality</u>. The Settling Parties agree to keep the terms of this Agreement confidential and all discussions surrounding this Agreement confidential and will not disclose same to any third parties except, when necessary, upon the request of their respective attorneys, and/or as otherwise required by law.  Such persons, upon disclosure, shall be expressly advised of the confidential nature of this Agreement and shall be directed to maintain it in strict confidence.

   i. Confidential Information. "Confidential Information" shall mean any all non-public or proprietary information relating to the disclosing party's products, services, technology or business. Examples of Confidential Information include, without limitation: current or future business plans or strategy, financial information, software, methodologies, specifications,

designs, customer lists or information, prospective and executed contracts, business opportunities, marketing or sales plans, and information regarding personnel, technology and products in development, whether any of the foregoing is embodied in hard copy, computer-readable form, or otherwise. The parties will make reasonable efforts to mark all Confidential Information as "confidential" or "proprietary" (or words of similar import) at the time of disclosure (whether on the above list or not). If Confidential Information is shown orally, it will be identified as confidential or proprietary at the time of disclosure and may also be summarized and appointed as confidential in a written memorandum delivered to Recipient within fifteen (15) days of the disclosure.

ii. Period and Level of Protection. The recipient of Confidential Information ("Recipient") has a duty to protect the Confidential Information shown under this Agreement for a period of two (2) years from the date the other Party (the "Disclosing Party") shows such information, provided that Recipient shall protect trade secrets indefinitely, until they are no longer properly defined as a trade secret under applicable law. Recipient shall protect the Confidential Information, and all trade secrets, by using at least the same degree of care as it uses to protect its own Confidential Information and trade secrets, but no less than a reasonable degree of care, to prevent unauthorized use, disclosure or publication.

iii. Authorized Use and Exchange Period. A Recipient shall use the Confidential Information solely to evaluate potential joint business opportunities (the "Purpose"). The Confidential Information will be exchanged beginning on the Effective Date (date signed by the last signng party) and until such time that the Parties decide if the entities create a joint product offering (the "Exchange Period"), but in no event longer than two (2) years from the date hereof.

iv. Restrictions. Recipient (a) shall not use, show, reproduce or allow the same except for the authorized Purpose; (b) shall not utilize the Confidential Information to compete directly or indirectly with PLM Health, (c) shall not reverse engineer, decompile, or disassemble Confidential Information for any reason; and (d) shall only disclose such information as directed by the Disclosing Party or to Recipient's partners, agents, lenders, consultants, attorneys, accounts, directors, officers, employees and representatives (collectively, "Representatives") having a reasonable need to know for the authorized Purpose herein. Prior to allowing such persons to receive or have access to any Confidential Information, the Recipient shall have entered into non-disclosure agreements with such persons having obligations of confidentiality as strict as those here.

v. Information Not Covered. This Agreement imposes no obligation upon a Recipient with respect to Confidential Information that (a) was in Recipient's possession without restriction before receipt from the Disclosing Party; (b) is or becomes a matter of public knowledge through no fault of Recipient in breach of this Agreement; (c) is rightfully received

by Recipient from a third party without, to the Recipient's knowledge, a duty of confidentiality on the third party; (d) is disclosed by the Disclosing Recipient; (e) is disclosed by Recipient with the Disclosing Party's prior approval; (f) is independently developed by Recipient or its Representatives without use of or access to the Confidential Information. If the Recipient is required by law or court order to show Disclosing Party's Confidential Information, Recipient shall give Disclosing Party advance notice of such requirement and shall supply reasonable aid in limiting or resisting such disclosure.

    vi.  Judicial Orders. In the event Recipient is directed to disclose the Disclosing Party's Confidential Information pursuant to a valid judicial order, such disclosure shall not be deemed to be a breach of this Agreement, provided the Recipient (a) provides timely notice of such order to the Disclosing Party and (b) cooperates with the Disclosing Party's efforts to contest or limit the scope of such order.

k.  <u>Other Provisions: Amendment.</u> The terms of this Agreement may not be modified, amended or otherwise changed in any manner, except by an instrument in writing executed by each of the Parties hereto.

l.  <u>Further Acts.</u> Each Party hereto agrees to perform any further acts, and to execute and deliver (with acknowledgment, verification and/or affidavit, if required) any further documents and instruments, as may be reasonably necessary or desirable to implement and/or accomplish the provisions of this Agreement and the transactions contemplated herein.

m.  <u>No Waiver.</u> The waiver or failure to enforce any provision of this Agreement shall not operate as a waiver of any future breach of any such provision or any other provision hereof.

n.  <u>Interpretation.</u> The language in all parts of this Agreement shall in all cases be construed simply as a whole and in accordance with its fair meaning and not strictly for or against any Party. The Settling Parties hereto acknowledge and agree that this Agreement has been prepared jointly by the Parties and has been the subject of arm's length and careful negotiation, that each Party has been given the opportunity to independently review this Agreement with legal counsel and other consultants, and that each Party has the requisite experience and sophistication to understand, interpret and agree to the particular language of the provisions hereof. Accordingly, in the event of an ambiguity in or dispute regarding the interpretation of this Agreement, this Agreement shall not be interpreted or construed against the Party preparing it, and instead other rules of interpretation and construction shall be utilized.

o.  <u>Governing Law</u>**.** This Agreement, and any and all disputes arising out of or relating to this Agreement, shall be governed by and construed in accordance with the laws of California, without regard to conflicts of law principles. No party shall contest the jurisdiction and venue of the Courts of the State of California, County of Los Angeles or the federal courts sitting in Los Angeles, California to hear and determine any dispute arising out of this agreement.

p.  <u>Severability</u>**.** The provisions of the Agreement are severable, and if any part of it is found to be unenforceable, the other paragraphs shall remain fully valid and enforceable.

q.  <u>Attorney's Fees and Costs.</u>  Each of the Settling Parties hereto shall bear its own legal fees, costs and expenses in connection with negotiating this Agreement. In the event of breach of any provisions of this Agreement, or if any Party is required to file any action or initiate any proceeding to enforce any covenants of this Agreement, the prevailing Party shall be entitled to seek recovery of its reasonable attorneys' fees and costs of litigation or other proceeding.

*[Signatures on following page.]*

IN WITNESS WHEREOF, the undersigned has caused this Assignment to be executed effective as of the first date set forth above.

| SA HOSPITAL ACQUISITION GROUP, LLC, a Delaware limited liability company | SA Hospital Real Estate Holdings - Jefferson LLC, a Delaware limited liability company |
|---|---|
| By _____<br>Jeffery Ahlholm, Member<br><br>By _____<br>Lawrence Feigen, Member<br><br>Dated: 2/4/23 | By _____<br>Jeff Ahlholm, Member<br><br>By _____<br>Larry Feigen, Member<br><br>Dated: 2/7/23 |
| MATTHEW HADDAD<br><br>By: _____<br>Dated: _____ | PLM HEALTH LLC, a California limited liability company<br><br>By: _____<br>Matthew Haddad, CEO<br>Dated: _____ |
| LAWRENCE FEIGEN<br><br>By: _____<br>Dated: 2/7/23 | JEFFREY AHLHOLM<br><br>By: _____<br>Dated: 2/7/23 |

10

PROMISSORY NOTE
Term Loan

$25,000.00

April 11, 2022

FOR VALUE RECEIVED, SA Hospital Acquisition Group, LLC, a Delaware limited liability company (the "SA Hospital Acquisition Group" or "Borrower"),promises and agrees to pay to the order of Fariborz Saidara, an individual (the "Lender"), in lawful money of the United States of America, the principal sum of up to TWENTY-FIVE THOUSAND AND NO/100ths DOLLARS ($25,000.00) or so much thereof as may be outstanding of even date hereof, between Borrower and Lender, with interest on the unpaid principal sum owing thereunder, all payable in the manner and at the time or times provided herein. Borrower's obligations under this Note shall be defined and referred to herein as "Borrower's Liabilities."  At request of Borrower, Lender transferred the principal sum to Modern HR, Inc.

The Note shall be repayable on demand and in the absence of demand shall be paid within 12 months from the date hereof. The Note shall accrue interest at the rate of 10% per annum.

 Prior to the occurrence of an Event of Default, all payments on account of this Note shall be applied: (i) first, to fees costs and other similar amounts payable to Lender, including late charges due hereunder, (ii) second, to accrued and unpaid interest on the principal balance owed, (iii) third, to any escrows, impounds or other amounts which may then be due and payable under the Loan Documents (as hereinafter defined), and (iv) last, to the unpaid principal balance of this Note.

Unless otherwise specified in writing by Lender, all payments hereunder shall be paid to Lender at 2355 Westwood Blvd, #1101, Los Angeles, CA 90064. All payments of principal and interest hereunder shall be paid by automatic debit, wire transfer, check or in coin or currency which, at the time or times of payment, is the legal tender for public and private debts in the United States of America and shall be made at such place as Lender or the legal holder or holders of the Note may from time to time appoint in the payment invoice or otherwise in writing, and in the absence of such appointment, then at the offices of Lender at the address set forth above. Notwithstanding the foregoing, the final payment due under this Note must be made by wire transfer or other final funds.

If an Event of Default shall have occurred and be continuing, Lender or the then-holder of the Note shall have the right and is authorized to apply payments, any other proceeds of Collateral and all other payments received by Lender against the Borrowers' Liabilities and any or all amounts payable hereunder or under the Loan Documents, in such order or manner as Lender or the then-holder hereof may in its sole discretion elect.

Following and during the continuation of an Event of Default, interest on the unpaid principal balance of the Note shall accrue at a rate equal to the Interest Rate plus five percent (5.00%) per annum (the "Default Interest Rate"). All payments of interest, fees, costs, expenses and other charges provided for in this Note or any other Loan Document that have not been paid to

Lender within five (5) days after the due dates thereof shall be added to the principal amount of the Note, and shall bear interest at the Default Interest Rate.

To secure the prompt payment to Lender of Borrower's Liabilities and the prompt, full and faithful performance by Borrower of all of the provisions to be kept, observed or performed by Borrower under this Note and the other Loan Documents, Borrower has executed and delivered to Lender that certain Security Agreement (" Security Agreement").

Additionally, to further secure the repayment of this Note, SA Hospital Real Estate Holdings – Jefferson LLC has executed and delivered to Lender a Guaranty executed contemporaneously with this Note (pursuant to which each has guaranteed the repayment of all amounts due under this Note.

All of the property interests described given by Borrower (or any other person) which now or hereafter secures the repayment of Borrower's Liabilities are referred to herein individually and collectively as "Collateral". This Note, along with all other notes, assignments, agreements, instrument or document heretofore, now and/or from time to time hereafter delivered by or on behalf of Borrower or the Guarantor to Lender (including, without limitation, this Note, Security Agreement and the Guaranties) are collectively referred to herein as the "Loan Documents". All of the agreements, conditions, covenants, provisions and stipulations contained in the Loan Documents which are to be kept and performed by Borrower are hereby made a part of this Note to the same extent and with the same force and effect as if they were fully set forth herein, and Borrower covenants and agrees to keep and perform them or cause them to be kept and performed, strictly in accordance with their terms.


**Defaults.**

Notwithstanding any cure periods described below, Borrower will immediately notify the Lender in writing when Borrower obtains knowledge of the occurrence of any default specified below. Regardless of whether the Borrowers have given the required notice, the occurrence of one or more of the following will constitute an "Event of Default":

(a) Nonpayment. The Borrowers shall fail to pay (i) any fees, charges, costs or expenses under the Loan Documents by five (5) days after the same becomes due; or (ii) any principal and interest amount hereunder when due.

(b) Nonperformance. Borrower or any guarantor of Borrower's Liabilities to the Lender ("Guarantor") shall fail to perform or observe any agreement, term, provision, condition, or covenant (other than a default occurring under (a), (c), (d), (e), (f), (g), (h), (i) or (j) herein) required to be performed or observed by the Borrower or any Guarantor hereunder or under any other Loan Document or other agreement with or in favor of the Lender, if the failure continues for a period of thirty (30) days after written notice from the Lender to the Borrowers of the same.
(c) Misrepresentation. Any financial information, statement, certificate, representation or warranty given to the Lender by Borrower or any Guarantor (or any of their representatives) in

connection with entering into this Note or the other Loan Documents and/or any borrowing thereunder, or required to be furnished under the terms thereof, shall prove untrue or misleading in any material respect (as determined by the Lender in the exercise of its judgment) as of the time when given.

d) Default with Respect to Loan Documents. A default shall occur with respect to any other of the Loan Documents:

(e)     Default on Other Obligations. Borrower or any Guarantor shall be in default under the terms of any loan agreement, promissory note, lease, conditional sale contract or other agreement, document or instrument evidencing, governing or securing any indebtedness owing by Borrower or any Guarantor to the Lender or any indebtedness owing by the Borrowers to any third party, and the period of grace, if any, to cure said default shall have passed.

(f)     Judgments. Any judgment greater than $10,000.00 shall be obtained against Borrower or any Guarantor which shall remain unvacated, unbonded or unstayed for a period of thirty (30) days following the date of entry thereof.

(g)     Inability to Perform; Bankruptcy/Insolvency. (i) Any of the Borrowers or any Guarantor or any Mortgagor shall die or cease to exist or dissolve; or (ii) any Guarantor shall attempt to revoke any guaranty of the Borrowers' Liabilities described herein, or any guaranty becomes unenforceable in whole or in part for any reason; or (iii) any bankruptcy, insolvency or receivership proceedings, or an assignment for the benefit of creditors, shall be commenced under any Federal or state law by or against the any of the Borrowers or any Guarantor or any Mortgagor; or (iv) the Borrowers or any Guarantor or any Mortgagor shall become the subject of any out-of-court settlement with its creditors; or (v) the Borrowers or any Guarantor or any Mortgagor is unable or admits in writing its inability to pay its debts as they mature.

(h)     Indictment. The indictment Borrower Or any director or responsible officer the Borrower under any criminal statute, or commencement of criminal proceedings against Borrowers, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture of any portion of the property of Borrowers.

(i)     Change of Control. A merger, change of control or consolidation Borrower with any other entity is consummated.

(j)     Adverse Change. There occurs any event or a change in the condition or affairs, financial or otherwise, of Borrower which, in the sole opinion of Lender, impairs Lender's security or ability.

of Borrower to discharge its obligations hereunder or any other Loan Document or which impairs the rights of Lender in Borrower's' Collateral securing the Borrower's Liabilities.

At any time during the existence of any Event of Default, at the option of Lender, the entire unpaid principal balance of this Note, and all interest accrued thereon, and all other sums due

by Borrowers hereunder or under the other Loan Documents shall, without prior written notice to Borrower, become due and payable immediately.

Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Note. Lender may hire or pay someone else to help enforce this Note, and Borrowers shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fee and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court. Any notice that Lender or Borrower is required to or may desire to give to the other hereunder shall be deemed given if handled pursuant to the notice provisions provided for herein.

Borrower agree that in any action or proceeding instituted to collect or enforce collection of this Note, the amount recorded on the books and records of the Lender shall be prima facie evidence of the unpaid principal balance of this Note; provided that the failure of the Lender to record any advance hereunder shall not limit or otherwise affect the obligation of the Borrower to repay the principal amount owing on this Note together with accrued interest thereon.

If any provision of this Note or the application thereof to any party or circumstance is held invalid or unenforceable, the remainder of this Note and the application thereof to other parties or circumstances will not be affected thereby, the provisions of this Note being severable in any such instance.

Any notice required hereunder shall be sent to the Borrowers via hand delivery, via nationally recognized over-night mail carrier, or via registered or certified U.S. mail, return receipt requested, sent to the address listed below (or any different address specified by Borrower in writing to Lender) and shall be deemed served: (a) on the date delivered if hand delivered or if sent by nationally recognized over-night mail carrier, or (b) two (2) days after mailing the notice if served by registered or certified mail. Notices to be served on Lender shall be served at 2355 Westwood Blvd, #1101, Los Angeles, CA 90064.

This Note and all other Loan Documents will be governed by and interpreted in accordance with internal laws of the State of California, except to the extent superseded by Federal law.

The invalidity of any provisions of this Note will not affect any other provision.
EACH OF THE BORROWERS HEREBY CONSENT TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITUATED IN LOS ANGELES COUNTY, CALIFORNIA AND WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS, WITH REGARD TO ANY ACTIONS, CLAIMS,DISPUTES OR PROCEEDINGS RELATING TO THE NOTE, THE COLLATERAL, ANY OTHER LOAN DOCUMENT, OR ANY TRANSACTIONS ARISING THEREFROM, OR ENFORCEMENT AND/OR INTERPRETATION OF ANY OF THE FOREGOING. BORROWER AND THE LENDER HEREBY JOINTLY AND SEVERALLY WAIVE

ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING RELATING TO ANY OF THE LOAN DOCUMENTS, THE BORROWER'S LIABILITIES THEREUNDER, ANY COLLATERAL SECURING THE BORROWER'S LIABLIITIES, OR ANY TRANSACTION ARISING THEREFROM OR CONNECTED THERETO.BORROWERS AND THE LENDER EACH REPRESENT TO THE OTHER THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY GIVEN.

Borrower, co-makers, sureties, endorsers and guarantors, and each of them, expressly waive demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of intent to accelerate the maturity hereof, notice of the acceleration of the maturity hereof, and bringing of suit and diligence in taking any action to collect amounts called for hereunder; such parties are and shall be jointly, severally, directly and primarily liable for the payment of all sums owing and to be owing hereon, regardless of and without any notice, diligence, act or omission as or with respect to the collection of any amount called for hereunder or in connection with any right, lien, interest or property at any and all times had or existing as security for any amount called for hereunder. This Note evidences all advances made, interest due and all amounts otherwise owed to Lender. This Note is executed in conjunction with the Loan Documents and is secured by the liens and security interests created under the Loan Documents.

No modification, waiver, estoppel, amendment, discharge or change of this Note or any related instrument shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, estoppel, amendment, discharge or change is sought.

This Note and all provisions hereof shall be binding upon Borrower, and their respective heirs, successors, assigns, legal representatives and all other persons or entities claiming under or through the Borrower.

If the interest provisions herein or in any of the Loan Documents shall result, at any time during the Loan, in an effective rate of interest which, for any month, exceeds the limit of usury or other laws applicable to the Loan, all sums in excess of those lawfully collectible as interest of the period in question shall, without further agreement or notice between or by any party hereto, be applied upon principal immediately upon receipt of such monies by the Lender, with the same force and effect as though the payer has specifically designated such extra sums to be so applied to principal and the Lender had agreed to accept such extra payment(s) as a premium-free prepayment.

Notwithstanding the foregoing, however, the Lender may at any time and from time to time elect by notice in writing to the Borrowers to reduce or limit the collection to such sums which, when added to the said first-stated interest, shall not result in any payments toward principal in accordance with the requirements of the preceding sentence. In no event shall any agreed to or actual exaction as consideration for this Loan transcend the limits imposed or provided by the law applicable to this transaction or the makers hereof in the jurisdiction in which the Property is located for the use or detention of money or for forbearance in seeking its collection.

Borrower shall pay, at the time of execution of this Note and the Loan Documents, all costs and expenses incurred by the Lender in connection with the preparation of this Note and the Loan Documents including, without limitation, reasonable attorneys' fees and time charges of attorneys who may be employees of the Lender or any affiliate or parent corporation of the Lender. Borrower shall pay any and all stamp and other taxes, UCC search fees, filing fees and other costs and expenses in connection with the execution and delivery of this Note and the other instruments and documents to be delivered hereunder, and agrees to save the Lender harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such costs and expenses. Borrowers also agree to defend (with counsel satisfactory to the Lender), protect, indemnify and hold harmless the Lender, its attorneys and agents (each, an "Indemnified Party") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and distributions of any kind or nature (including, without limitation, the disbursements and the reasonable fees of counsel for each Indemnified Party thereto, which shall also include, without limitation, reasonable attorneys' fees and time charges of attorneys who may be employees of the Lender or any parent or affiliated corporation of the Lender), which may be imposed on, incurred by, or asserted against, any Indemnified Party (whether direct, indirect or consequential and whether based on any federal, state or local laws or regulations, including, without limitation, securities, environmental laws and commercial laws and regulations, under common law or in equity, or based on contract or otherwise) in any manner relating to or arising out of this Note or any of the Loan Documents, or any act, event or transaction related or attendant thereto, the preparation, execution and delivery of this Note and the Loan Documents, the making or issuance and management of the Loan, the use or intended use of the proceeds of the Loan and the enforcement of the Lender's rights and remedies under this Note, the Loan Documents, any other instruments and documents delivered hereunder or thereunder, or under any other agreement between Borrower and the Lender; provided, however, that Borrower shall not have any obligation hereunder to any Indemnified Party with respect to matters caused by or resulting from the willful misconduct or gross negligence of such Indemnified Party. To the extent that the undertaking to indemnify set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall satisfy such undertaking to the maximum extent permitted by applicable law. Any liability, obligation, loss, damage, penalty, cost or expense covered by this indemnity shall be paid to such Indemnified Party on demand, and failing prompt payment, together with interest thereon at the Default Rate from the date incurred by such Indemnified Party until paid by the Borrower, shall be added to the obligations of Borrower evidenced by this Note. This indemnity is not intended to excuse the Lender from performing hereunder. The provisions of this section shall survive the closing of the Loan, the satisfaction and payment of this Note and any cancellation of this Note and the Loan Documents. Borrower shall also pay, and hold the Lender harmless from, any and all claims of any brokers, finders or agents claiming a right to any fees in connection with arranging the Note.

[SIGNATURE PAGE TO FOLLOW]

EXECUTED as of the date first written above.

BORROWER:

SA HOSPITAL ACQUISITIONS GROUP, LLC, a Delaware limited liability company
By: _____
Name: _____ Jeffrey K. Dahlholm
Its: _____ 4/11/2020