**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SA Hospital Acquisition Group, LLC, | Case No. 23-11367-BLS |
| Alleged Debtor. | **Re: D.I. 22** |

**RESPONSE IN OPPOSITION TO MORRISANDERSON & ASSOCIATES, LTD.'S**
**MOTION TO DISMISS OR ABSTAIN**

SA Hospital Acquisition Group, LLC (the "Alleged Debtor"), by and through its undersigned counsel, hereby files its *Response in Opposition to MorrisAnderson & Associates, Ltd.'s Motion to Dismiss or Abstain* (the "Response") and in support of this Response, respectfully states the following:

**INTRODUCTION**

1.     The matter presently before this Court is properly heard here as it is an involuntary proceeding under Chapter 11 (the "Involuntary Proceeding") – a simple and straightforward matter of aggrieved creditors (the "Petitioning Creditors") seeking the relief afforded them by the Bankruptcy Code. MorrisAnderson & Associates, Ltd. (the "Receiver") filed its *Motion to Dismiss or Abstain* [D.I. 22] (the "Motion") the present involuntary bankruptcy proceeding (the "Involuntary Proceeding"), in a transparent effort to avoid the restructuring efforts of the Alleged Debtor and to continue its goal of piecemeal liquidation of the Alleged Debtor through the Missouri receivership ordered on May 25, 2023 in the Missouri Circuit Court Twenty-Second Judicial Circuit (the "Receivership Order"). Irrespective of the Receivership Order, the Receiver intends to liquidate the Alleged Debtor, rather than seek a restructuring (despite the opportunities for a going-concern sale that would provide significantly more value to creditors than a piecemeal liquidation that would inure only to the benefit of American Health Systems, Inc. ("AHS"), rather

than other creditors with sizable claims but who do not benefit from the waterfall payment structure currently implemented in the receivership the Receiver has pursued after the Receivership Order). Dismissing the present case is not to the benefit of the estate (the "Estate"), the Alleged Debtor, nor the creditors, as it denies nearly all creditors any payment and may well result in a creditor preferred by the Receiver to intervene the administration of the Estate and buy it for far below its worth – further aggrieving other creditors and an underserved inner-city community in need of healthcare options.

## JURISDICTION AND VENUE

2. This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334.

3. This is a core matter pursuant to 28 U.S.C. § 157(b)(2). The Alleged Debtor consents to this Court entering final orders and judgments with respect to this Motion.[1]

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

## BACKGROUND[2]

5. South City Hospital ("SCH"), formerly known as St Alexius Hospital, was purchased on January 19, 2021 in a Bankruptcy 363 Sale from the Americore bankruptcy estate. Former SAH and SARE Managing Member Ben Klein ("Klein") exclusively managed and operated South City Hospital from January 19, 2021 to June 13, 2021, at which time Klein sold all his interest in SAH and SARE. As a result, Ahlholm and Feigen became Co-Managing Members and 90% owners of SAH[3] and SARE effective June 14, 2021. *See Ahlholm*

---

[1] Intriguingly, the Motion appears to *speak for* the Alleged Debtor. This is highly presumptuous, given that the Receiver may not even have standing to contest the present bankruptcy case.

[2] For a more complete recitation of the facts that have brought the Alleged Debtor before this Court, please see the *Declaration of Jeffrey Ahlholm*, attached hereto as **Exhibit A** (the "Ahlholm Declaration and the *Supplemental Declaration of Jeffrey Ahlholm*, attached hereto as **Exhibit B** (the "Supplemental Declaration").

[3] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the *Ahlholm Declaration* or the *Supplemental Declaration*.

*Declaration*, at 1:19-24.

6.　　On December 29, 2021, SARE closed on a 99-year ground year lease financing with Twain GL XXV, LLC ("Twain")　with SARE as the master tenant.　*See Ahlholm Declaration*, at 1:25-26.　SAH, the operating entity for South City Hospital, entered into a sublease with SARE. *Id*. at 2:26-27.　Per the Twain closing documents, SARE prepaid rent to Twain for the entire 2022 calendar year. *Id*. at 2:27-28.

7.　　On May 24 or 26, 2022 SAH entered into both an Asset Purchase Agreement ("APA") and Interim Management Agreement ("IMA") for the sale of substantially all of the assets of SCH to AHS. The substantial economic terms included in the APA include the payoff or assumption of an approximate　$3.25 million senior secured loan on SAH, payoff or assumption of an approximate balance of $2.5 million on a senior secured equipment (NFS sale-leaseback) financing that was closed in April 2021 by Klein on behalf of SAH, plus AHS's assumption of approximately 50% of South City Hospital's approximate $12 million in Accounts Payable, consisting of unsecured debt/creditors, payroll and tax liabilities as of the May 24 2022 APA signing date, plus agreement to add up to $15 million in new financing, of which approximately $5.4 million ($5,400,000.00) would be paid to SAH creditors.　As of the date of AHS's withdraw of its last renegotiation offer on the APA a year later in May 2023, AHS performed on only one of the above economic terms and never filed the required change in ownership. *Id*. at 3:1-14.

8.　　At the time of the signing of the APA, Ahlholm and Feigen had provided over $6 million in personal cash and collateral to keep SCH operating, along with six individual bridge lenders with an aggregate outstanding balance of over $2 million ($2,000,000.00). *Id*. at 3:15-18.

9.　　The IMA provided for AHS to assume all operational and financial responsibility

for the hospital business after May 24, 2022.  *Id*. at 3:19-22.

10.    There were two (2) senior secured liens at the time of the APA – Fleet Funding and NFS Equipment Finance. Under the terms of the APA, AHS was obligated to satisfy the Fleet loan.  AHS was later informed that AHS assumed the Fleet Loan/Note as opposed to a full payment and satisfaction of such loan as required by the APAAs such, AHS should not be a secured creditor of SAH.  *Id*. at 2:21-25.

11.    Soon after the APA was signed and throughout the period of its management under the IMA, AHS represented to the public that it had already purchased and owned the hospital through its website, various announcements and through emails to SCH vendors.  *Id*. at 2:26-3:1.

12.    As of June 2022, Twain wanted to exit its 99-year Ground Lease financing. Representatives of Twain stated that it had a bad experience with another hospital financing and would no longer finance hospitals going forward. In July 2022, Ahlholm and Feigen traveled to AHS corporate offices and arranged a call between AHS and Twain to discuss together in person a mutually acceptable plan to transition the financing provided by Twain to AHS. During that conversation, AHS agreed to buy out Twain's position and asked to have until June 2023 to raise the capital to execute the property purchase. Twain offered until September 2022, which was eventually extended to November 2022. *Id*. at 3:2-9.

13.    By August 2022, HAS became very concerned over AHS's lack of performance under the terms of the APA.  For example, AHS had not taken to action to obtain the necessary regulatory approvals for the purchase of the hospital, failure to file a Change of Ownership with the Missouri Dept of Health to transition the hospital license. Concerned by the numerous breaches of AHS by the end of August 2022, SAH retained Missouri local legal counsel and delivered a formal Breach Notice to AHS.  To resolve the matter, SAH provided various

transaction alternatives to SAH. Twain was copied on all letters of default delivered to AHS along with all proposed amendment to the APA suggested by SAH. *Id*. at 3:10-18.

14.     At the end of December 2022, out of growing frustration over AHS not turning over SAH's own financial records that were necessary for the filing of tax returns to finding replacement real estate financing for Twain, SAH decided to try and build some financial data from the SAH bank accounts at US Bank, as well as to at least try to gain an understanding of monthly revenue and expense breakdowns during the IMA period. It was at this time SAH discovered that AHS had been sweeping all collected revenue out of the SAH operating accounts and wiring all SAH monies to AHS's own bank accounts at UMB Kansas City. In effect, AHS was comingling SAH monies with its own. Per the US Bank records, AHS swept over $37 million dollars ($37,000,000.00) out of the South City Hospital operating accounts to AHS own bank accounts without ever providing notice to SAH. To date AHS has provided no transparency whatsoever on how all that money was spent, including AHS ignoring SAH's repeated requested for payroll records, which appear to have greatly increased in size during the AHS IMA period. *Id*. at 4:12-24.

15.     AHS withheld the release of SAH's own financial records, despite numerous written demands by SAH legal representatives to turn over the records. Not having any current operating data or performance metrics (which were never shared) significantly impaired SAH's ability to both market the hospital for a replacement buyer and secure replacement financing for Twain on the Ground Lease. AHS would eventually provide SAH with incomplete 2021 and May 2022 Year to Date financial and operating statistics in January 2023. AHS would later provide 2022 annual financial data in March 2023, but the information from AHS never included any census information, payroll information, the general ledger, or other essential operating

statistics that are all automatically generated by the hospital's software systems. *Id*. at 4:25-5:6.

16.     By May of 2023, Twain sought a resolution to these problems. SAH utilized what South City Hospital financial data it was provided by AHS to recruit a new buyer - My Better Today, LLC.   SAH received Twain's notice that it intended to put SAH and SARE into receivership due to non-payment of rent. SAH attempted to negotiate with Twain to allow for the new buyer.  Twain responded to SAH's request with a list of demands with a timeline that could not be reasonably met as AHS in bad faith would not produce the required information.  SAH provided all deal documents related to the purchase of the hospital by My Better Today, LLC to Twain.  SAH and My Better Today were committed and confident that the removal of AHS would allow for Twain's full takeout by the end of 2023.  Despite this, Twain demanded an immediate takeout of its position. *Id*. at 5:24-6:6.

17.     After the appointment of the Receiver in June, the Receiver agreed to make monthly lease payments to NFS to keep the equipment at the hospital.  Despite this, after making *one* payment of eighty-five thousand dollars ($85,000) to NFS, the Receiver notified NFS that it would not continue making cash payments and allowed Twain to sweep the available cash from the SCH bank accounts and would allow NFS to remove the hospital equipment from SCH.  *Id*. at 6:23-27.

18.     On August 11, 2023, due to concerns about the continuing administration of the receivership and concerns regarding high fees being paid to the Receiver and its advisors, a Chapter 11 proceeding in the United States Bankruptcy Court for the Central District of California was filed (the "California Bankruptcy").  The California Bankruptcy was subsequently dismissed.

19.     On August 31, 2023, feeling that the Receiver was not managing the affairs of the estate properly under the Receivership Order the Petitioning Creditors filed the present

Involuntary Proceeding under Chapter 11 of the United States Code with this Court.

20.     On September 11, 2023. the  Receiver filed the Motion, seeking dismissal of this properly-filed Involuntary Proceeding.

## THE ALLEGED DEBTOR HAS STANDING TO OPPOSE THE MOTION AND IS THE PROPER PARTY TO APPEAR BEFORE THE COURT

**I.      Section 303(d) of the Bankruptcy Code, governs who can answer an involuntary petition and provides the Alleged Debtor with standing in the present involuntary proceeding.**

21.     Section 303(d) provides that "the debtor, or a general partner in a partnership debtor that did not join in the petition, may file an answer to a petition under this section."  11 U.S.C. § 303(d).  *See In re Earl's Tire Service, Inc.*, 6 B.R. 1019 (D. Del. 1980) (noting that a creditor or other entity may not attempt to confer on itself standing to oppose an involuntary bankruptcy petition in characterizing its claim as attack on subject matter jurisdiction of Bankruptcy Court); *In re New Era Co.*, 115 B.R. 41, 45 (Bankr. S.D.N.Y. 1990) (citing Federal Rule of Bankruptcy Procedure 1011(a) and noting that the rule compliments the precept that only "the debtor . . . may file an answer to a petition under [section 303]"); *In re QDN, LLC*, 363 Fed. Appx. 873, 876 (3d Cir. 2010) (same – observing that parties not referenced in 303(d) cannot bootstrap their way into having the ability to answer an involuntary petition or otherwise contest it); *In re Sun World Broadcasters, Inc.*, 5 B.R. 719, 720-721 (Bankr. M.D. Fla. 1980) (observing that 303(d) would normally prevent a receiver from being able to respond to an involuntary petition, but the debtor corporation had responded to the petition and *joined in* the receiver's arguments, a far cry from the facts of the present case).  Based on the foregoing, the Debtor clearly has standing in the present case under a plain reading of 303(d).  Additionally, there are grave doubts as to the ability of the Receiver to have any standing under Section 303(d) under a plain reading of the statute.

22.     The Third Circuit's employment of the rule of judicial interpretation known as

Strict Constructionism bolsters the argument that *only* the Debtor may respond to the involuntary petition. *See, e.g., Orexigen Therapeutics, Inc.*, 596 B.R. 9, 22 n. 13 (Bankr. D. Del. 2018) (discussing the Third Circuit's use of strict construction in bankruptcy cases); *Interbusiness Bank, N.A. v. First Nat'l Bank*, 328 F.Supp.2d 522, 528-529 (M.D. Pa. 2004) (collecting cases and noting the use of strict construction as the canon for interpretation in the Third Circuit); *U-Haul Int'l, Inc. v. Gross Metal Prods. (In re Gross Metal Prods.)*, No. 97-30376 DAS, 1997 Bankr. LEXIS 2041 (E.D. Pa. Dec. 16, 1997) (same). The Strict Constructionism that is the rule in the Third Circuit also forecloses the ability of the Receiver to take actions with respect to the Estate property. It also raises serious questions regarding the Receiver's standing in the present matter postpetition. While applications of Strict Constructionism typically carry with them the admonition that a court should not pursue the letter of the law against principles of common sense, here there is no such issue: The Receiver is *not* the Debtor and, therefore, cannot answer the petition for the Debtor. To do so is an impermissible attempt to prevent access to the Bankruptcy Court. Accordingly, the Receiver's argument that it somehow steps into the shoes of the Debtor also falls flat under the strict construction standard in the Third Circuit.

## II.    Under 11 U.S.C. § 543, the Receiver does not stand in the shoes of the Debtor for the purposes of answering an involuntary petition.

23.    Under 11 U.S.C. § 543, the Receiver is a "custodian," as that term is defined under 11 U.S.C. § 101(11). This designation forbids the Receiver from taking any action except as necessary to preserve assets or property. *In re O'Reilly & Collins*, No. 12-33016, 2013 Bankr. LEXIS 3521 *5 (Bankr. N.D. Ca. Aug. 26, 2013) ("Upon the filing of the involuntary petition, the liquidator was forbidden from making any distribution of property or taking any action in the administration of the purported debtor's estate, except such action as is necessary to preserve such property.") (internal quotation marks omitted); *In re 245 Assocs.*, 188 B.R. 743, 747-748 (Bankr.

S.D.N.Y. 1995) ("Ordinarily, the commencement of the case supersedes the custodianship. Once the receiver becomes aware of the filing of the petition, including an involuntary petition, he cannot make any further disbursements or take action except to do what is necessary to preserve the property"). Because the Receiver is clearly a custodian, as defined by the Bankruptcy Code, it does not step into the shoes of the Alleged Debtor, nor does it gain a new suite of rights and powers. The Receiver cannot seek to substitute itself for the Alleged Debtor in an involuntary proceeding and must only manage the assets as necessary to preserve them for a debtor and other interested parties, such as creditors who now benefit from that debtor's fiduciary duties.

24.     The Receiver is divested of power over the Alleged Debtor and the Estate by the filing of the involuntary proceeding. This result is consonant with the exact verbiage of 11 U.S.C. § 543, which explicitly differentiates a "debtor" from a "custodian," stating that the latter "may not make any disbursement from, or take any action in the administration of, property of the debtor." The precise language of Section 543 marks the debtor as a different entity from a custodian *and* also states that the custodian does not rise to obtaining the special rights and duties of that debtor, further emphasizing the separation of the debtor from the custodian and their differing powers. *See Szwak v. Earwood (In re Bodenheimer, Jones, Szwak, & Winchell L.L.P.)*, 592 F.3d 664 (5th Cir. 2009) (discussing Section 543 and stating that "nowhere in the relevant bankruptcy statutes does it state that a superseded custodian is authorized to oppose a bankruptcy petition or to employ the estate's resources in doing so.").

25.     While a receiver takes legal possession of property from a distressed entity, it does not become the owner of that property. *Papadopoulos v. WBCMT 2006-C29 NC Office, LLC*, No. N17C-12-209 CLS, 2018 Del. Super. LEXIS 417 at *5-6 (Del. Super. Oct. 1, 2018) ("[A] receiver does not in itself change the title to the property or determine any rights therein.") (citing

75 C.J.S. Receivers § 89); *Propper v. Clark*, 337 U.S. 472 (1949) (appointment of a receiver does not change property title despite the receiver possessing the property).  These cases and their holding that property title does not – without *more* – pass to the receiver merely due to the receiver possessing the property, is consistent with the language of Section 543.  The Receiver has not demonstrated that such a "more" exists to allow title to the Estate to pass over to it.

26.     Because title to the property of the estate does not pass automatically to the receiver, when an involuntary petition is filed, the receiver, as a custodian, must turn the property over to the bankruptcy estate, pursuant to  28 U.S.C. § 1334(a).  Section 1334(a) affords the district court exclusive jurisdiction over the bankruptcy estate.  *See In re Roxwell Performance Drilling, LLC*, No. 13-50301 RLJ, 2013 Bankr. LEXIS 5345 at *12 (Bankr. N.D. Tex. Dec. 20, 2013) ("The jurisdiction over bankruptcy cases lies exclusively with the district courts"); *Green v. Mitsui Sumitomo Ins. Co. (In re TK Holdings, Inc.)*, No. 17-11375 BLS, 2021 Bankr. LEXIS 3462 at *15-16 (Bankr. D. Del. Dec. 20, 2021) ("Section 1334 grants jurisdiction over bankruptcy cases and proceedings to the district courts"); *Williams v. Sears, Roebuck & Co. (In re Williams)*, 244 B.R. 858, 865-866 (S.D. Ga. Jan. 19, 2000) ("The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate"); *Lawson v. NationsBanc Mortg. Corp. (In re Lawson)*, 2000 Bankr. LEXIS 2208 at *26-27 (S.D. Ga. Sept. 21, 2000) ("Jurisdiction over bankruptcy cases is granted to the district courts by 28 U.S.C. § 1334(a)").  It is clear from the exclusive jurisdiction of district courts over bankruptcy matters, and through the order of reference, the bankruptcy court,[4] that the Receiver must turn over control of the property of the bankruptcy estate to the Alleged Debtor under the jurisdiction of the District

---

[4] *See District of Delaware Amended Standing Order of Reference*, dated February 29, 2012.

of Delaware. It remains unclear whether the Receiver has done so, given that it swept the Alleged Debtor's bank accounts to pay itself significant administration fees and to pay other expenses *postpetition*, rather than merely managing the property and assets to prevent loss before the Alleged Debtor could take control of them in the present case.

27.    The language of the Receivership Order issued in Missouri also does not confer title to the Estate upon the Receiver. Nowhere in the Order, nor anywhere in Mo. Rev. Stat. § 515.510 (the state receivership statute) is title to the assets of the Estate discussed. This further cuts against the Receiver having standing to respond to the involuntary petition.

28.    While the Receiver could argue that it has standing here on some *other* basis, the statement that the Receiver is the only proper party is entirely wrong and serious questions remain as to whether the Receiver has *any* standing at all in the present case.

**III.    Dismissing the case or otherwise abstaining from the present matter is not in the best interests of the Debtor, its Creditors, the Estate, and other parties in interest and would be a grievous violation of 11 U.S.C. § 305(a).**

**A.    This Involuntary Proceeding Presents an Opportunity for Restructuring Rather than Liquidation.**

29.    At no time in the history of the Alleged Debtor, both prepetition and postpetition, has the Receiver indicated any interest in a going-concern sale that would maximize value for the various creditors and interested parties in the case. The Receiver cites – disingenuously – the case *In re Williamsburg Suites, Ltd.*, 117 B.R. 216, 218 (Bankr. E.D. Pa. 1990) for the proposition that a dismissal of the case is appropriate even despite the petitioning creditors establishing a case for an involuntary bankruptcy. That case can be easily distinguished and bears little resemblance, both legally and factually, to the present scenario. *Id.* That case dealt with a partnership, rather than a distressed corporation. *Id.* The partnership possessed de minimis assets, a restructuring was clearly impossible, and there was little chance of securing a meaningful sale. *Id.* That is

clearly not the case here. There are substantial assets that provide the basis for a going-concern sale that not only produces significant value for creditors and stakeholders, but also essential services for an underserved community. *See Supplemental Declaration*, at 3:25-4:4 (discussing the significant community value that this restructuring can and will provide). This can only be effectuated through a Chapter 11 restructuring rather than a piecemeal state court liquidation proceeding. See *Ahlholm Declaration*, at 6:26-7:27.

> **B. The Factors the Third Circuit Uses in Determining Whether to Dismiss a Bankruptcy Weigh Overwhelmingly in Favor of Allowing this Involuntary Proceeding to go Forward.**

30.     The high fees paid to the Receiver combined with the sale of the assets piecemeal as opposed to seeking a going-concern sale are troubling enough in their suggestion that the Receiver is behaving in a manner that does not rise to the level of a fiduciary. *See Supplemental Declaration*, at 2:17-22 ("The $530,000 in professional fees charged by the Receivership through July, plus the $150,000 per month estimated to wind down the hospital over 5 months," is quite high for the liquidation activities conducted and "is actually greater in cost than the 6-month Management Consultant contract to restart and ramp up the hospital operations to maintain and create greater value for SA Creditors"). This is unsurprising and is only made worse by the fact that some courts have held that receivers do not have duties that resemble those of debtor in possession. *See PNC Bank, N.A. v. OCMC, Inc.*, No. 06-755 LJM, 2010 U.S. Dist. LEXIS 98368 at *17-19 (S.D. Ind. Sept. 20, 2010) (noting the limited scope of *any* fiduciary duty a receiver could possibly owe and that it only protects certain creditors, by way of comparison with a debtor who has a fiduciary duty to all creditors). The broad and well-defined fiduciary duty to maximize the value of the Estate's assets in this proceeding make it an inherently better forum for a disposition of assets than a state court receivership where the duties are ill-defined and easily-arbitraged or otherwise abused. *Id*. This is particularly evident given the Receiver's preferential

behavior towards certain creditors. *See Ahlholm Declaration*, at 6:7-9, 6:10-16, 6:23-7:11, 8:3-8.

31.     The present case is most properly administered by the Bankruptcy Court to prevent additional destruction of assets and to properly execute the Debtor's fiduciary duties to creditors. *See, e.g., In re R.H. Macy & Co.*, 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994) (debtor has a "fiduciary duty to maximize estate assets"); *In re Enron Corp.*, 279 B.R. 695, 701 (Bankr. S.D.N.Y. 2002) (same; and noting that this fiduciary duty is empowering and critical for creating value for creditors); *see generally* 11 U.S.C. § 363.  Not much has actually occurred during the pendency of the receivership, which is a blessing in disguise, as had the Receiver managed to dispose of more of the Debtor's assets (particularly vital healthcare equipment) prior to the involuntary petition, there may have been no hope to avoid a liquidation. *Ahlholm Declaration*, at 7:7-11 ("The removal or auction of the equipment would all but eliminate the ability to sell the business to a new operator").[5]

32.     While the Receiver repeats the continual refrain that the company was mismanaged prior to the Receiver's appointment, the Petitioning Creditors would not have filed the involuntary proceeding if they had not been aggrieved by the Receiver's conduct while disposing of the company.  *See Ahlholm Declaration*, at 8:3-8 ("There are three significant lawsuits that must be filed on behalf of SAH creditors that will result in a minimum net recovery of $5.5 million, and potentially many multiples of that minimum baseline" and "SAH and [its] Creditors have no confidence that these matters will ever be pursued by the receiver").  Further, the Receiver takes pains to claim mismanagement plagued the Debtor prior to its appointment, but the cause of the

---

[5] *See also Ahlholm Declaration*, at 7:4-11. "The equipment is much more valuable than the current NFS balance, especially as it relates to the replacement value to the prospective buyer" and this strategy of equipment sale "would also put in serious jeopardy, if not fully eliminate, the chance to keep over $10M in residency slot payments intact over the next 3-4 years, again denying SAH creditors of a valuable form of recovery."

mismanagement and the identity of the perpetrator is deliberately left unclear beyond vague insinuations that members of the Debtor were involved,[6] when in fact, it was American Health Systems – a party interested in buying the Debtor's assets as cheaply as possible. *See Ahlholm Declaration*, at 6:7-9 ("SAH has declarations from South City Hospital employees who were directly told by a senior AHS and South City employee 'don't worry about the receiver, that's just so that Mike (Sarian, owner of AHS) can buy the assets cheaper'") (parenthetical and internal quotation marks in original). This dirge is unavailing.

33.     Dismissing the involuntary proceeding would essentially allow AHS to dodge its obligations under the APA, permitting it to receive the benefits of the Receiver's currently-planned liquidation, while leaving other creditors with no recovery. Even from the beginning of the negotiations over the APA, AHS sought a number of changes to the APA, which dragged the negotiations out as AHS's financial situation worsened. *See also Ahlholm Declaration*, at 2-3. The negotiations were marked by AHS's demand for numerous changes to the APA after it had taken over the control and operations of the hospital. *Id.* During the negotiations, APA refused to communicate with SAH on at least two occasions regarding requested amendments to the APA. *Id.* at 3:21-22. SAH attempted to complete the APA by providing a twelve (12) million dollar discount in the APA, only to find that AHS, subsequent to the execution of the APA, discount included, ceased making the necessary monthly equipment financing payments. *Id.* at 3:19-27. AHS would later invoke its right to have a receiver appointed, whereupon a liquidation conducted almost solely for its own benefit began. *Id.* at 5:26-6:22. While the Debtor wishes to restructure the hospital to provide more value for the *all* creditors, the Receiver's goal from the start – and

---

[6] *Ahlholm Declaration*, at 5-6 (discussing the various misdeeds of AHS, including failure to pay equipment financing fees).

AHS's goal before then – has been the piecemeal sale of assets to enable an enterprise purchase for pennies on the dollar.

34.     In support of its restructuring goals, the Debtor is close to securing a debtor-in-possession financing facility (the "DIP Facility") that will allow it to finance its operations through a sale process, maximizing the value for creditors by securing a higher sale price as a "turn-key" going concern.  *See Ahlholm Declaration*, at 7:14-26.  By executing a going-concern sale that is not merely the sale of a building full of empty rooms,[7] the Debtor will be better-positioned to make higher distributions to the various creditors.

35.     While the receivership in Missouri *is* available as a method of disposing of the assets of the Alleged Debtor, it does not have the same strictures that this bankruptcy proceeding possesses.  Notably absent is the imposition of a fiduciary duty on the Receiver requiring it to maximize the value of the Estate for creditors.  *See* Mo. Rev. Stat. § 515.510 (statute providing the right to appoint a receiver in certain situations and enumerating powers – notably, the only "duty" discussed is the duty to "keep and preserve" various types of property; nowhere is a fiduciary duty discussed).  While the Receiver is a custodian of the Alleged Debtor, and has some limited duties to the company prepetition, there is no overriding, animating requirement equivalent to the fiduciary duty to maximize the value of the estate as there is in this involuntary proceeding.  *See, e.g., Enron*, 279 B.R. at 701 ("[t]he Debtors specifically reference their fiduciary duty to maximize the value of all their assets for the benefit of their creditors"), and *R.H. Macy*, 170 B.R. at 77 (fiduciary duty to maximize value for all creditors it can even require not complying with a covenant that would "would prevent all creditors of the estate from the benefit

---

[7] *Ahlholm Declaration*, at 7:12-13 ("SAH will provide minimum of $6 million in DIP financing against all of the available South City receivables").

of the Debtor's discharge of its fiduciary duty").  There is no equivalent duty for the Receiver, which makes the involuntary proceeding an inherently superior venue for administering the Alleged Debtor's assets.  The fiduciary duty owed by the Alleged Debtor precludes it from abusing creditors for the benefit of the receiver itself and for its "preferred" creditors and stake-holders.[8]  This, *alone*, makes the involuntary proceeding a superior forum.  *See, e.g., In re Family Health Servs., Inc.*, 101 B.R. 618, 626 (Bankr. C.D. Ca. 1989) ("If the choice is between a state liquidation [of the debtor] and a . . . federal reorganization . . . the practical policy factors support the conclusion that a proceeding under chapter 11 is the preferred method of reorganizing."); *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 419-420 (5th Cir. 2009) (noting the usefulness of the special tools of bankruptcy and fiduciary duties).

36.     The Receiver has, since the petition, engaged in a pattern of activity aimed at lining its own pockets at the expense of other parties to the receivership, and, now, the involuntary proceeding.  It has swept the bank accounts of the Alleged Debtor and it has provided advantageous terms to certain preferred buyers while behaving skinflinted towards others. *Ahlholm Declaration*, at 4:17-21, 6-7.  This is entirely predictable under the terms of the receivership, where the Receiver has received broad free reign to act as a liquidator – not as a fiduciary.  The Receiver has been attempting to parcel off assets piecemeal, as opposed to seeking a sale of the Alleged Debtor and its enterprise as a going concern at a significantly higher value. *Id*.

37.     A significant factor in the decision to dismiss a bankruptcy or otherwise abstain from adjudicating the dispute is the question of which forum provides the most equitable means

---

[8] It is clear that the Receiver and some of the more senior creditors of the Debtor, are attempting to liquidate the Debtor in a piecemeal fashion, in order to pay only the most senior "in the money" creditors, while avoiding paying the more junior claim holders. *Ahlholm Declaration*, at 6-7.

of disposing of the assets.  It is clear that, due to the fiduciary duties owed to all creditors by the Alleged Debtor in this involuntary proceeding, that it is the better forum.  *See generally, PNC Bank, N.A. v. OCMC, Inc.*, No. 06-755 LJM, 2010 U.S. Dist. LEXIS 98368 at \*17-19 (S.D. Ind. Sept. 20, 2010).  There is no particularized interest favored above another, or allowing a receiver to run up fees while accomplishing little.  *See* 11 U.S.C. § 363, *Enron*, 279 B.R. at 701, *compare with OCMC* at \*17-19.  Where a receiver may be appointed according to contractual terms or other methods, a debtor in possession has a duty to *everyone* and has incentives to seek out the best outcomes.  The DIP Facility will allow the Debtor to operate in a manner that maximizes the most value for the most creditors, as opposed to allowing a private party to favor various creditors and pay itself fees that have no relationship to the work (if any) accomplished.  This involuntary proceeding provides the most equitable and most just means of providing returns to creditors.

38.     Not only is the present involuntary proceeding a more equitable forum to pursue relief and recovery in, it also has another inherent advantage over a receivership.  That advantage is the ability to sell assets free and clear of encumbrances and liabilities, 11 U.S.C. § 363.  This section of the Bankruptcy Code provides incredible incentives to asset purchasers and it allows liabilities to remain in the estate and attach to the proceeds of the sale, which should be managed through a competitive auction process, thus providing additional value to creditors.  The ability to conduct free and clear asset sales and relieve the Estate from encumbrances almost definitionally provides more value to creditors than any receivership.  Additionally, due to the manner in which the asset sales must be conducted according to the Bankruptcy Code, favoritism

by the Receiver will be eliminated.  *Id.*[9]  Given the high fees being paid to MorrisAnderson,[10] it may be the only entity involved in these proceedings that experiences any prejudice – particularly as it will no longer be allowed to sweep up the Alleged Debtor's bank accounts for dubious payments for work which only appears to have helped though creditors at the top of the payment scheme.

39.     It is the contention of the Alleged Debtor that, given the above, the involuntary proceeding provides significantly more money to creditors and on a more equitable basis with more transparency and better opportunities to work out quarrels.

40.     As has already been discussed, the Receiver cannot and must not take steps to attempt to implement a liquidation any further.  The Receiver is blocked by the automatic stay from attempting any additional liquidation maneuvers.  *See* 11 U.S.C § 362.  Even were the receiver to attempt to further the liquidation, it is not in the best interest of the Estate.  The Estate has value as a going-concern and "turn-key" operation.  *Ahlholm Declaration*, at 7; *see also Supplemental Declaration*, at 3:4-4:4 (discussing the significantly enhanced value of a going-concern sale).  It has very little value should the Receiver attempt to continue to sell the enterprise off piecemeal to its preferred buyers.  *Id.*  Not only do these preferred creditors seem to receive sale deals that no one else is offered, the Receiver's preferred creditors seem to be intent on buying

---

[9] Bankruptcy sales procedures are tightly controlled under Section 363 and provide a fair, impartial process for sales that is unlike any system required under state law, particularly due to the requirement that there be a finding of good faith throughout the sale process under 363(f) before the sale can be finalized.  *See, e.g. In re Flying J Inc.*, 2010 Bankr. LEXIS 6558 (Bankr. D. Del. Mar. 24, 2010) (extensive discussion of the fairness and good faith requirements of a bankruptcy sale process); *Pursuit Capital Mgmt. Fund I, L.P. v. Burtch (In re Pursuit Capital Mgmt., LLC)*, 874 F.3d 124, 135-136 (3d Cir. 2017) (discussing good faith and the prohibition on collusion between potential buyers); *In re Pursuit Capital Mgmt.*, 2016 U.S. Dist. LEXIS 130980 at *11-16 (D. Del. Sept. 26, 2016) (collecting case law on sales under Section 363, and discussing what is meant by "good faith" and the protections required in Section 363 sales to prevent favoritism and maximize estate value).

[10] *See Supplemental Declaration*, at 3:16-3:24 (discussing the very high fees run-up by the Receiver in its two months of appointment and administration of the receivership estate; *see also Ahlholm Declaration*, at 7.

the enterprise at a massive discount compared to the assets' real value.  *Id.*

41.     The Receiver appears to take issue with the timing of the involuntary proceeding. Yet, this involuntary proceeding is a natural result of the aggrieved circumstances some of the creditors in both the Receivership and the present proceedings in which they have found themselves.  The involuntary petition was a direct reaction to the abuses of certain creditors at the hands of the Receiver, a lack of accountability, and a fear that a strong albeit troubled business would be parceled in what amounts to a series of "fire sales."  *Ahlholm Declaration*, at 6:27-7:1-11 (discussing the parceling off for sale by NFS of equipment for low value).

42.     As has been said, the Receiver is open about acting as a liquidator of the Alleged Debtor, not as a fiduciary interested in an enterprise sale or a going-concern sale of a turn-key entity that could produce real value for creditors and other interested parties.  Allowing the involuntary proceeding to continue will rectify the inconsistency of the Receiver's position and protect creditors.  *Id.* at 7 (generally discussing the value of a going-concern sale through the bankruptcy process).  Were the case to be dismissed, the Receiver would continue to sell the Debtor piecemeal and at massive discounts over the enterprise worth, whereas adjudicating the present case will almost certainly result in benefits to creditors, an end to favoritism and the Receiver's high fees that seem to accomplish nothing, along with significantly higher levels of accountability.

**IV.**     **The Petitioning Creditors have established the existence of their noncontingent claims that are not subject to bona fide dispute and, ergo, had standing to file the Involuntary Petition at issue in the present case.**

43.     The Receiver asserts that the Petitioning Creditors have failed to prove their burden that their claims are not subject to a bona fide dispute and that the Petitioning Creditors have also failed to show that their claims are noncontingent.  The Receiver provides little indication of what these vital terms mean, despite assuming the Petitioning Creditors have failed.

44.     The Third Circuit has investigated what is meant by "bona fide": "The test to be applied in determining the existence *vel non* of a bona fide legal dispute in this context has been described in various ways." *B.D.W. Assoc., Inc. v. Busy Beaver Bldg. Centers, Inc.*, 865 F.2d 65, 66 (3d Cir. 1989) (citing *In re Johnston Hawks, Ltd.*, 49 B.R. 823 (Bankr. D. Hi. 1985) (a bona fide dispute was defined as "a conflict in which an assertion of a claim or right made in good faith and without fraud or deceit on one side is met by contrary claims or allegations made in good faith and without fraud or deceit on the other side")). In *In re Stroop*, 51 S. B.R. 210 (D. Colo. 1985), the test was equated with the standards for granting summary judgment. A more complete formulation was expressed in *In re Lough*, 57 B.R. 993 (Bankr. E.D. Mich. 1986): "If there is a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts, then the petition must be dismissed." *Id*. at 997. The Seventh Circuit Court of Appeals has adopted that definition with a gloss. *See In re Busick,* 831 F.2d 745 (7th Cir. 1987) ("Substantial factual and legal questions raised by debtor preclude finding of involuntary bankruptcy (which the parties agree is acceptable), and we adopt it here.") (internal quotation marks omitted) (citing *B.D.W. Assocs., Inc. v. Busy Beaver Bldg. Ctrs., Inc.*, 865 F.2d 65, 66-67 (3d Cir. 1989)). None of these issues is relevant here. Today, this Court is faced with the fact that aggrieved creditors were essentially compelled to file this involuntary proceeding as they were being abused by a Receiver intent on liquidating the company and leaving them without a means of recovery.

45.     It has sometimes been deemed the *sine qua non* of (or at least the summary for) the test for whether a bona fide dispute exists: "[a bona fide dispute] exists if there is an objective basis for either a factual or legal dispute. . . ." *In re Sims*, 994 F.2d 210 (5th Cir. 1993) *cert denied*, 510 U.S. 1049 (1994). The present case presents this Court with one of those times where

there is no dispute the Alleged Debtor owes the Petitioning Creditors the payments and moneys of which they complain. *See In re Park Place Dev. Primary, LLC*, No 21-10849 CSS, 2021 Bankr. LEXIS 3017, at *21 (Bankr. D. Del. Nov. 2, 2021) ("When there is a genuine issue of material fact that bears upon a debtor's liability . . . then a *bona fide* dispute exists") (italics in original). There is no bona fide dispute.[11]

46.     It is beyond any doubt that the Petitioning Creditors' claims are legitimate, real, and out of the realm of dispute. The claims were accrued in the normal course of business and are without any intent to defraud or deceive. There is no dispute that the debts called here are debts for which the Alleged Debtor is liable. *See Park Place*, 2021 Bankr. LEXIS 3017, at *21. As such, there does not seem to be a "bona fide" dispute as to the claims against the Debtor. The claims produced against the Debtor appear to be legitimate, real, and beyond real dispute. It is clear these claims were made by the Creditors and were not the product of someone that the Receiver was paying off in order to receive some benefit. With the question of whether the claim is bona fide or not answered, we now turn to whether the claims are contingent.

47.     Regarding whether a claim is contingent: In *Frenville*, the Third Circuit held that the court must determine the point in time when the creditor first had a right to payment in order to ascertain whether it had a claim, albeit contingent, which arose pre-petition. *In re Frenville*, 744 F.2d 332 at 336 (3d Cir. 1984). In *Frenville*, a creditor, Huhtamaki had a contingent "right to payment" under its contractual indemnification theory at the time the contract was executed. *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 51 (Bankr. D. Del. 2001). The Petitioning Creditors' rights for payment arose prepetition and have continued to accrue. These claims are not subject

---

[11] *See Supplemental Declaration*, at 4 (discussing the money – in various claims and causes of action) owed to the Petitioning Creditors by the Alleged Debtor.

to bona fide dispute and, as such, the involuntary proceeding was not filed in bad faith.

**V.     Abstention is not warranted for all the reasons that dismissal is not warranted and would be an abdication of the Bankruptcy Court's vital role in enabling the maximum return for creditors.**

48.     For all the reasons listed above, Alleged Debtor contends that abstention is not warranted as it would be just as detrimental to the Estate as dismissal would prove to be and would severely harm both the value of the Estate ability to provide predictable and reasonable reorganization for the Alleged Debtor.  Abstention is an extraordinary remedy over and above dismissal, which is itself disfavored.  *See, e.g., In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462 (Bankr. S.D.N.Y.) (citing *In re Eastman*, 188 B.R. 621, 624 (B.A.P. 9th Cir. 1995)).  Courts disfavor abstention for a number of reasons, including that it represents a refusal of the typical duty to adjudicate a controversy properly before it, as this matter is.  *Crown Vill. Farm, LLC v. ARL, L.L.C. (In re Crown Vill. Farm, LLC)*, 415 B.R. 86, 95-96 (Bankr. D. Del. 2009) (collecting cases on the rarity of abstention and holding that abstention is "extraordinary" and "narrow" in scope and application), *see also In re Holiday RV Superstores, Inc.*, 362 B.R. 126, 130 (citing Section 1334(a) and noting the rarity of abstention).  Abstention sometimes applies to matters which "include . . . difficult, uncertain issues of state law or those in which the state has a unique interest" and can also be applied where "the proceedings principally involve claims asserted by or against non-debtors . . . and matters in which some other truly extraordinary aspect is present." *Crown Vill.*, 415 B.R. at 95.  None of these matters provide a reason for abstention in the present case.   No uncertain questions of state law permeate these proceedings – the case is a straightforward one of paying as much to creditors as they are owed in the most efficient manner possible, which is the present proceeding, *not* the Missouri receivership.  These proceedings do not primarily involve claims against a non-debtor entity.  Finally, these proceedings have nothing extraordinary about them; this bankruptcy presents what is likely one of the *least* extraordinary

matters this Court will see all year.  Abstention, in short, is unwarranted.

**VI.** **Allowing the Receiver to substitute itself for the Debtor or to otherwise dismiss the involuntary proceeding would constitute a *de facto* bar to filing for bankruptcy.**

49.     The Receiver asserts that it is the only proper party to the involuntary proceeding and that it is the only entity that can respond to the involuntary petition.  *Motion*, at 3 (also stating "[s]ince the appointment of Receiver . . . for the Alleged Debtor . . . no other person other than the Receiver has the capacity or authority to operate the business of the Alleged Debtor").  This is fallacious reasoning.  The federal bankruptcy courts routinely hold that terms of a state receivership proceeding cannot dictate the availability of federal bankruptcy relief.  *See In re Orchards Vill. Invs., LLC*, 405 B.R. 341, 349 (Bankr. D. Or. 2009).  The Receiver's argument attempts to take the right to respond to an involuntary proceeding out of the hands of the Debtor, essentially eviscerating the role of the Debtor and the bankruptcy process.

50.     It is axiomatic that a state court cannot abrogate the federal bankruptcy process. *See, e.g. Sino Clean Energy, Inc. v. Seiden*, 565 B.R. 677, 683 (Bankr. D. Nev. 2017); *Struthers Furnace Co. v. Grant*, 30 F.2d 576, 577 (6th Cir. 1929) (pendency of a receivership does not ordinarily prevent the filing of a bankruptcy petition).  Allowing a state court proceeding, which has no jurisdiction or power over the federal bankruptcy process, to take over the bankruptcy process is a violation of the Supremacy Clause.  *Esopus Creek Value L.P. v. Hauf*, 913 A.2d 593, 604 (Del. Ch. 2006) (discussing the Supremacy Clause and federal preemption curtailing state court activities); *In re Medifacts Int'l., Inc.*, 2007 Bankr. LEXIS 5093, at *3, 2007 WL 521917, at *1 (Bankr. D. Del. Feb. 8, 2007) ("Since a state court clearly has no jurisdiction to interfere with a commenced bankruptcy proceeding, it seems to me to equally follow from the rationale discussed in these cases, that a state court would not have any authority to enjoin the filing of a

petition.").[12] Receiver's argument that it is the only party allowed to respond to the involuntary petition impermissibly restricts access to federal bankruptcy courts, privileging it at the expense of creditors and other entities.

51.　　"Reorganization policy generally favors turnover of business assets to the debtor in a chapter 11 case." *See Orchards Vill.*, 405 B.R. at 352 (citing 5 *Collier on Bankruptcy* § 543.05 (15th ed. rev. 2009)).　Pre-Code legislative history made explicit that a bankruptcy case would ordinarily supersede a state receivership and that a state receiver would ordinarily be required to turn over the estate assets to a debtor in possession or trustee. *See In re Corporate & Leisure Event Prods.*, 351 B.R. 724, 732 (Bankr. D. Ariz. 2006).

52.　　Furthermore, Section 543(b)(1) of the Bankruptcy Code provides as a matter of default that pre-petition receivers must turn over estate property to a debtor in possession or trustee, stating that a state court receiver "shall…deliver to the trustee [or debtor-in-possession] any property of the debtor held by or transferred to" such receiver. *See Orchards Vill.*, 405 B.R. at 347 (quoting 11 U.S.C. § 543(b)(1)).　Bankruptcy courts, however, have discretion under Section 543(d)(1) to waive that requirement if the interests of creditors would be better served by continuing the receiver in possession. *See* 405 B.R. at 352 (citing 11 U.S.C. § 543(d)(1)).　"The express powers to excuse turnover or abstain" allow a bankruptcy court to determine the equities "based on the facts of each individual case, and provide a more sensible and fact-based resolution than any bright-line test of corporate authority or race to the courthouse could provide." *Corporate & Leisure*, 351 B.R. at 733.

53.　　Accordingly, "in light of the general turnover and accounting requirements for

---

[12] While *Medifacts* largely involved whether the filing of a bankruptcy could be enjoined by a state court, Debtor finds it instructive for whether a creature of state court could substitute itself for a debtor, essentially stymying any attempt by any party to access the federal bankruptcy courts.

'custodians' in § 543," among other things, courts have concluded "that a state court receivership proceeding cannot be used to preclude a debtor from seeking federal bankruptcy protection, in spite of the broad authority granted to receivers in their appointment orders." *Orchards Vill.*, 405 B.R. at 349; *see also Corporate & Leisure*, 351 B.R. at 732-33.

54.     A debtor's bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "The definition of property of the estate is interpreted broadly, and 'every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of Section 541.'" *Geltzer v. Soshkin (In re Brizinova)*, 588 B.R. 311, 326 (Bankr. E.D.N.Y. 2018) (quoting *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008)) (brackets and quotation marks omitted).

55.     "The broad definition of property of the estate clearly encompasses a debtor's interest in another corporation's stock." *Id.* (quotation and brackets omitted). Moreover, corporate governance rights that are part and parcel with such equity interests also fall under section 541. *See, e.g.*, *See Walro v. Lee Grp. Holding Co., LLC (In re Lee)*, 524 B.R. 798, 804 (Bankr. S.D. Ind. 2014) (finding debtor's voting rights in limited liability company were property of the estate). Thus, on the Petition Date, all the property administered by the Receiver constituted property of the Debtor's estate. To the extent the Receiver, or any other party, purported to hold any title or other rights over the property, such rights were automatically turned over upon the bankruptcy filing.

*Remainder of page intentionally left blank*

Date: September 15, 2023            Respectfully submitted,

/s/ Rafael X. Zahralddin-Aravena
Rafael X. Zahralddin-Aravena (DE Bar ID 4166)
Rolando A. Diaz, Esq. (DE Bar ID 5845)
Kevin F. Shaw, Esq. (DE Bar ID 6239)
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
500 Delaware Avenue, Suite 700
Wilmington, DE 19801
Telephone: (302) 985-6004
Facsimile: (302) 985-6001
Rafael.Zahralddin@lewisbrisbois.com
Ron.Diaz@lewisbrisbois.com
Kevin.Shaw@lewisbrisbois.com

*Proposed Counsel to the Alleged Debtor*