# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| SA Hospital Acquisition Group, LLC, | Case No. 23-11367 (BLS) |
| Alleged Debtor. | **Re: Docket Nos. 22, 33 and 34** |

## RECEIVER'S REPLY TO THE RESPONSES TO MOTION TO DISMISS OR ABSTAIN

COMES NOW MorrisAnderson & Associates, Ltd. ("Receiver"), as court-appointed general receiver for SA Hospital Acquisition Group, LLC ("Alleged Debtor") and SA Hospital Real Estate Holdings, LLC ("SAH Real Estate"), and for its reply to the *Petitioning Creditors' Response to Motion to Dismiss or to Abstain* (Dkt. No. 33) filed by Goldberg Healthcare Partners, LLC, Fariborz Saidara, Matthew Haddad, and Yoel Pesso (the "Petitioning Creditors") and the *Response in Opposition to MorrisAnderson & Associates, Ltd's Motion to Dismiss or Abstain* (Dkt. No. 34) by Jeffrey Ahlholm and Lawrence Feigen (the "Co-Managing Members") purportedly on behalf of the Alleged Debtor, Receiver states as follows:

## INTRODUCTION

1. The Petitioning Creditors espouse a laudable goal for this bankruptcy case – the equitable distribution to the creditors of the Alleged Debtor – but this is only lip service. Equitable distribution is equally available in the receivership under the provisions of the Missouri Commercial Receivership Act (the "MCRA"), and at this point proceeding forward in State Court will be far more efficient and in the best interests of the Alleged Debtor and its creditors.

2. The Co-Managing Members' "plan" for the Alleged Debtor is to stack on additional debt (if they can source DIP financing despite failing to provide any funding to the Alleged Debtor for the past 90 days) above the prepetition creditors, so that they can maybe complete a sale

financed by the Alleged Debtor to make possible future distribution to creditors. There is nothing efficient about adding $6 million in debt. The Petitioning Creditors and Co-Managing Members want to chase a mirage and want to sacrifice the significant work that the Receiver has completed for the Alleged Debtor and its creditors to do so. Given the numerous untruths in the Co-Managing Members' papers filed in this court, the possibility of a promise of future payment by a potential purchaser, if one actually exists, is hard to believe. And it is the same story the Co-Managing Members have been telling in State Court and the California Bankruptcy Court. Not once have the Co-Managing Members provided any salient details despite numerous requests to do so. This is not worth placing the recoveries for creditors of the Alleged Debtor through receivership at risk.

3. The Response by the Co-Managing Members is chock-full of false, and even defamatory, statements about the Receiver. Not surprisingly, the Co-Managing Members fail to take responsibility for their own inaction in permitting South City Hospital to get into the poor financial state that the Receiver found when its appointment became effective. Like many in their position, they are quick to point fingers at anyone but themselves.

4. The Co-Managing Members are not concerned for the Alleged Debtor. Their neglect over the last year demonstrates that. The Co-Managing Members are not concerned for the creditors. Their design is to put more debt on top of the Alleged Debtor's creditors in order to possibly sell South City Hospital to a purchaser that is only willing to purchase the assets over time with *seller* financing. The Co-Managing Members are not concerned for the community. The Receiver under the oversight of a court in St. Louis is seeking purchasers that are interested in buying all or substantially all assets of the Alleged Debtor that are interested in operating a healthcare facility in south St. Louis city. Maximizing recovery for the creditors of the Alleged Debtor is the primary goal for the Receiver and always has been throughout its efforts to streamline

operations and to identify a purchaser. Despite being asked for any leads that Co-Managing Members had, they have never identified any party to the Receiver that was potentially interested in purchasing South City Hospital.

5. Neither the Co-Managing Members nor the Petitioning Creditors deny that the Co-Managing Members solicited, or at least coordinated, the filing of the Involuntary Petition in order to remove the current management ordered by the Missouri State Court in the appointment of the Receiver. In addition to the best interests of the Alleged Debtor and its creditors being better served in the State Court, it seems clear that the Co-Managing Members did, in fact, solicit this involuntary filing in an attempt to get around the Missouri State Court injunction that was enforced by the California Bankruptcy Court and that the Involuntary Petition was filed in bad faith.

6. Dismissing this case and permitting this matter to go forward in the Missouri State Court receivership, with the attentive Receiver that was appointed and is being overseen by a scrupulous local judge, is in the best interests of the creditors and the Alleged Debtor.

**ARGUMENT**

**I. Notice was Proper for the Motion.**

7. In this instance, this motion is being held on an expedited basis. All creditors appearing (i.e., the Petitioning Creditors) have been provided notice and they agreed to the expedited process for this hearing.

8. Petitioning Creditors have cited to 1017(a) for the proposition that the Receiver failed to provide proper notice. Notice to all creditors on a motion to dismiss a case on an involuntary petition (except under prescribed circumstances) is only required after an order for relief is entered. *See* In re Centennial Ins. Assocs., Inc., 119 B.R. 543, 545 (Bankr. W.D.Mich. 1990). The list of creditors has not been filed, which is not surprising since this list is only required

to be filed after entry of the order for relief. Fed.R.Bankr.P. 1007(a)(2) (list of creditors must be filed within 14 days after entry of order for relief).

9. There are, of course, certain prescribed circumstances in which notice to all creditors would be required on a dismissal of an involuntary bankruptcy petition before entry of an order for relief. Section 303(j) specifically provides for notice to be provided to all creditors for a dismissal of an involuntary petition as follows:

> Only after notice to all creditors and a hearing may the court dismiss a petition filed under this section –
> (1) on the motion of a petitioner;
> (2) on consent of all petitioners and the debtor; or
> (3) for want of prosecution.

If Congress intended notice to be provided to all creditors prior to the order for relief being entered in an involuntary case, notwithstanding the reason or consent of the petitioning creditors and alleged debtor, Congress would have provided for that in the statute. It did not require notice to all creditors in this instance.

10. Any suggestion that the notice provided indicates a lack of care for the creditors of the Alleged Debtor is simply ridiculous. Because the order for relief has not been entered yet, creditors have not been provided notice of the start of this case, and for good reason. An involuntary petition has the potential to damage an alleged debtor and its business. There is no reason to damage the progress made by the Receiver for the creditors before an order for relief is entered. Providing notice of a motion to dismiss on a case that creditors do not even know exists would sow confusion and disruption. What the Receiver has done is provide notice of the receivership to all creditors of the Alleged Debtor and diligently worked through the process of evaluating creditors' claims.

11. The notice provided is proper under the current circumstances.

## II. The Receiver has Standing.

12. Petitioning Creditors and the Co-Managing Members seem intent on ignoring the fact that the Missouri State Court placed the Receiver in charge of operating the business of the Alleged Debtor, placed the Receiver as the sole authority to take any actions on behalf of the Alleged Debtors, and enjoined the Co-Managing Members from controlling and directing the actions of the Alleged Debtor.

13. This is not an instance where an assignee or receiver is merely in place regarding certain assets of the Alleged Debtor. Here, the Receiver replaced the management role previously held by the Co-Managing Members in the Alleged Debtor. This has been previously explained (Dkt. No. 30), and there is no reason to go into detail on this point again.

14. The case most on point with this one is In re Starlite Houseboats, Inc., 426 B.R. 375 (Bankr. D.Kan. 2010). That is why the Receiver cited to this case in its Motion. In that case, the receiver was not only an asset receiver, but it was a general receiver under Kansas's receivership laws, which vests a receiver "with power to prosecute and defend, in the name of the corporation or otherwise, all claims or suits, ...." Id. at 381 (*citing* K.S.A. 17–6901). That court concluded that the receiver was the proper party to respond to the involuntary petition for the alleged debtor. Id. The opposition filed by the Petitioning Creditors suggests that a distinction can be made because the alleged debtor in that case did not answer the involuntary petition. This argument fails to grasp that the management of the alleged debtor in Starlite did not have authority to answer the involuntary petition, so there would be no response.

15. The same is true here. The Receiver is in charge of the management functions for the Alleged Debtor. It is directing the operation of the business of the Alleged Debtor, and Alleged Debtor's response to the Involuntary Petition filed in this case. Like the Kansas statute that was

determinative in Starlite, the Missouri statute provides robust authority for the Receiver. R.S.Mo. § 515.545(1).[1] In addition, the Receivership Order also clearly provides the Receiver with the authority to manage the affairs of the Alleged Debtor and to defend actions against the Alleged Debtor. Ex. 1, Receivership Order at ¶ 5 (Dkt. No. 22-2).[2] The Receiver is appearing, exercising its exclusive management powers, and defending against this action for the Alleged Debtor.

---

[1] The receiver has the following powers and authority:
\*\*\*
    (2)      If the appointment applies to all or substantially all of the property of an operating business or any revenue-producing property of the debtor, to do all the things which the owner of the business or property may do in the exercise of ordinary business judgment, or in the ordinary course of the operation of the business as a going concern or use of the property including, but not limited to, the purchase and sale of goods or services in the ordinary course of such business, and the incurring and payment of expenses of the business or property in the ordinary course;
\*\*\*
    (3) To assert any rights, claims, or choses in action of the debtor, if and to the extent that the rights, claims, or choses in action are themselves property within the scope of the appointment or relate to any estate property, to maintain in the receiver's name or in the name of the debtor any action to enforce any right, claim, or chose in action, and to intervene in actions in which the debtor is a party for the purpose of exercising the powers under this subsection;

    (4) To intervene in any action in which a claim is asserted against the debtor, for the purpose of prosecuting or defending the claim and requesting the transfer of venue of the action to the court appointing the receiver. However, the court shall not transfer actions in which a state agency is a party and as to which a statute expressly vests jurisdiction or venue elsewhere. This power is exercisable with court approval by a limited receiver, and with or without court approval by a general receiver;
\*\*\*
    (11) All other powers as may be conferred upon the receiver specifically by sections 515.500 to 515.665, by statute, court rule, or by the court.

[2] The Receiver shall have the usual powers vested, conferred, enjoyed, and exercised by receivers according to the practice of this Court, the Act, and other statutes of this State including, without limitation, the following:
    a.      To operate the businesses of the Defendants and manage the Receivership Property;
\*\*\*
    e.      The Receiver shall be vested with, and is authorized and empowered to exercise, all the powers of Defendants, their officers, directors, shareholders, and general partners or persons who exercise similar powers and perform similar duties, including without limitation the sole authority and power to file a voluntary petition under Title 11 of the United States Code;
    f.      To assert any rights, claims, or choses in action of the Defendants, if and to the extent that the rights, claims or choses in action are themselves property within the scope of the appointment or relate to any Receivership Property, to maintain in the Receiver's name or in the name of the Defendants any action to enforce any right, claim, or chose in action, and to intervene in actions in which the Defendants are a party for the purpose of exercising the powers under this subsection;
\*\*\*
    h.      To intervene in any action in which a Claim is asserted against the Defendants and that impacts the Receivership Property, for the purpose of prosecuting or defending the claim and requesting the transfer of venue of the action to this Court. The Court, however, shall not transfer

16. The other cases cited by the Petitioning Creditors actually support Receiver's position. The court in In re 318 Retail, LLC, 640 B.R. 407 (Bankr. N.D.Ill. 2022) focused on the express language of the Illinois receivership statute and the receivership order in determining that the Receiver could file a motion to dismiss, but could not answer the involuntary petition because the Illinois receivership statute was different from the Kansas receivership statute.

> Unlike the Kansas statute, the Illinois receivership statute, 210 ILCS 47/3-508 (2020), does not specifically mention defending "all claims or suits." It provides that the receiver "[s]hall exercise those powers and shall perform those duties set out by the court" and "[s]hall take such action as is reasonably necessary to protect or conserve the assets or property of which the receiver takes possession, or the proceeds from any transfer thereof, ...." 210 ILCS 47/3-508(a), (c).

Id. at 412. 318 Retail distinguished Starlite because the Illinois statute and the receivership order did not provide the receiver with more robust powers like the receiver had in Starlite and like this Receiver has in this case.

17. In In re A & B Liquidating, Inc., 18 B.R. 922, 925 (Bankr. E.D.Va. 1982), cited by the Petitioning Creditors (Dkt. No. 33 at ¶ 53), the court determined that an assignee had the right to respond to an involuntary petition because "he holds the same position as the debtor and represents the debtor's interests." This case clearly supports Receiver's position on standing.

18. In In re Sun World Broadcasters, Inc., 5 B.R. 719 (Bankr. M.D.Fla. 1980), the state court receiver responded to an involuntary petition with a motion to dismiss. While certainly *dicta*, the court agreed that the receiver had standing because the receiver was the only real party in interest. Id. at 721 ("This Court is inclined to agree with the receiver but does not find it necessary to rule on the point."). The Co-Managing Members misstate the determination that the court made

---

actions in which a State agency is a party and as to which a statute expressly vests jurisdiction or venue elsewhere;

in Sun World, by opining that the Sun World court "observ[ed] that 303(d) would normally prevent a receiver from being able to respond to an involuntary petition…". See Dkt. No. 34 at ¶ 21. That is not what that court concluded at all. The receiver argued, based on the broad powers granted to the receiver under Florida law and a prior court determination on that issue, that the receiver was the proper party in interest to appear and be heard on the involuntary petition. *See* Sun World, 5 B.R. at 721 (court in *dicta* stating it was "inclined to agree with the receiver" regarding standing).

19. This is exactly the case here. The Co-Managing Members are enjoined by the Receivership Order and have no power to direct the actions of the Alleged Debtor. Ex. 1 at ¶ 10. The Receiver is the real party in interest because the Receiver has been placed by the State Court in charge of not only the assets of the Alleged Debtor, but also the duties of management and business operations of the Alleged Debtor. As if this needed further support, the issue has already been decided by the California Bankruptcy Court by final order that is not the subject of an appeal. *See* Ex. 4, California Bankruptcy Court's Dismissal Order (Dkt. No. 22-5).

20. Finally, in In re Skybridge Spectrum Foundation, No. 21-BK-5-ELG, 2023 WL 5561105, at *3 (D.D.C. Aug. 29, 2023) (*citing* 318 Retail and Starlite), the court determined that a receiver had the authority to file a motion to dismiss in response to an involuntary petition. The Petitioning Creditors' position that the Court did not permit the receiver in that case to file an answer is pure supposition because the receiver did not answer, it filed a motion to dismiss. *See* Id. The issue before the court was whether a receiver could pursue a motion to dismiss the involuntary case. Id.

21. As previously acknowledged by the Receiver (Dkt. No. 30 at ¶ 33), the Receiver is a custodian of the assets of the Alleged Debtor, but the Receiver in this instance is also placed in charge to operate the business of the Alleged Debtor and to perform the functions of the

management for the Alleged Debtor. Ex. 1 at ¶ 5(e). The Receiver has also been empowered to defend actions, like this one, for the Alleged Debtor. Ex. 1 at ¶ 5(h). Nothing in the Bankruptcy Code prevents the Receiver from exercising its power to manage the Alleged Debtor and to represent the Alleged Debtor's interests in this case.

22. The conclusion on standing is clear: the Receiver has standing and has the authority to manage the assets and operate the business of the Alleged Debtor.

### III. Dismissal or Abstention is in the Best Interests of the Alleged Debtor and its Creditors.

23. There is nothing in the responses of Petitioning Creditors or the Co-Managing Members that would lead one to conclude that the Receiver under the supervision of a local State Court judge is not the more efficient equitable forum for this matter than the bankruptcy court. At best, the Co-Managing Members offer a highly speculative and expensive alternative through bankruptcy. Even if they can get financing, which is doubtful, the Co-Managing Members want to put at least $6 million in debt ahead of the creditors of the Alleged Debtor that were already left unpaid by South City Hospital and delay the potential recovery for creditors from the receivership. They want to do this all for the possibility that Co-Managing Members can re-open and sell South City Hospital with seller financing in a few short months.

**(a) The Missouri State Court is the Most Efficient Means of Administration for this Matter.**

24. The suggestion that the Receiver and counsel for the Receiver have not been efficient in the State Court proceedings is truly a bizarre sentiment from the Co-Managing Members. Dkt. No. 34 at ¶¶ 18, 30, 38 n.10, and 40. The State Court reviewed and approved the fees for June 2023 and July 2023, after notice and an opportunity for hearing. The Co-Managing Members' counsel was on notice of the fee applications and had an opportunity to object if they felt that the fees were excessive or otherwise not justified for compensation. The Co-Managing

Members did not object. If they had a problem with the fees, they had the opportunity to voice their concerns and should have done so. They did not, and now seek to collaterally attack those fees (and the receivership itself) through this proceeding.

25. The Co-Managing Members state that the Receiver in this matter has "engaged in pattern of activity aimed at lining its own pockets at the expense of other parties to the receivership, and, now, the involuntary petition." Dkt. No. at ¶ 36. The Receiver has not "pocketed" money from receivership. It has been compensated after filing its fee applications and providing notice and opportunity for a hearing and being awarded those fees by the State Court. Twain GL XXV, LLC ("Twain") directly paid the Receiver's approved fees, so the fees did not come from the Alleged Debtor's bank accounts. This unsubstantiated and unsupported smear is merely an outlandish conspiracy theory contrived by the Co-Managing Members. There is no basis in reality for this scandalous allegation. There is no proof that the Receiver has received anything other than approved compensation, and there could not be proof otherwise because this allegation that the Receiver has lined its pockets is a lie. In addition, the Receiver has not swept any bank accounts at South City Hospital.[3] This is another lie by the Co-Managing Members. Dkt. No. 34 at ¶ 36.

26. The financing provided by American Healthcare Systems-Missouri ("AHS") and Twain is discussed at some length in the Motion to Dismiss (Dkt. No. 22 at ¶¶ 16, 19, 20, 22 and 23). The Alleged Debtor's cash flows were significantly negative. Dkt. No. 22-6 at ¶ 6. This necessitated financing to continue the active South City Hospital patient care operations for a period to determine what plans could be implemented by the Receiver. Dkt. No. 22-6 at ¶¶ 9 and 10. The financing provided by AHS and Twain for South City Hospital under receivership is

---

[3] Twain has also not been permitted to sweep available cash from South City Hospital as stated by the Co-Managing Members. See Dkt. No. 34 at ¶ 17. Twain does not have access to South City Hospital's bank accounts.

public information and was presented to and approved by the State Court. Counsel for the Co-Managing Members and two of the four Petitioning Creditors has been at nearly every hearing held by the State Court. If the Co-Managing Members or the Petitioning Creditors had an issue with the financing terms, they should have voiced those concerns directly to the State Court. Once again, they did not.

27. In considering the Co-Managing Members' "plans" for South City Hospital, it is important to consider that these "plans" come from the co-managing members that completely abdicated their role prior to the appointment of the Receiver. According to their own statements, Co-Managing Members allowed AHS to mismanage South City Hospital (Dkt. No. 34 at ¶¶ 7-15). As a result, after notice and a hearing, the State Court displace them and Co-Managing Members' holdover manager, AHS, by appointing the Receiver to manage and operate the business affairs of the Alleged Debtor. *See* Ex. 1 at 5(a) and (e). Now, the Co-Managing Members want this Court to overrule the State Court's decision and place them back in charge of the Alleged Debtor so they can possibly obtain $6 million in DIP financing to restart the hospital, in a speculative effort to potentially sell the assets to their own preferred buyer with seller financing. Given the paucity of information, it is hard to believe that these opportunities are even real, but even if they are real, they are not very good for the Alleged Debtor or creditors.

28. The Co-Managing Members have not even been to South City Hospital since the Receiver was appointed. In fact, by their own admission, they have been completely absent from their management role, instead relying on American Healthcare Systems-Missouri to manage the business of the Alleged Debtor for the year before the Receiver was appointed. Dkt. No. 34 at ¶ 9; Dkt. No. 33 at ¶ 11. This decision or inaction by the Co-Managing Members seems hard to explain when Co-Managing Members believe that AHS breached its obligations in numerous ways

since at least August 2022. Dkt. No. 34 at ¶¶ 7-15. Instead of stepping in, the Co-Managing Members permitted AHS to stay at the Alleged Debtor after the term of the interim management agreement expired. Even after determining at the end of December that AHS's cash management for the South City Hospital involved moving money from South City Hospital's accounts to AHS's account, the Co-Managing Members did not step in to take over the management of South City Hospital. Dkt. No. 34 at ¶ 14. Petitioning Creditors have also noted that AHS was "siphoning millions of dollars, belonging to South City Hospital, out of South City Hospital's bank accounts for AHS' personal use." Dkt. No. 33 at ¶ 11.[4] The lack of judgment by the Co-Managing Members in relying on AHS beyond the terms of the interim management agreement in the fall of 2022, when Co-Managing Members believed that AHS was already in breach of their obligations, is inexplicable.

29. The Co-Managing Members were invited to bring alternatives and propose possible avenues to help the Receiver to maximize value. They have had three and a half months since the appointment of the Receiver, and other than theorizing about concepts, they have never provided any details or brought any opportunities to the table. The Petitioning Creditors, in coordination with the Co-Managing Members, are risking the recoveries that can be accomplished through the receivership by attempting to stack even more debt on South City Hospital for a remote chance at a different recovery. They want to try this shot in the dark at the expense of the Alleged Debtor, and more importantly, at the expense of all of the other creditors of South City Hospital.

30. The Co-Managing Members claim that there is a going concern, "turn-key" operation that can be sold. Dkt. No. 34 at ¶ 40. Despite having the opportunity to step up to assist with financing the operations, Co-Managing Members never came forward with definitive

---

[4] If the Petitioning Creditors have evidence that AHS utilized South City Hospital's funds for its own personal use, they should provide this information immediately to the Receiver.

funding. Dkt. No. 22-6 at ¶ 15. Without that funding in place, patient safety dictated that South City Hospital be closed. Id. So the Receiver closed South City Hospital. Id. Starting up a hospital and operating a hospital is not "turn-key," in any sense of that word, and at this point, there is no going concern.

31. As clearly stated in the Motion to Dismiss, there is no going concern. The patients have been discharged or transferred to other facilities and the employment of essentially all employees, and all clinical staff required for patient care, has been terminated. There is no realistic reorganization that is going to happen here. It is just as easy and in fact quicker for the Receiver to sell the facility in total to a new operator without the need for an additional $6 million DIP loan. The Missouri Commercial Receivership Act provides for this process. The Receiver has invested time and effort to do so. The Co-Managing Members, on the other hand, have done everything in their power to disrupt this process by opposing Receiver's efforts in State Court, filing an unauthorized bankruptcy petition in the California Bankruptcy Court, and now conspiring with the Petitioning Creditors to get around their own management restrictions to attempt to place the Alleged Debtor in bankruptcy through an involuntary filing. The Co-Managing Members' speculative "plan" for South City Hospital is to obtain DIP financing to stack on top of the debt structure, to reopen a closed facility that they have not been at for months, and to sell the reopened facility to a buyer that at best will only make promises of future payments.

32. Consider the terms that the Co-Managing Members want to foist on top of the Alleged Debtor and its creditors in some detail:

- The "plan" provides for a DIP loan in the amount of up to $6 million. Dkt. No. 35-1 at ¶ 9(1); *but see* Dkt. No. 35-1 at ¶ 27:32 ("The Purchaser will assume the financial responsibility of restarting operations.").[5] So in reality, the purchaser will

---

[5] The Co-Managing Members have no DIP financing lined up for the Alleged Debtor. Dkt. No. 34 at ¶ 34. The counsel for Co-Managing Members told counsel for the Receiver on August 3, 2023, that DIP financing would be available within 10 days. More than a month later that DIP financing still has not been secured. Id. This is not

- be funding the restart of the operations at South City Hospital by placing a lien on the assets that are currently available for recoveries to the creditors of the Alleged Debtor. So it is the creditors that are funding the restart.

- The Alleged Debtor's creditors will also be forced to finance the purchaser's hospital equipment. Dkt. No. 35-2 at ¶ 9(3) (through a lease of the equipment to the purchaser, with no mention of how the current financing would be paid).

- The Alleged Debtor's creditors will be providing $5 million in seller financing to the purchaser through a take back note. Dkt. No. 35-2 at ¶ 9(4).

- There is no provision to cure obligations to SA Hospital Real Estate Holdings, LLC and Twain for the ground lease and facility, though the plan assumes that the purchaser will be able to make full payoff of the obligations to Twain in 18 months. Dkt. No. 35-2 at ¶ 9(5). They do not have the wherewithal to make any payments for the purchase of South City Hospital, but seem to believe that the funding will be found in 18 months.

- Finally, the "plan" provides for a share of the value of the potential residency slots. Dkt. No. 35-2 at ¶ 9(6).

Other than the DIP financing the supposed purchaser will be providing to fund the startup costs, which will be secured by a lien on assets currently available for creditor recoveries, there is no payment being paid for the assets and no money being paid to the creditors. Just promises.

33. The better alternative here is clear. The State Court appointed Receiver has focused its attention to maximizing value that can be obtained in a sale of the assets so that the creditors can recover now. The Co-Managing Members want creditors to wait for years to recover anything from a purchaser that apparently, at best, will only make promises to pay in the future. The Receiver understands that the Co-Managing Members are willing to place these risks on the Alleged Debtor and the creditors, and the Petitioning Creditors seem willing to allow the Co-Managing Members to try, but this is not in the best interests of the Alleged Debtor or the creditors in general.

---

surprising since no one has asked for detailed information on the accounts receivable to perform any diligence for this supposed DIP financing.

34. Suggesting that the Receiver is simply looking for piecemeal sale assets of South City Hospital (Dkt. No. 34 at ¶¶ 1 and 30) has no basis in fact and ignores the efforts by the Receiver to sell South City Hospital in total to potential interested parties. There is no agenda here. As a fiduciary, the Receiver is obligated to maximize the value of South City Hospital, and made it clear in its Motion and supporting Declaration, that the Receiver is pursuing duel paths – (1) potentially selling South City Hospital, or the bulk thereof, to a single buyer; or (2) selling the assets of South City Hospital by auction. The Receiver obtained a suspension (rather than surrender/termination) of the hospital's license for ninety days, and the Receiver has engaged in discussions with prospective buyers for various components of the assets - with some of the prospective buyers having expressed interest in acquiring all or essentially all of the assets with plans to redevelop the South City Hospital facility into some form of healthcare provider. The Receiver has executed non-disclosure agreements with several parties envisioning reopening South City Hospital as some form of healthcare provider, the Receiver has hosted tours of the South City Hospital facility for interested parties, and the Receiver has established data rooms to facilitate responses to due diligence requests. Of course, the Co-Managing Members know that the Receiver has encouraged the Co-Managing Members to identify alternatives and requested that the owners of the Alleged Debtor provide information on any prospective buyers to the Receiver. Despite apparently having a plan since March 2023, (Dkt. No. 35-2 at ¶ 4), the Co-Managing Members have never provided their plan or any leads for purchasers of South City Hospital. The Receiver welcomes such leads.

35. The Petitioning Creditors cite to In re Orchard Village Investments, LLC, 405 B.R. 341 (Bankr. D.Or. 2009) for the proposition that a debtor should be permitted to sell an operating business. Orchard Village is not similar to this situation at all. The debtor in Orchard Village filed

a voluntary bankruptcy for a company in receivership that was operating and paying its expenses on a regular basis. Id. at 345. South City Hospital is not open. It was closed more than a month ago because it continued to lose money every month, and no one, including the Co-Managing Members, was willing to fund the operations in order to make payroll and maintain patient safety.

**(b) The Receivership in State Court Provides the Tools Necessary to Maximize Recovery for Creditors.**

36. The Receiver has not provided any advantageous terms to preferred buyers or behaved "skinflinted" toward others. Dkt. No. 34 at ¶ 36.[6] It is, of course, yet another lie that the Receiver would provide any advantageous terms to any interested party or that the Receiver has any preferred buyers. There is no evidence to support this statement. The Receiver has no preferred buyers, and the Receiver is more than happy to hear from any genuinely interested would-be purchaser. The Receiver forcefully disagrees with the assertion that the Receiver somehow prefers a liquidation over a going-concern sale. The Receiver would welcome a viable, value-maximizing going-concern offer to consider. It just has not received such offer to date.

37. Even if the Receiver wanted to provide advantageous terms for a purchaser (it does not), sales by a Receiver under the Missouri Commercial Receivership Act outside the ordinary course of business, just like the Bankruptcy Code, have to be presented to and approved by the court. The Co-Managing Members claim that the sale process under the Missouri Commercial Receivership Act does not have strictures and does not provide for a sale free and clear. *See* Dkt. 34 at ¶ 35. This is not correct. The MCRA in R.S.Mo. § 515.645 provides for a strict process, court oversight, notice and hearing, and for a sale free and clear. Any sale of property by the

---

[6] Being a skinflint, while a bit pejorative, can actually be a good thing in the right context. The Receiver is being efficient to save money in order to maximize the chance for recovery by creditors. So on one hand, the Co-Managing Members state that the Receiver is too expensive and on the other hand, the Co-Managing Members state that the Receiver is being too cheap. While Co-Managing Members apparently have no problem risking the money of the Alleged Debtor (and ultimately the creditors) in their speculative plan, the Receiver is trying to efficiently manage South City Hospital for the benefit of all creditors.

Receiver outside the ordinary course will be competitive and be presented to the State Court for approval. It should be noted that the only proposed sale at this point is a 2007 Ford Econoline with almost 300,000 miles and a 1999 Ford pickup (that does not operate). Although fairly nominal, even these sales were being presented to the State Court for scrutiny and approval. No advantageous terms have been or would be provided to anyone in any sale of property by the Receiver.

38. The Co-Managing Members and Petitioning Creditors suggest that the Receiver will not pursue potential litigation. Dkt. No. 35-1 at ¶ 29; Dkt. No. 33 at ¶ 88. Again, there is no basis for this allegation. The Receiver has sought, and continues to seek, electronic and paper records pertaining to particular activities and transactions. However, the Receiver, as a court appointed fiduciary, is not going to air the issues relating to potential litigation it may pursue here as there is no possible advantage to doing so. These matters may still be pursued by the Receiver. There is no support for any suggestion that the Receiver is ignoring the allegations of Co-Managing Members and other potential litigation or that the Receiver will not be pursuing claims held by South City Hospital. The opposite is true. *See* Dkt. No. 22-6 at ¶ 19. Like the potential litigation, the Receiver is very happy to work with the Petitioning Creditors and the Co-Managing Members to explore the *potential* recovery on the Employee Retention Tax Credit that they believe *could* provide liquidity. *See* Dkt. No. 33 at ¶ 87.[7] Despite the requests for information from the Co-Managing Members, Co-Managing Members never provided any information on how South City Hospital would be eligible for the Employee Retention Tax Credit or how any such *potential* credit would be available imminently for the beneficial use by South City Hospital. The Receiver is

---

[7] Of course, Co-Managing Members' supposed plan, described in the Declarations of Jeffrey Ahlholm (Dkt. No. 35-1 and Dkt. No. 35-2), states nothing about the Employee Retention Tax Credit. Based on the logic employed by the Petitioning Creditors, this must mean that Co-Managing Members have no intention of pursuing this.

interested in pursuing all assets. There is nothing exclusive to bankruptcy that allows these items to be completed. .

**(c) Missouri State Court Receivership Provides an Equitable Means for Distributions to Creditors.**

39. The mechanism for claims and distributions under the MCRA are equitable. The waterfall required by the MCRA was quoted in full in the Motion to Dismiss (Dkt. No. 22 at ¶ 41 n.2), so that the Court could see that the MCRA does not favor any "particularized interest" as suggested by the Co-Managing Members in their response (Dkt. No. 34 at ¶ 37) in any meaningful way different from the Bankruptcy Code.

**(d) The Evidence Supports that this Involuntary Petition was Filed in Bad Faith.**

40. Notably absent from the responses filed by Petitioning Creditors and the Co-Managing Members is a clear statement that the Co-Managing Members did not solicit, coordinate, facilitate, or collude in the filing the Involuntary Petition by the Petitioning Creditors or that the Petitioning Creditors did not file the Involuntary Petition at the request of the Co-Managing Members.

41. At this point, based on the responses from the Petitioning Creditors and the Co-Managing Members, it is clear that Co-Managing Members coordinated and facilitated the filing of the Involuntary Petition by the Petitioning Creditors in an attempt to get around the State Court injunction against the Co-Managing Members filing a voluntary bankruptcy for the Alleged Debtor, but also the California Bankruptcy Court that determined that the Co-Managing Members had in fact been enjoined from exercising their management rights in the Alleged Debtor. This case is little more than an attempt by the Co-Managing Members to do indirectly what they cannot accomplish directly.

42. Petitioning Creditors are simply wrong when they assert that good faith creditors can join a bad faith involuntary petition in order to cure a bad faith filing. Dkt. No. 33 at ¶ 102. Once an involuntary bankruptcy is filed in bad faith, it cannot be salvaged by finding good faith creditors to join. *See* In re Centennial Ins. Assocs., Inc., 119 B.R. 543, 546 (Bankr.W.D.Mich. 1990); *cf.* In re Forever Green Athletic Fields, Inc., 804 F.3d 328, 338 (3rd Cir. 2015) (not taking a stance on this issue). This case is already tainted by Co-Managing Members' involvement in soliciting the filing of the Involuntary Petition by the Petitioning Creditors. Additional creditors should not be permitted to join.

43. The evidence supports the conclusion that this involuntary case was filed by the Petitioning Creditors for the Co-Managing Members. The Court should conclude that the Involuntary Petition was filed in bad faith, and for that reason, if not because the dismissal of this case is in the best interests of the Alleged Debtor and its creditors, this case should be dismissed.

[remainder of page intentionally left blank]

| | |
|---|---|
| Dated: September 18, 2023<br>Wilmington, Delaware | **POLSINELLI PC**<br><br>*/s/ Katherine M. Devanney*<br>Christopher A. Ward (Del. Bar No. 3877)<br>Katherine M. Devanney (Del. Bar No. 6356)<br>222 Delaware Avenue, Suite 1101<br>Wilmington, Delaware 19801<br>Telephone: (302) 252-0920<br>Facsimile: (302) 252-0921<br>cward@polsinelli.com<br>kevanney@polsinelli.com<br><br>-and-<br><br>**THOMPSON COBURN LLP**<br>Brian W. Hockett<br>One US Bank Plaza<br>St. Louis, Missouri 63101<br>Telephone: (314) 552-6461<br>Facsimile: (314) 552-7000<br>bhockett@thompsoncoburn.com<br><br>*Counsel for MorrisAnderson & Associates, Ltd, as general receiver for SA Hospital Acquisition Group, LLC and SA Hospital Real Estate Holdings, LLC* |